Thomas S. Waldo
Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, Alaska 99801
Ph: 907-586-2751
Fax: 907-463-5891
Email: twaldo@earthjustice.org

Nathaniel S.W. Lawrence
NATURAL RESOURCES DEFENSE COUNCIL
3723 Holiday Drive, SE
Olympia, WA 98501
Ph: 360-534-9900
Fax: 360-534-9909
Email: nlawrence@nrdc.org

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ORGANIZED VILLAGE OF KAKE, SOUTHEAST ALASKA CONSERVATION COUNCIL, NATURAL RESOURCES DEFENSE COUNCIL, SIERRA CLUB, THE WILDERNESS SOCIETY, and CENTER FOR BIOLOGICAL DIVERSITY, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES FOREST SERVICE; UNITED STATES DEPARTMENT OF AGRICULTURE; MARK REY, in his official capacity as Under Secretary of Agriculture; DENNIS E. BSCHOR, in his official capacity as Alaska Regional Forester; and FORREST COLE, in his official capacity as Forest Supervisor for the Tongass National Forest, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. J04-0029 CV (JKS) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

MOTION FOR EQUITABLE RELIEF PENDING REVISION
OF THE TONGASS LAND MANAGEMENT PLAN

Organized Village of Kake, et al. v.
U.S. Forest Service, et al.,
J04-0029 CV (JKS)

**TABLE OF CONTENTS**

PROCEDURAL BACKGROUND ........................................................................................1

ARGUMENT .................................................................................................................3

    I.      STANDARDS FOR INJUNCTIVE RELIEF AND VACATUR. ..........................4

    II.     EQUITABLE RELIEF IS NEEDED TO AVOID IRREPARABLE
           HARM TO PLAINTIFFS, TO THE PUBLIC, AND TO THE
           ENVIRONMENT. ................................................................................6

           A.   All logging in the Tongass will cause irreparable harm. ..................6

           B.   Roadless areas have special values for wildlife, fish, recreation, and
                tourism. ...................................................................................8

           C.   Kuiu Island has cultural, historical, economic, and spiritual
                significance for the people of Kake. ..............................................9

           D.   Injunctive relief is needed to stop the Forest Service from continuing
                to authorize new timber sales in roadless areas and on Kuiu Island
                before the forest plan revision is completed. ...................................13

           E.   Vacatur and injunctive relief are needed to stop the Forest Service
                from offering timber sales under existing RODs in roadless areas and
                on Kuiu Island before the forest plan revision is completed. .........17

    III.    THE BALANCE OF EQUITIES FAVORS ENTRY OF THE
           REQUESTED INJUNCTION. .............................................................20

           A.   The requested injunction will allow logging to continue at current
                levels. ...................................................................................21

           B.   Forest-wide injunctive relief is necessary and appropriate to remedy
                the defects in the Tongass Plan. ...................................................24

           C.   Limited exceptions are appropriate. .............................................26

    IV.    THE PUBLIC INTEREST FAVORS ENTRY OF THE REQUESTED
           INJUNCTION. ................................................................................26

CONCLUSION ............................................................................................................28

Organized Village of Kake, et al. v.
U.S. Forest Service, et al.,
J04-0029 CV (JKS)

Plaintiffs Organized Village of Kake, et al., hereby move for an order that would, with certain exceptions:  (1) enjoin the Forest Service from signing or implementing any decision documents authorizing timber sales on Kuiu Island or in roadless areas of the Tongass National Forest until 45 days after the Forest Service completes its required revision of the Tongass Land Management Plan; and (2) vacate site-specific decision documents that authorize timber sales on Kuiu Island or in roadless areas of the Tongass.  A proposed order specifying this relief in greater detail is attached.

PROCEDURAL BACKGROUND

Plaintiffs file this motion to implement the Ninth Circuit's direction in *Natural Resources Defense Council v. United States Forest Service*, 421 F.3d 797 (9th Cir. 2005).  In that case, the court found that the Forest Service had made a substantial error in estimating the market demand for timber in the 1997 Tongass Land Management Plan, which "fatally infected its balance of economic and environmental considerations, rendering the Plan for the Tongass arbitrary and capricious in violation of the APA."  *Id.* at 816.  The court also found numerous, mostly related, defects in the environmental impact statement (EIS) for the Plan.  *Id.*  Accordingly, the court remanded to this Court "to conduct such further proceedings as are appropriate, and consistent with this opinion, to address the scope of permanent injunctive relief."  *Id.* at 816 n.29.

Plaintiffs in the present case raise identical claims to those on which the Plaintiffs prevailed in *Natural Resources Defense Council*.  *See* First Amended Complaint at 20-24, Counts II, III & IV (June 24, 2005) (Docket No. 36).  The same claims are also before this Court in *Natural Resources Defense Council v. United States Forest Service*, No. J03-0029 CV (JKS) (D. Alaska), and *Natural Resources Defense Council v. United States Forest Service*, No. J04-

Organized Village of Kake, et al. v.
U.S. Forest Service, et al.,
J04-0029 CV (JKS)

0010 CV (JKS) (D. Alaska).  The parties initially attempted to negotiate a settlement of relief in these cases.  *See* Exhibit 37 (Order Approving Joint Status Report, *NRDC v. USFS*, No. J03-0029, Dec. 29, 2005, Docket No. 93).  After these negotiations failed, the parties proposed, and this Court approved, a briefing schedule in which plaintiffs in all three cases would move for relief simultaneously, incorporating by reference to avoid redundancy.[1]  *See* Exhibit 40 (Joint Status Report, *NRDC v. USFS*, No. J03-0029, Feb. 15, 2006, Docket No. 106); Exhibit 41 (Order approving status report, *NRDC v. USFS*, No. J03-0029, Feb. 17, 2006, Docket No. 107).

Plaintiffs in these three cases are filing their principal motion in the present case, because this case includes not only the conservation groups that are parties in all three cases, but also the Organized Village of Kake, the federally-recognized tribal government for Kake, Alaska, which is a party only in this case.  By filing their principal motion in the present case, Plaintiffs can ensure that all interests are fully represented in a single brief that takes into account forest-wide relief on behalf of all concerned parties in all three cases.  The motions in the two *NRDC* cases will incorporate this motion by reference and as an exhibit.

In the present case, Plaintiffs have also raised two claims specific to the Threemile timber sale that were not at issue in the *Natural Resources Defense Council* appeal.  *See* Pls.' Opening Br. (Nov. 23, 2005) (Docket No. 48).  The relief sought in the present motion addresses only the programmatic forest plan claims on which Plaintiffs prevailed in *Natural Resources Defense Council*.  If the Court vacates the Threemile Record of Decision, as requested in this motion, there will be no site-specific final agency action to challenge, and the claims raised in Plaintiffs'

---

[1] The cases were not consolidated because the present case and Case No. J04-0010 contain unique claims not raised in the other cases.  *See* Exhibit 40 at 3 (Joint Status Report at 2, *NRDC v. USFS*, No. J03-0029, Feb. 15, 2006, Docket No. 106).

Organized Village of Kake, et al. v.
United States Forest Service, et al.

Opening Brief may be dismissed without prejudice as moot.  If vacatur is not granted, Plaintiffs

may later seek additional appropriate relief based on the site-specific timber sale claims raised in

their opening brief.

<u>ARGUMENT</u>

In formulating their request for permanent relief, Plaintiffs have attempted to propose a

solution that would protect their interests and those of the public without causing unnecessary

risk to the active sawmills in Southeast Alaska or the communities in which they operate.  This

motion accomplishes that purpose.

Although the Court of Appeals found fundamental defects in the 1997 Tongass Plan and

its EIS, Plaintiffs do not seek to vacate that plan or to stop all logging under it.  Rather, they seek

relief that would enable the logging companies to continue operations at the levels that have

prevailed consistently on the Tongass for the last five years by focusing in the places that cause

the least damage to Plaintiffs and the public.

Specifically, Plaintiffs are concerned about the roadless areas of the Tongass because of

their extraordinary values for wildlife, fish, recreation, and tourism.  Additionally, Plaintiffs seek

to avoid further timber sales on Kuiu Island because of its unique importance to the Organized

Village of Kake and the enormous destruction to the island caused by thirty years of industrial

logging under a long-term pulp mill contract.  For these reasons, Plaintiff request that the Court

enjoin the Forest Service from permitting or authorizing timber sales in these areas pending

completion of the plan revision, and vacate the existing site-specific decision documents that

authorize logging in these areas.

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    3

There is more than enough timber on the existing road system, outside of Kuiu Island, to allow logging to continue at prevailing levels on the Tongass for the time it will take the Forest Service to correct the defects in the forest plan.  Granting Plaintiffs' requested relief would still leave enough timber volume on the Forest Service's most recent timber sale schedule to allow that to happen.  However, without injunctive relief, that same timber sale schedule would not just damage the interests Plaintiffs seek to preserve, it would also allow logging to increase significantly above the prevailing levels.  To do so while the Forest Service is considering, at the direction of the Ninth Circuit Court of Appeals, whether additional lands can be spared from logging in light of more realistic demand projections would vitiate the plan revision process, predetermining its outcome as to those places logged during its preparation.  Plaintiffs' request for relief strikes a reasonable balance by allowing logging to continue at prevailing levels while protecting those places most highly valued by Plaintiffs and other members of the public.

I.      STANDARDS FOR INJUNCTIVE RELIEF AND VACATUR.

The normal, but not automatic, remedy under the Administrative Procedure Act is to "vacate the agency's action and remand to the agency to act in compliance with its statutory obligations."  *Defenders of Wildlife v. U.S. EPA*, 420 F.3d 946, 978 (9th Cir. 2005).  *See also* 5 U.S.C. § 706(2) (directing "reviewing court" to "hold unlawful and set aside" arbitrary or unlawful agency action).  In the present case, Plaintiffs do not request vacatur of the 1997 Tongass Land Management Plan, because to do so, without more, could reinstate the preexisting, 1979 plan, which is even less reflective of current timber market demand and environmental concerns than the inadequate 1997 plan.  *See*, *e.g.*, *Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005) ("The effect of invalidating an agency rule is to reinstate the rule previously in

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    4

force."). The court may "adjust [its] relief to the exigencies of the case in accordance with the equitable principles governing judicial action." *Asarco, Inc. v. OSHA*, 647 F.2d 1, 2 (9th Cir. 1981) (quoting *Ford Motor Co. v. NLRB*, 305 U.S. 364, 373 (1939)) (declining to vacate arbitrary arsenic exposure standard where to do so would expose workers to health risk). In the present case, as discussed below, an appropriate exercise of this judicial discretion is to vacate certain timber sale decisions without vacating the entire plan or all timber sale decisions.

The bases for injunctive relief are irreparable injury and inadequacy of legal remedies. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987). The court must also "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* This is commonly called "the traditional balance of harms analysis." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 737 (9th Cir. 2001) (quoting *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1496 (9th Cir. 1995)); *see also Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 732 (9th Cir. 1995). The court must also consider the public interest. *Amoco Prod. Co.*, 480 U.S. at 542.

Only in rare cases will the courts refuse to issue an injunction needed to avoid irreparable harm in an environmental case. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Id.* at 545. For this reason, an injunction is usually appropriate: "If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id.* Thus, the burden is on the defendants to demonstrate "unusual circumstances" that would warrant denial or limitation of injunctive relief. *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 737 n.18; *Forest Conservation Council*, 66 F.3d at 1496.

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                5

II.     EQUITABLE RELIEF IS NEEDED TO AVOID IRREPARABLE HARM TO
        PLAINTIFFS, TO THE PUBLIC, AND TO THE ENVIRONMENT.

        A.     <u>All logging in the Tongass will cause irreparable harm.</u>

        Irreparable injury in this case flows from multiple causes:  the failure to evaluate

adequately the impacts of and alternatives to the Tongass Plan in the Plan EIS; the cutting of old-

growth forests that take hundreds of years to replace; and the permanent loss of wildland

characteristics through road building and logging in roadless areas.

        The Ninth Circuit has held that, in the EIS for the Tongass Plan, the Forest Service

included a misleading analysis of the economic effects of the Plan, failed to consider reasonable

alternatives that would strike an appropriate balance between logging and protection of the

environment, and failed to consider the cumulative environmental impacts of disproportionately

logging the most valuable "high-volume" old-growth stands on the Tongass.  *Natural Res. Def.*

*Council*, 421 F.3d at 811-16.  Proceeding with logging projects before correcting these errors

causes irreparable harm.  "In the NEPA context, irreparable injury flows from the failure to

evaluate the environmental impact of a major federal action."  *High Sierra Hikers Ass'n v.*

*Blackwell*, 390 F.3d 630, 642 (9th Cir. 2004); *see also Nat'l Parks Conservation Ass'n*, 241 F.3d

at 738 n.18 ("[B]ecause NEPA is a purely procedural statute, the requisite harm is the failure to

follow the appropriate procedures.").  While not every NEPA violation dictates injunctive relief,

"the presence of strong NEPA claims gives rise to more liberal standards for granting an

injunction."  *High Sierra Hikers Ass'n*, 390 F.3d at 642 (quotations and citation omitted).

        The logging of old growth on the Tongass also causes irreparable harm, because it takes

hundreds of years for the forest to regain its original characteristics.  The EIS for the Tongass

Land Management Plan states, "The development of old-growth characteristics *begins* at

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    6

approximately 250 years."  Exhibit 7 at 6 (TLMP FEIS at 3-18) (emphasis added).  All of the

logging in the Tongass occurs in old growth.  *Id.* at 12 (TLMP FEIS at 3-27) (stating that

Tongass logging "is limited to old growth for at least another six decades.").  The courts have

universally recognized that the logging of old-growth forests constitutes irreparable harm for

purposes of injunctive relief, and that this harm normally outweighs any countervailing claims of

economic harm:

> This evidence of environmental harm is sufficient to tip the balance in favor of
> injunctive relief.  Although the record indicates that a preliminary injunction
> could present a financial hardship to the Forest Service, the appellee-intervenors,
> and the communities in and around the [Payette National Forest], this possible
> financial hardship is outweighed by the fact "[t]he old growth forests plaintiffs
> seek to protect would, if cut, take hundreds of years to reproduce."

*Idaho Sporting Cong. v. Alexander*, 222 F.3d 562, 569 (9th Cir. 2000) (quoting *Neighbors of*

*Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1382 (9th Cir. 1998) (quoting *Portland*

*Audubon Soc'y v. Lujan*, 884 F.2d 1233, 1241 (9th Cir. 1989))).

Similarly, irremediable, long-term, and hence irreparable injury results from development

activity in previously roadless areas.  The Ninth Circuit has already recognized that in this case.

In entering an injunction pending appeal for the Orion North timber sale, the court noted that

"the road-building activities will cause an immediate and irreparable change to the part of the

now-roadless old-growth forest that would be affected by the challenged timber sale."

Exhibit 24 at 3-4 (*NRDC v. USFS*, No. 04-35868, Order at 3-4, Oct. 18, 2004).

For these reasons, all logging in the Tongass will cause irreparable harm.  However,

Plaintiffs seek to enjoin only those timber sales occurring in roadless areas or on Kuiu Island,

because these are the areas of most particular concern.  The reasons for this are explained below.

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    7

B.      Roadless areas have special values for wildlife, fish, recreation, and tourism.

Plaintiffs and other members of the public place a particularly high value on the

remaining roadless areas of the Tongass, because these are the places that, by definition, retain

their natural character without roads and clearcuts.  The FEIS for the Tongass Plan recognizes

this:

>           Local residents of Southeast Alaska seem to value highly the opportunities
> for remote, uncrowded wildland and marine outdoor recreation.  Most of
> Southeast Alaska is known for its abundant opportunities to "get away from it
> all."  Many residents take advantage of this fact and frequently head for the wilds
> to boat, fish, hunt, camp, hike, beachcomb, pick berries, and to do the many other
> things possible in this vast region.

Exhibit 7 at 16 (TLMP FEIS at 3-119 to 3-120).  "This wildness and the lifestyles associated

with it are highly prized by residents and visitors alike."  *Id.* at 19 (TLMP FEIS at 3-162).

Roadless areas also possess particularly high values for wildlife, because they contain

large blocks of unfragmented old-growth habitat.  "Blocks, or concentrations, of productive old-

growth forest are important as habitat for many wildlife species, as representations of the old-

growth ecosystem, and in general for biological diversity."  Exhibit 1 at 7 (TLMP RSDEIS

at 3-17).  Roads and clearcuts fragment the habitat to the detriment of wildlife:  "The

fragmentation of habitats, which isolates and creates small insular populations, contributes to

decreased population distribution and increased likelihood of local extirpation."  Exhibit 7 at 33

(TLMP FEIS at 3-379).  Most of the Tongass does not contain productive forest habitat.  It

consists mostly of icefields, glaciers, low-lying alpine vegetation, muskegs, wetlands, grass-

sedge meadows, and scrub forest.  *Id.* at 4-5 (TLMP FEIS at 3-6 to 3-7).  Out of the 17 million

total acres in the Tongass, only 2.3 million acres remain as "interior" old-growth forest, which is

more than 300 feet inside the forest edge and is associated with wildlife species of concern.  *Id.*

at 9 (TLMP FEIS at 3-24).  These important, intact blocks of forest are particularly vulnerable to

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    8

fragmentation from logging: "The harvest of blocks of old-growth forest containing interior old-growth will typically reduce the interior at a greater rate than the harvest, since remaining stands that had been interior may no longer be so – the remainder of the block may be too small or too narrow." *Id.* Further road construction also threatens fish, a vitally important resource to the region: "The greatest risk to the fish resource is caused by roads." *Id.* at 14 (TLMP FEIS at 3-64).

Plaintiffs' members include commercial fishers, Native subsistence hunters, big game guides, charter boat captains, tour operators, lodge owners, and recreational users of the forest. They use and enjoy the roadless areas of the Tongass, and their uses are threatened by the Tongass timber sale program. *See* Exhibits 53-81 (declarations).

C.    Kuiu Island has cultural, historical, economic, and spiritual significance for the people of Kake.

Kuiu Island has special importance to the Organized Village of Kake. The history of Kuiu Island is that, in the space of about a hundred years, the federal and state governments forced the people of Kake to relocate off the island and subsequently decimated the habitat, cultural values, and deer populations of the island. Timber sale planning should not proceed on Kuiu Island until the Forest Service has adopted a forest plan that complies with the law.

For at least several centuries, ancestors of the present-day residents of Kake lived in camps and village sites scattered around Kuiu Island. *See* Exhibit 22 at 7 (Threemile FEIS at 3-94); Exhibit 7 at 35 (TLMP FEIS at 3-583); Exhibit 46 at 3 (N. Davis declaration ¶ 5). The Kake Tlingit had several military conflicts with the Russian and American governments in the 19th century. Exhibit 7 at 35 (TLMP FEIS at 3-583). Early in the 20th century, missionaries established a school at the current village site, just across Keku Strait on Kupreanof Island.

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                 9

Exhibit 46 at 3 (N. Davis declaration ¶ 5); Exhibit 7 at 35 (TLMP FEIS at 3-583). They forced the Tlingit children to attend the school by levying fines on families that did not comply, with the result that the Kake Tlingit began to spend most of their year in present-day Kake. Exhibit 46 at 3 (N. Davis declaration ¶ 5) "Still, as recently as the 1950's, many returned to Kuiu Island in the summer to hunt, fish and gather for their year round needs." *Id.*

Government programs have had a particularly severe impact on subsistence (and other) deer hunting opportunities on Kuiu Island. Before and after statehood, the federal and, later, state governments administered a wolf eradication program that caused deer populations to grow artificially high, straining the habitat. Exhibit 22 at 11, 15 (Threemile FEIS at 3-127, 3-165). This led to a deer population crash following a particularly severe winter in 1972. *Id.* As a direct result, from 1973 to 1991, the deer hunting season on Kuiu Island was closed. *Id.* at 11.

Until the 1972 deer population crash, Kuiu Island remained a largely intact old-growth forest. From 1930 to 1972, there were some small timber sales and one four-mile road. *See* Exhibit 10 at 2-4 (Threemile Road Analysis); Exhibit 22 at 3-4 (Threemile FEIS at 3-6 to 3-7).

In 1972, however, Kuiu Island became part of the contract area for the 50-year timber sale contract held by Alaska Lumber and Pulp Co., later renamed Alaska Pulp Corporation. From then to 1993, the same essential time span that the deer season was closed, Alaska Pulp logged the island heavily under the 50-year pulp mill contract. *See* Exhibit 10 at 4 (Threemile Road Analysis); Exhibit 22 at 3-4 (Threemile FEIS at 3-6 to 3-7). In the late 1990's, after cancellation of the long-term contract, there were a few additional independent sales. Exhibit 10 at 4 (Threemile Road Analysis). Since 1972, timber operators have constructed 190 miles of

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                10

"classified" roads and an additional 115 miles of "temporary" roads,[2] 305 miles in total, to clearcut a vast but unspecified amount of old-growth forest. Exhibit 22 at 4 (Threemile FEIS at 3-7).

The heavy logging that occurred during this time destroyed a great deal of high quality deer habitat. For example, in Wildlife Analysis Area 5012, constituting the north part of Kuiu Island closest to Kake, logging before 1995 reduced the original deer habitat capability by 20 percent. *See* Exhibit 7 at 29 (TLMP FEIS at 3-372). The Alaska Department of Fish and Game had found this area to be one of the "Highest Value Community Use Areas" in southeast Alaska. *Id.* Clearcutting of old-growth forests in southeast Alaska damages deer habitat by reducing both forage and snow interception. *Id.* at 26 (TLMP FEIS at 3-353). Deer hunting is an important part of the food supply for Kake. *See*, *e.g.*, Exhibit 46 at 5 (N. Davis declaration ¶ 14).

The people of Kake value the forest not only for the food supply it provides, but for their culture and a connection to the past. They speak frequently of traveling to the old village sites, camps, and places for hunting, fishing and gathering, learning traditions and stories from their parents and grandparents, and passing them on to the next generation. *See*, *e.g.*, Exhibit 46 at 4, 6 (N. Davis declaration ¶¶ 9, 16); Exhibit 78 at 2, 3 (K. Jackson declaration ¶¶ 3, 8); Exhibit 81 at 2, 3 (M. Jackson declaration ¶¶ 5, 6, 7); Exhibit 77 at 3, 4 (Smith declaration ¶¶ 11, 14); Exhibit 79 at 2 (L. Davis declaration ¶ 7).

---

[2] A "temporary" road does not disappear by virtue of its temporary designation. This is simply a term used by the Forest Service to identify roads that are not maintained as part of the long-term forest transportation system. *See* Exhibit 22 at 5 (Threemile FEIS at 3-8). These temporary roads are not, however, physically removed or differently treated after a timber sale than permanent, "classified" roads that are not in active use. *Id.*

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    11

As a result of their forced relocation to the current village site on Kupreanof Island, the two-decade closure of the deer season, and the clearcutting and roading of Kuiu Island during that time, the people of Kake have been deterred from returning to their ancestral hunting and gathering grounds on Kuiu Island. "By the time the island was reopened for hunting in 1992, logging roads, bordered by clearcuts on either side, ran up most of the major drainages on the northeast part of the island." Exhibit 46 at 4 (N. Davis declaration ¶ 10). Unable to hunt (or hunt successfully) on Kuiu, residents of Kake have been forced to make a long, dangerous crossing of Frederick Sound to Admiralty and even Baranof Islands. *Id.* at 4-5, ¶ 11. In December 2003, three Kake tribal members drowned while attempting to return by skiff from a hunting trip on Admiralty. *Id.* at 5, ¶ 12; *see also* Exhibits 17 & 18 (news articles).

The loss of much of Kuiu Island to logging has damaged important connections to the past. One tribal member explains:

> Our ancestors lived all around the Kuiu Island area, but we no longer feel the same connection to the land, because every time we go somewhere, there are logging camps and logging, and we feel like we don't belong. My grandfather used to tell stories about when they lived off the land, and they walked up the mountains near Threemile Arm, and he would talk about how sacred a lot of these places, including Security Bay and Saginaw Bay and other areas, were to them. We feel displaced now.
>
> …
>
> … With all the logging, I just don't feel my ancestors anymore. It's just a feeling, and you don't feel it anymore, and you don't hear the drumbeat or the culture anymore. We're losing the legends with the trees. You can't carve a totem if you don't know the legends. Our stories are connected to places and they are logging some of those places.

Exhibit 78 at 2, 3 (Ken Jackson declaration ¶¶ 3, 7).

The Forest Service continues to target Kuiu Island as part of the timber sale program. In April 2004, while the *Natural Resources Defense Council* litigation was pending in this Court,

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    12

the Forest Service issued the Threemile Record of Decision, located on Threemile Arm on Kuiu

Island, authorizing logging of 19.5 MMBF of timber from 8.4 miles of new classified and

temporary roads.  Exhibit 23 at 7 (Threemile ROD at 3).  As discussed further below, the agency

is also proceeding with new plans for more timber sales on Kuiu.

For these reasons, the Organized Village of Kake and its members feel strongly that Kuiu

Island must be allowed to recover without further loss of habitat and sacred places due to

logging.  *See* Exhibits 46, 76-81 (Kake declarations).  This is true not only for the remaining

roadless areas, but for those parts of Kuiu that have already been damaged by roads and

clearcuts.  The planning process now underway to correct the defects in the Tongass Plan

provides an opportunity to consider new alternatives, but that opportunity would be lost to the

extent that the destruction of Kuiu Island is allowed to continue during this process.

D.    <u>Injunctive relief is needed to stop the Forest Service from continuing to authorize new timber sales in roadless areas and on Kuiu Island before the forest plan revision is completed</u>.

Notwithstanding the Ninth Circuit's holding regarding the inadequacy of the Tongass

Plan and the enormous controversy over continued logging in roadless areas and on Kuiu Island,

the Forest Service continues to sign new decision documents authorizing new timber sales in

these places.  An injunction is needed to avoid the prejudice to the planning process that results

from the agency's continued actions making commitments to logging places that should be

considered for protection in that process.

Less than two months after the Ninth Circuit's decision, during a time when the parties

were attempting to settle the question of injunctive relief, the Forest Service signed the Record of

Decision for the Emerald Bay timber sale, which contains 16.4 mmbf of timber and 6.2 miles of

roads located entirely in an area that is currently roadless.  *See* Exhibit 35 at 3-4 (Emerald Bay

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    13

ROD at 2-3).  The agency later denied all administrative appeals.  Exhibit 44 (Emerald Bay

appeal decision).  Over two miles of the road will cross an "old growth reserve," which, under

the forest plan, is supposed to be set aside for protection of wildlife habitat.  *See* Exhibit 35 at 3

(Emerald Bay ROD at 2); *see also id.* at 35 at 9 (Emerald Bay ROD at 8) ("new road

construction is generally inconsistent with Old-growth Habitat [Land Use Designation]

management….").

     During this same time period, the Forest Service released a draft EIS for the proposed

new Kuiu Timber Sale.  This project would, under the preferred alternative, log another 42.6

MMBF of timber, nearly a year's supply for the entire Tongass, with 19 miles of new roads.  *See*

Exhibit 38 at 3-5 (Kuiu DEIS at 2-3 to 2-4, 2-16).  Absent an injunction from this Court, the

Forest Service plans to sign the Record of Decision (ROD) for the Kuiu project in May 2006 and

to offer the first sale from the project – the 16.0 MMBF "Kuiu Roaded" sale – before the end of

the current fiscal year.  *See* Exhibit 34 (FY 2006 5 Year Timber Sale Plan, Nov. 10, 2005).  The

agency would offer another sale from the project – the 18.0 MMBF "Straight Creek" sale – in

FY 2007.  *See id.*

     The Forest Service intends to continue to sign an even larger number of new RODs to

authorize new timber sales in roadless areas and on Kuiu Island while the planning process is

underway.  The agency currently intends to release the final Record of Decision for the plan

revision in August 2007, about sixteen months from now.  *See* Exhibit 36 at 9 (Study Plan at 42).

The timber sale schedule contemplates the following new site-specific timber sale RODs before

that time:

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    14

| Sale Name | Decision Date | Volume (MMbf) | Percent Roadless or on Kuiu |
|---|---|---|---|
| Scratchings | March 2006 | 26 | 31 |
| Kuiu | May 2006 | 34 | 100 |
| Gravina | June 2006 | 36 | 100 |
| Logjam | February 2007 | 25 | 40 |
| Big John/Central Kupreanof | May 2007 | 35 | 60 |
| Klam | June 2007 | 25 | 36 |
| Navy | FY 2007 | 50 | 90 |
| TOTAL | | 231 | |

*See* Exhibit 34 (FY 2006 5 Year Timber Sale Plan, Nov. 10, 2005).

Moreover, if the Forest Service fails to complete the revision on schedule, there will be an even larger number of new timber sale offerings and new RODs in roadless areas. The schedule of timber sale offerings focuses overwhelmingly on roadless area sales beginning in FY 2008 and displays another seven new RODs for timber sale projects in roadless areas in that fiscal year. *See id.*

The signing of new RODs for timber sales in roadless areas and on Kuiu Island during the planning process prejudices that process inappropriately. One of the specific reasons the Forest Service is required to prepare a new EIS for the forest plan is to consider reasonable alternatives that would protect more roadless areas of the Tongass while still providing sufficient timber to meet market demand, correctly interpreted. *Natural Res. Def. Council*, 421 F.3d at 814. Although Kuiu Island was not specifically at issue in that appeal, the same rationale applies: because it is possible to meet the market demand for timber in the Tongass with less land open for logging, reasonable alternatives would consider protecting the most sensitive places. To commit so many of these areas to timber sales while the agency is supposed to be considering alternatives that would avoid that very result makes a mockery of the process. As

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                15

discussed further below, there is plenty of timber available in existing roaded areas to continue

logging at prevailing levels while the planning process is underway and, in fact, indefinitely. *See*

*infra* pp. 21-24.

This Court recognized this concern in similar circumstances in *Sierra Club v. Rey*, No.

J00-0009 CV (JKS) (D. Alaska), where the Forest Service had failed to consider any alternatives

that would recommend any new wilderness designations in the forest plan. The plaintiffs in that

case moved for clarification of an order enjoining timber sales in roadless areas to ensure that the

Forest Service would not sign new RODs for roadless area timber sales while the process was

underway. This Court agreed, noting that the Court had allowed certain projects to proceed, but

that "it was the intention of the Court … that the process as to other potential timber sales should

be halted. And that would, as plaintiffs suggest, cover the issuance of records of decisions."

Exhibit 11 at 4 (hearing transcript at 58). Accordingly, the Court held that "no further records of

decision should be issued, and certainly no laying out of timber sales, marking boundaries of

units with tape, appraisal of timber sales or preparation of contract language should go forward

until the final supplemental environmental impact statement is issued." *Id.* at 5 (hearing

transcript at 59).

If the Court does not enjoin the issuance of new RODs in roadless areas and on Kuiu

Island, Plaintiffs, and probably other parties, will likely be forced to file lawsuits challenging

these projects. Any plaintiff in these cases would automatically be entitled to judgment on the

merits, because all of the RODs would necessarily be based on a forest plan that has been held

invalid. The Forest Service's proposal to continue signing new RODs in controversial areas

under an unlawful plan while a new planning process is underway would spawn needless

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    16

litigation.  Plaintiffs urge the Court to reject this result and follow the precedent set in *Sierra Club v. Rey*.

      E.     <u>Vacatur and injunctive relief are needed to stop the Forest Service from offering timber sales under existing RODs in roadless areas and on Kuiu Island before the forest plan revision is completed</u>.

The Forest Service not only continues to sign new RODs for timber sales, but also continues to advertise and enter into contracts for timber sales in roadless areas and on Kuiu Island pursuant to previously issued RODs.  Plaintiffs request that the Court vacate those RODs and enjoin further implementation of them.

Since the Ninth Circuit decision, the Forest Service has offered the following large timber sales located at least partly in roadless areas:

| Sale Name | EIS/ROD Name | Date Advertised | Volume (MMBF) |
|---|---|---|---|
| Lindenberg | South Lindenberg | Sept. 29, 2005 | 23.2 |
| Skipping Cow | Skipping Cow | Sept. 29, 2005 | 18.6 |
| Upper Carroll II | Upper Carroll | Sept. 30, 2005 | 16.5 |
| Buckdance Madder Reoffer | Sea Level | Jan. 31, 2006 | 15.4 |
| Red Mountain | King George | Feb. 18, 2006 | 5.9 |
| TOTAL | | | 79.6 |

*See* Exhibits 31-33, 39, 43 (timber sale advertisements).

The Forest Service intends to continue this practice throughout the time that it will be revising the forest plan.  During that time, the Forest Service plans to offer the following timber sales in roadless areas and on Kuiu Island, in addition to those already offered:

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)        17

| Sale Name | EIS/ROD Name | Offer Date | Volume (MMBF) | Percent Roadless or on Kuiu |
|-----------|--------------|------------|---------------|-----------------------------|
| Kuiu Roaded | Kuiu | FY06 | 34.0 | 100 |
| Scratchings | Scratchings | FY07 | 26.0 | 31 |
| Synchro, SRD HRD | NW Baranof | FY07 | 40.0 | 84 |
| Straight Creek | Kuiu | FY07 | 18.0 | 100 |
| North Corner | Doughnut EA | FY07 | 1.5 | 100 |
| TOTAL | | | 119.5 | |

*See* Exhibit 34 (FY 2006 5 Year Timber Sale Plan, Nov. 10, 2005).  Further, because this

schedule is not legally required or binding, it is also possible that – without injunctive relief – the

Forest Service could offer other roadless area timber sales not listed on the schedule.  For

example, the Upper Carroll II, Lindenberg, and Red Mountain sales listed above did not appear

on this or any other recent timber sale schedule for this time frame.

An injunction is necessary to put a stop to these sales while the planning process is

underway.

An injunction standing alone, however, is not sufficient to ensure that these areas will get

fair consideration in the planning process.  The Forest Service has signed RODs for these sales,

creating an institutional commitment to them during the planning process.  For this reason,

Plaintiffs also request that the Court vacate previously entered RODs that authorize timber sales

in roadless areas or on Kuiu Island.

The effect of vacatur is that the Forest Service would be required to enter a new decision

for any vacated timber sale after adopting a forest plan that is based on a correct understanding

of timber market demand and a full consideration of alternatives and environmental impacts.

This is a limited, appropriate remedy to ensure that the bureaucratic momentum behind these

decisions causes as little prejudice as possible to the forest planning process required on remand.

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    18

NEPA's purpose "is to require consideration of environmental factors before project momentum is irresistible, before options are closed, and before agency commitments are set in concrete." *Massachusetts v. Watt,* 716 F.2d 946, 953 (1st Cir. 1983) (quoting W. Rodgers, *Environmental Law* § 7.7 at 767 (1977)).  *See also Sierra Club v. Marsh,* 872 F.2d 497, 504 (1st Cir. 1989) (describing "[t]he difficulty of stopping a bureaucratic steam roller, once started") ; *Village of False Pass v. Clark,* 733 F.2d 605, 617, 619 (9th Cir 1984) (Canby, J., concurring in part and dissenting in part) ("[t]he prime purpose of NEPA in requiring Environmental Impact Statements is to assure that federal decision-makers consider the environmental consequences of their major actions before the decision to act is made;" each further step that an agency takes toward a project without full NEPA compliance "represents a link in a chain of bureaucratic commitment that will be come progressively harder to undo") (quoting *Mass. v. Watt*)..

As discussed above, the Forest Service already has timber sales offered or under contract from the RODs for the Upper Carroll, South Lindenberg, Skipping Cow, Sea Level, and King George projects.  In addition, the Forest Service plans to offer timber sales in the first year following revision of the forest plan – FY 08 – from RODs already signed for the Emerald Bay, Chasina, Threemile, Crane and Rowan Mountain, and Madan projects.  *See* Exhibit 34 (FY 2006 5 Year Timber Sale Plan, Nov. 10, 2005).  Even more sales from RODs already signed are scheduled for the following years.  *Id.*

It is, of course, impossible to eliminate the bureaucratic momentum behind these sales altogether.  Vacating the decisions, thereby requiring new decisions after an adequate planning process, at least ensures that the agency will be required to take a fresh look at the project in light of the new plan and current circumstances, and to justify its decision accordingly.  Vacatur of the RODs would not necessarily require the Forest Service to start over with new EISs, but –

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    19

regardless of whether the ROD is vacated – a supplemental EIS may be required if there is

significant new information or changed circumstances since the original ROD. *See* 40 C.F.R.

§ 1502.9(c)(1)(ii). Some of the RODs were signed a decade ago or more, when there were pulp

mills, long-term contracts, weaker environmental standards, and an entirely different market for

timber. *See*, *e.g.*, Exhibits 2-5 (NW Baranof, King George, Upper Carroll, and S. Lindenberg

RODs). Others are much more recent, such as the Emerald Bay ROD signed just five months

ago, after the Ninth Circuit's decision holding the Tongass Plan arbitrary and unlawful. *See*

Exhibit 35 (Emerald Bay ROD). A fresh look at these decisions, under a forest plan that is

lawful and not arbitrary, is warranted.

Vacatur of the RODs would also render it unnecessary for this Court to decide the site-

specific claims pending in the present case, *see* Pls.' Opening Br. (Nov. 23, 2005) (Docket

No. 48), and in the case challenging the Woodpecker decision. *See NRDC v. USFS*, No. J04-

0010 CV (JKS) (D. Alaska), Pls.' Opening Br. on Count VI (June 25, 2004) (Docket No. 11).

Vacatur of the Threemile and Woodpecker RODs would eliminate the final agency action that

the site-specific claims in these cases seek to review. Those claims could be dismissed without

prejudice as moot.

III.    THE BALANCE OF EQUITIES FAVORS ENTRY OF THE REQUESTED
        INJUNCTION.

The relief requested by Plaintiffs strikes an appropriate balance, because it seeks neither

reductions nor increases in prevailing logging levels. Rather, it seeks to protect the places most

important to Plaintiffs and other members of the public while allowing logging to continue at

prevailing levels during the planning process. It avoids unnecessary harm and maintains the

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    20

status quo while the Forest Service prepares a plan that strikes a better balance between logging

and other uses of the forest.

A.     The requested injunction will allow logging to continue at current levels.

Since the last of the logging was completed under the long-term pulp mill contracts,

logging levels on the Tongass have been remarkably stable.  Throughout the long-term contract

years, logging was a highly volatile, boom-and-bust industry.  *See* Exhibit 29 (Tongass logging

history graph).  Since logging was concluded under the last long-term contract in 2000,[3]

however, Tongass logging levels have stabilized at about 46 MMBF/year, with relatively little

variation from year to year:

|  | Volume Cut (MMBF) |
|---|---|
| FY 2001 | 48 |
| FY 2002 | 34 |
| FY 2003 | 51 |
| FY 2004 | 46 |
| FY 2005 | 50 |
| Average | 46 |

*See* Exhibit 38 at 8 (Kuiu DEIS App. A at A-4, Table A-1).  These are approximately the cutting

levels that prevailed before the 50-year pulp mill contracts, when the average yearly cut was

about 41 MMBF.  *See* Exhibit 7 at 22 (TLMP FEIS at 3-259).

---

[3] The Ketchikan Pulp Co. (KPC) contract was canceled early in 1997, when the company closed
the mill.  However, a settlement agreement with the United States required KPC to continue
operations for three years (1997-99), Exhibit 6 (KPC Settlement Agreement), and was later
extended for an additional year (2000).  Exhibit 9 (KPC Contract Extension).  During the fiscal
years 1998, 1999, and 2000, with the stimulus provided by these agreements, logging averaged
138 MMBF/year.  *See* Exhibit 38 at 8 (Kuiu DEIS App. A at A-4, Table A-1).

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    21

It is possible to continue cutting at this level indefinitely without any logging in roadless areas. In 2003, the Forest Service prepared a supplemental EIS for the Tongass Plan to consider whether to recommend any new wilderness designations. One of the alternatives considered was to keep the 1997 plan, except to designate all of the roadless areas as wilderness, the most restrictive available designation. Under this alternative, the Forest Service calculated that the Allowable Sale Quantity (ASQ) – the average allowable cut – would be 96 MMBF/year. Exhibit 14 at 8 (Wilderness SEIS at 2-46, Table 2-23). This total included 17 MMBF of "NIC II" volume, *id.*, which would not be viable to log except in unusually strong markets. *See id.* at 3 (Wilderness SEIS at 2-10). Even the more economically viable "NIC I" component of the ASQ, however, would be 79 MMBF/year. *Id.* at 8 (Wilderness SEIS at 2-46, Table 2-23). In the same document, the Forest Service asserted that it is realistic to predict that – taking into account logging standards and guidelines, economics, and litigation – about 70% of the NIC I volume would actually be sold and cut. *Id.* at 16 (Wilderness SEIS at 3-287). Thus, according to the Forest Service, it is realistic to assume that a timber sale program could exist in the existing roaded areas of the Tongass indefinitely at an average level 70% of 79 MMBF/year, or 55 MMBF/year. That is 20% higher than the average cut over the last five years. In short, it is not necessary to log a single tree in a roadless area to sustain logging at prevailing levels permanently, not just for the duration of the planning effort. In fact, there would be room for 20% growth.

Moreover, the 79 MMBF "NIC I" ASQ is an average level over time, not an annual maximum. *See id.* at 2 (Wilderness SEIS at 2-9). For the two logging seasons the Forest Service projects it will take to complete the forest plan revision, or longer if necessary, it would easily be possible to exceed this average. Of course, some of the roaded area timber is located on Kuiu

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    22

Island, for which Plaintiffs also seek injunctive relief. However, given the fact that the roaded areas of the whole Tongass contain 20% more timber than needed to continue at prevailing levels indefinitely and that this level can be exceeded in the short term, there is plenty of timber to continue logging at current levels for many years, without logging at all in roadless areas or on Kuiu Island.

Logistically, the Forest Service is capable of making sufficient timber sale offerings in the short term from other, already-roaded areas, without further logging on Kuiu Island. Most of the sales on the schedule for FY 2006-07 are neither roadless nor on Kuiu Island. *See* Exhibit 34 (FY 2006 5 Year Timber Sale Plan, Nov. 10, 2005). An injunction protecting roadless areas and Kuiu Island need not reduce prevailing logging levels.

Even if more timber were available to the sawmills, it is unlikely it would be cut. The mills have had substantially more timber available for the last five years, but have not cut it due to economic realities. Between FY98 and FY03, the Forest Service offered 307 timber sales through a competitive bidding process. *See* Exhibit 25 at 17-18 (Compl. ¶¶ 77-81); Exhibit 27 at 8 (Defs' Ans. ¶¶ 77-81). When offered for sale, eighty-nine – or 29% – of those sales received no bids at all. *See* Exhibit 25 at 18 (Compl. ¶¶ 78, 82); Exhibit 27 at 8-9 (Defs' Ans. ¶¶ 78, 82). For the sales on which companies did submit bids and enter contracts, many were never cut. In August 2002, recognizing persistently weak timber markets, the Forest Service granted an emergency extension of time, beyond the maximum time already granted under the terms of the contracts, for companies to complete logging the timber. *See* Exhibit 13 (Extension of Certain Alaska Timber Sale Contracts, 67 Fed. Reg. 51,165, 51,166-67 (Aug. 7, 2002)). When markets did not rebound under the extensions, Congress passed special legislation allowing the contractors to cancel many of these contracts without penalty. *See* Department of the Interior

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                23

and Related Agencies Appropriations Act, 2004, Pub. L. No. 108-108, Title III, § 339, 117 Stat. 1241, 1314 (2004).  Pursuant to this authority, the agency offered to cancel 20 timber sales totaling 138 MMBF then under contract.  *See* Exhibit 19 (USFS News Release).  The timber companies accepted this offer for 17 of the sales totaling 122 MMBF.  Exhibit 26 (canceled sales).

The prevailing market conditions over the last five years reflect structural changes in the market and not a mere cyclical slump.  The principal reason for this change is that Japan – historically the biggest consumer of Tongass timber products – has changed its practices and its suppliers, and the Tongass sawmills have not found replacement markets that will generate the high prices formerly received in Japan.  In July 2003, the Forest Service explained:  "The Pacific Rim market for timber products has considerably changed due to new suppliers and modifications to Japanese building codes.  The Alaska industry struggles to replace the demand." *See* Exhibit 15 at 1 (USFS briefing paper).  *See also* Exhibit 14 at 10 (Wilderness SEIS at 3-253) ("[the] value of [Tongass timber exports to Japan] has declined by more than half over the last five years."); Exhibit 8 at 1 (USFS letter) ("Extremely soft Asian markets are the principal reason for [the] lack of interest in our timber offerings.  Demand actually declined about ten percent per month from July to November.").

B.     Forest-wide injunctive relief is necessary and appropriate to remedy the defects in the Tongass Plan.

Defendants have taken the untenable position that relief in these case should be "limited to the specific timber sale projects" named in the complaints in these actions.  Exhibit 40 at 2 (Joint Status Report, *NRDC v. USFS*, No. J03-0029, Feb. 15, 2006, Docket No. 106).  The complaints in the three pending actions collectively raise site-specific challenges to nine timber

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    24

sale projects:  Threemile, Woodpecker (2003), Madan, Finger Mountain, Cholmondeley, Canal Hoya, Sea Level, Chasina, and Crane and Rowan Mountain.  *See* Exhibits 25, 21, & 20 (complaints).  However, they also all challenge the 1997 Tongass Land Management Plan, and it is on these forest-wide claims that they have prevailed, obtaining a ruling that the Plan is invalid.  *See Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797 (9th Cir. 2005).  Plaintiffs challenged the Plan because it, and the errors it incorporated, formed the basis for all Tongass timber sales, by designating where and how logging would be allowed.  As discussed above, the Forest Service is proceeding with timber sales in roadless areas and on Kuiu Island, not only in those nine specifically challenged sales, but throughout the Tongass.  Plaintiffs have an interest in Kuiu Island and in roadless areas throughout the Tongass, as demonstrated in the declarations of their members who use these places.  *See* Exhibits 53-82 (declarations).

Under these circumstances, the only appropriate remedy for the forest-wide, plan-level claims on which Plaintiffs prevailed is a forest-wide, plan-level injunction.  That is what this Court did under similar circumstances in *Sierra Club v. Rey*, No. J00-0009 CV (JKS) (D. Alaska).  *See* Exhibit 12 (injunction order); Exhibit 11 at 4-5 (transcript of proceedings).  Other courts have come to the same conclusion in similar circumstances.  Where conservation groups challenged the 2004 Record of Decision for the Northwest Forest Plan, but did not challenge any specific timber sales, the court nevertheless enjoined timber sales approved under the 2004 ROD.  *Northwest Ecosystem Alliance v. Rey*, No. 04-844P, 2006 WL 44361 at *7 (W.D. Wash. Jan. 9, 2006).  The court specifically rejected an argument from the Forest Service that relief should be available only where the plaintiffs had raised a site-specific challenge.  *Id.* This Court should do the same.

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                   25

C.     <u>Limited exceptions are appropriate.</u>

The proposed order submitted by plaintiffs includes exceptions for the Fusion timber sale and for any timber sales offered under the 1996 Lab Bay timber sale project ROD. Some of the Plaintiffs in this case and other parties have previously entered into consent decrees regarding litigation over those projects, and all Plaintiffs intend to honor those agreements, whether they are party to them or not.

While the *Natural Resources Defense Council* appeal was pending, the parties entered into a time-limited, interim agreement in which, among other things, Plaintiffs would agree not to challenge the Buckdance Madder timber sale if Defendants would cancel the existing contract for the Orion North timber sale. Exhibit 28 (interim settlement). That agreement provided for cancellation of the Orion North contract only within five months of the agreement, *id.* at 3 ¶ 3, which did not occur after no one bid on the Buckdance Madder timber sale. On January 31, 2006, however, the Forest Service successfully reoffered the Buckdance Madder sale. *See* Exhibit 39 (Buckdance Madder advertisement). Although the interim agreement is no longer binding, Plaintiffs have informed Defendants that they are prepared to extend the agreement and withdraw their request for injunctive relief as to the Buckdance Madder sale if Defendants promptly cancel the Orion North contract.

IV.     THE PUBLIC INTEREST FAVORS ENTRY OF THE REQUESTED INJUNCTION.

The relief requested by Plaintiffs is in the public interest, because it will help ensure compliance with the law in a manner that protects the public's interest in the most sensitive areas of the Tongass while also enabling a continuing supply of timber at prevailing levels. "Under Ninth Circuit case law, . . . it is also appropriate to consider the broader public interest in the preservation of the forest and its resources." *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    26

1291, 1308 (9th Cir. 2003) (reversing denial of preliminary injunction for national forest timber sale).  Requiring federal agencies to act in accordance with the law is "a public interest of the highest order."  *Seattle Audubon Soc'y v. Evans*, 771 F. Supp. 1081, 1096 (W.D. Wash.), *aff'd* 952 F.2d 297 (9th Cir. 1991).

The requested injunction will also help avoid waste of public money.  While the Tongass timber sale program has always lost money for taxpayers, the drain on the treasury has become extreme in recent years, as the Forest Service has been preparing and offering so much more timber than the market has been able to absorb.  In FY 2002, for example, the Forest Service lost $35 million of taxpayer money on the Tongass timber sale program.  Exhibit 16 at 6 (2003 subsidy report at 6).  With only 195 direct Tongass timber-related jobs, each job cost the U.S. treasury about $178,000.  *Id.* at 6, 13 Fig. 5.  In FY 2004, the loss to taxpayers grew to $47 million.  *See* Exhibit 30 (Taxpayers for Common Sense).

Much of the loss in recent years is caused by building new roads into roadless areas.  In the past, timber sale contractors were required to pay for the roads themselves.  Since the loss of the Japanese market and the corresponding low prices for wood, however, Tongass timber sales have not been able to generate enough profit to pay for roads.  To compensate, the Forest Service has begun, as a routine practice, to use taxpayer dollars to build the roads for the timber sale contractors.  The cost of the roads normally exceeds the price of the timber, often by a substantial margin.  For example, in the recent Upper Carroll II sale, the Forest Service entered into a road contract, before a timber sale was even offered, at a cost of $1.5 million.  *See* Exhibit 45 (road contract chart).  The subsequent timber sale fetched only $185,000.  *See* Exhibit 42 at 1 (volume under contract).  Thus, taxpayers lost over $1.3 million on the road alone, plus millions on the other normal costs the Forest Service must incur to offer a timber

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    27

sale, such as layout, administration, and preparation of the EIS.  In many of the recent new

timber sales in roadless areas, the Forest Service has contracted to spend more public money to

build the roads than it has received in the price of the associated timber sale contract.  For

example, the Forest Service paid $391,800 for the Lindenberg road, *see* Exhibit 45 (road contract

chart), while the timber sale went for only $267,293.56.  *See* Exhibit 42 at 2 (volume under

contract).  The Skipping Cow road contract cost over $1.1 million, *see* Exhibit 45 (road contract

chart), and there has not yet been a successful bid on the timber sale.  An injunction against

timber sales in roadless areas will avoid this huge cost to taxpayers for future sales.

<u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs request that, as specified in greater detail in the

attached order, the Court:  (1) enjoin the Forest Service from authorizing or implementing further

timber sales or associated road construction in roadless areas of the Tongass and on Kuiu Island;

and (2) vacate site-specific decision documents authorizing timber sales in roadless areas and on

Kuiu Island.

Respectfully submitted this 8th day of March, 2006,

  /s/ Thomas S. Waldo
Thomas S. Waldo (ABA# 9007047)
Eric P. Jorgensen (ABA# 8904010)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
Ph: 907-586-2751
Fax: 907-463-5891
Email: twaldo@earthjustice.org

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    28

Nathaniel S.W. Lawrence
NATURAL RESOURCES DEFENSE COUNCIL
3723 Holiday Drive, SE
Olympia, WA 98501
Ph: 360-534-9900
Fax: 360-534-9909
Email: nlawrence@nrdc.org

*Attorneys for Plaintiffs*

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    29

**CERTIFICATE OF SERVICE**

I, Tom Waldo, certify that on March 8, 2007, a true and correct copy of MOTION FOR
EQUITABLE RELIEF PENDING REVISION OF THE TONGASS LAND MANAGEMENT
PLAN, with accompanying documents, was served electronically to Bruce Landon, Steve Silver,
and Amy Gurton Mead.


  /s/ Thomas S. Waldo
_____

Thomas S. Waldo


Organized Village of Kake, et al. v.
U.S. Forest Service, et al.,
J04-0029 CV (JKS)

## TABLE OF EXHIBITS

Ex. No.      Description

1        1996 TLMP Revised Supplemental Draft Environmental Impact Statement (TLMP RSDEIS) (excerpt)

2        Northwest Baranof Timber Sales Record of Decision, February 1996

3        King George Timber Sale Record of Decision, August 1996

4        Upper Carroll Timber Sale Record of Decision, October 1996

5        South Lindenberg Timber Sale(s) Record of Decision, December 1996

6        Ketchikan Pulp Company and U.S. Forest Service Settlement Agreement, February 21, 1997 (KPC Settlement Agreement)

7        1997 TLMP Final Environmental Impact Statement (TLMP FEIS)

8        Jim Webb, Opinion/Editorial, January 8, 1999

9        Ketchikan Pulp Company Contract Extension, August 6, 1999 (KPC Contract Extension)

10       Grantham, et al., 2001, Kuiu Island Road Analysis (Threemile Road Analysis)

11       Transcript of Hearing re. Plaintiffs' Motion for Clarification, *Sierra Club v. Rey*, No. J00-0009, June 11, 2002 (hearing transcript)

12       Order clarifying injunction, *Sierra Club v. Rey*, No. J00-0009, June 11, 2002

13       Extension of Certain Alaska Timber Sale Contracts, 67 Fed. Reg. 51,165, 51,166-67, August 7, 2002

14       2003 Wilderness Final Supplemental Environmental Impact Statement (Wilderness SEIS) (excerpt)

15       U.S. Forest Service Briefing Paper, July 2003 (USFS briefing paper)

16       SEACC, 2003, "Taxpayer Losses and Missed Opportunities: How Logging and Road Building in the Tongass National Forest Costs Taxpayers Millions" (SEACC Subsidy Report)

17       "Coast Guard quits search for Kake teen," Juneau Empire, January 4, 2004

18      "Kake grieves as search continues," Juneau Empire, January 7, 2004

19      "USDA Forest Service offers timber sale contract cancellations to Southeast lumber
        companies," January 9, 2004 (USFS News Release)

20      First Amended Complaint, *NRDC v. USFS*, No. J03-0029, January 21, 2004

21      Complaint, *NRDC v. USFS*, No. J04-0010, March 23, 2004

22      Threemile Timber Harvest Final Environmental Impact Statement, April 2004
        (Threemile FEIS) (excerpt)

23      Threemile Timber Harvest Record of Decision, April 2004 (ROD)

24      Order, *NRDC v. USFS*, No. 04-35868, October 18, 2004

25      Complaint, *Organized Village of Kake v. USFS*, No. J04-0029, November 4, 2004

26      Timber Sale Cancellations as of 11/30/04

27      Answer, *Organized Village of Kake v. USFS*, No. J04-0029, January 12, 2005

28      Interim Settlement Agreement, *NRDC v. USFS*, No. J03-0029, April 7, 2005

29      Tongass Logging History Graphs

30      Taxpayers for Common Sense, "The Tongass Timber Program: A Case Study in Bad
        Business," 2005

31      Lindenberg Bid Notice, 9/29/05

32      Skipping Cow Bid Notice, 9/29/05

33      Upper Carroll II Bid Notice, 9/30/05

34      FY 2006 5 Year Timber Sale Plan, November 10, 2005

35      Emerald Bay Timber Sale Record of Decision, November 2005 (Emerald Bay ROD)

36      U.S. Forest Service, Study Plan for Adjustment and Update of the Tongass Forest
        Plan, December 7, 2005

37      Order Approving Joint Status Report, *NRDC v. USFS*, No. J03-0029, December 29,
        2005, Docket No. 93

38     Kuiu Timber Sale Area Draft Environmental Impact Statement, January 2006 (Kuiu DEIS) (excerpt)

39     Buckdance Madder Reoffer Bid Notice, 1/31/06

40     Joint Status Report, *NRDC v. USFS*, No. J03-0029, February 15, 2006, Docket No. 106

41     Order Approving Joint Status Report, *NRDC v. USFS*, No. J03-0029, February 17, 2006, Docket No. 107

42     Volume Under Contract, 2/16/06

43     Red Mountain Bid Notice, 2/18/06

44     Emerald Bay Appeal Decision, February 21, 2006

45     Road Contract Chart, 3/7/06

46     Declaration of Nicholas C. Davis

47     Declaration of Robert E. Lindekugel

48     Declaration of Johanna Wald

49     Declaration of Mark Rorick

50     Declaration of Eleanor Huffines

51     Declaration of Keri Dixon

52     Declaration of Stanley Senner

53     Declaration of Bonnie Oaksmith

54     Declaration of Dale Philman

55     Declaration of Joan McBeen

56     Declaration of John Erickson

57     Declaration of Kurt Wohlhueter

58     Declaration of Larry Edwards

59     Declaration of Margaret Clabby

60      Declaration of Nancy Behenke

61      Declaration of Pete Smith

62      Declaration of Peter Branson

63      Declaration of Stephen Todd

64      Declaration of Therese Tavel and Karen Walter

65      Declaration of Wayne Weihing

66      Declaration of Martha Smith

67      Declaration of Melissa Crawford

68      Declaration of David Beebe

69      Declaration of Eric Lee

70      Declaration of Marcel LaPerriere

71      Declaration of Mike Sallee

72      Declaration of Evening Star Grutter

73      Declaration of Jacquelyne Hunley

74      Declaration of Robert Hunley

75      Declaration of Irene Alexakos

76      Declaration of Cornell Bean

77      Declaration of Henry Smith

78      Declaration of Ken Jackson, Sr.

79      Declaration of Lloyd Davis

80      Declaration of Manuel Acevida

81      Declaration of Michael Jackson

82      Declaration of Mark Galla