### Alternatives Eliminated from Detailed Study

Three alternatives were considered during the early stages of the alternative development process that were subsequently eliminated from detailed study. These alternatives are described below:

**Road to Rodman Bay** - The original proposed action for the Northwest Baranof Project included construction of approximately 80 miles of road, which would have been interconnected between Nakwasina Passage and Rodman Bay. In addition to providing transportation for timber, the road would have provided portions of a road system extending from Sitka to Rodman Bay. Consideration of this interconnected route was dropped after initial analysis due to a number of factors including the shift to smaller independent timber sales, the high cost of the many road connections, and the lack of public support for an interconnected route. In addition, no harvest is planned in the Fish Bay Creek watershed in any alternative considered in detail, further reducing the need for an interconnected road system.

**Harvest in Fish Bay and along Deadman Reach** - The Alaska Region released a draft Environmental Assessment that proposed interim guidelines for maintaining viable wildlife populations. One component of this proposal was to establish a network of Habitat Conservation Areas (HCAs) across the Tongass. Two of the mapped areas lie within the Northwest Baranof Project Area. As a result, I have decided to defer consideration of timber harvest in the Fish Bay drainage and along Deadman Reach as a part of this project to allow more time for consideration of the HCA option. Therefore, no alternative was considered in detail that included harvest in these two areas.

**VCUs 310, 312, and 313** - These VCUs at the south end of the Project Area (nearest to Sitka) were dropped from consideration after initial field reviews. These field reviews determined that the suitable timber within the three VCUs was not economically accessible, nor found in sufficient quantity to justify harvest at this time.

### Environmentally Preferred Alternative

There is no single factor that can be used to determine which alternative is environmentally preferred. Maintaining the basic productivity of the land and the quality of lifestyle of the local residents are vitally important.

Based on the comparison of the alternatives shown in Table 2 and as displayed in Chapters 2 and 4 of the Final EIS, Alternative 5, the "No Action" alternative, would cause the least environmental disturbance. Among the action alternatives, Alternative 3 is the environmentally preferred alternative. This alternative has the second lowest level of acres proposed for harvest, has the fewest miles of road construction and associated stream crossings, avoids important subsistence use areas close to Sitka, and maintains the current scenic quality south of Fish Bay.

The Selected Alternative is more environmentally preferred than Alternatives 1, 2, and 4 because of modifications incorporated in response to comments on the Draft EIS which mitigate potentially adverse environmental effects. Only two sale areas are planned south of Fish Bay and those two areas are located and designed to minimize impacts on subsistence and scenic resources. Only one new LTF site is planned. Furthermore, specific harvest units have been dropped and two units have been changed to group selection to provide additional protection to wildlife, subsistence, and scenic resources. The Selected Alternative was chosen over Alternative 3 because it provides additional timber volume

in areas previously harvested, and provides opportunity for small timber sales close to Sitka.

## Mitigation

Applicable standards and guidelines of the Tongass Land Management Plan of 1979 (as amended), the Alaska Regional Guide, and applicable Forest Service Manuals and Handbooks will minimize or negate many potentially adverse environmental effects from timber harvest and road construction. We protect water quality and fisheries habitat through the application of Best Management Practices (BMPs) stated in the Soil and Water Conservation Handbook (FSH 2509.22) and the direction contained in the Aquatic Habitat Management Handbook (FSH 2609.24). In addition, the Tongass Timber Reform Act (TTRA) requires a minimum 100-foot buffer for all Class I streams and Class II streams directly flowing into Class I streams. The buffers and other stream protection measures adopted in this decision equal or exceed Tongass Timber Reform Act requirements.

Measures were applied in the development of the project alternatives, including the Selected Alternative, and in the location of the harvest units and road corridors to avoid, reduce, minimize or eliminate the adverse affects of timber harvest related actions. The Mitigation Measures section of Chapter 2 and Appendix A of the Final EIS discuss those measures common to all action alternatives including the Selected Alternative. Mitigation measures adopted include all practicable means to avoid or minimize the environmental harm from the proposed actions (40 CFR 1505.2(b)). The Final EIS includes Unit Cards (Appendix N) and Road Cards (Appendix O) which incorporate site-specific mitigation. A more detailed description of the Selected Alternative mitigation is included below. Appendix A of the Final EIS gives specific mitigation measures applicable to the Selected Alternative.

Mitigation measures and BMPs designed to protect water quality and fisheries habitat will likewise reduce impacts on forest soils. Soils with an extreme mass-wasting hazard have been avoided in the design of harvest units. Partial or full suspension of logs during yarding will be required in areas of units with high hazard soils. Trees will be felled away from v-notches and split yarding of v-notches will be required. Throughout the planning process, a number of units and parts of units have been dropped in order to reduce impacts on forest soils. Past experience indicates these measures are effective. In all harvest units, there will be reserve areas in which 5 - 80 percent of the existing volume will not be harvested. In areas where wind may cause blowdown, timber harvesting will be done in such a way that the edge of remaining timber stands are feathered, reducing the risk of blowdown and resulting impacts on soils, particularly in adjacent stands. Group selection, overstory removal, and feathering have not been widely used in Southeast Alaska, but the location of the harvest units, both topographically and in relation to adjacent stands, the harvest method and logging system, and the recommendations in the unit cards should minimize the adverse effects on soils.

Ten units in the Project Area have been identified for uneven-aged management by the group selection harvest method. In this method, approximately 20% of each unit would be harvested in 0.5 to 2.0 acre groups. The primary reasons for proposing group selection rather than clearcutting were to reduce the visual impact as viewed from boats outside the Project Area and to reduce the loss of old-growth wildlife habitat and travel corridors. Harvest will be by helicopter, reducing associated impacts of road building on visual and

other resources. Openings will be located and shaped so as to minimize their visibility. These units will be managed on a 160- to 200-year rotation. The extended rotations are consistent with the direction in the 1985-86 Amendment to TLMP for Visual Management Class I in LUD III and IV. Further measures to decrease impacts to the visual and recreation resources include dropping highly visible units, and feathering the boundaries of some of the other visible units. See unit cards in Final EIS (Appendix N) and ROD Appendix B for a more detailed description.

To avoid adverse effects on wildlife habitat values, units were located outside of the beach and estuary fringe habitats, thereby reducing the potential to adversely impact high value habitats. Maintaining travel corridors for wildlife and retention of snags in harvest units (where safe to do so) are measures individually identified on the road or unit cards in the Final EIS Appendix N and ROD Appendix B which minimize adverse effects to wildlife. In addition, approximately 30 miles of road are to be closed following the completion of sale activities. Drainage structures may be removed, if necessary, for long-term resource protection. Erosion control measures (waterbars, grass seeding) will also be performed. Avoiding timber harvest at this time in the watersheds of Nakwasina River, Noxon Creek, Fish Bay, and Deadman Reach will retain the acres of old-growth habitat and consequently buffer effects on wildlife habitat.

## Monitoring

Monitoring is the process by which the Forest Service evaluates if a project has been implemented as specified, if environmental mitigation measures were effective, and if resource management assumptions are valid. Three types of monitoring are recognized. The first two, implementation monitoring and effectiveness monitoring, are feasible at the project level. The third, validation monitoring, is conducted at the Forest wide level.

Applicable monitoring requirements for all action alternatives including the Selected Alternative are specified in Appendix A of the Final EIS. For each monitoring item, we identified an objective, desired result, method of measurement, threshold and corrective action, along with the responsible staff. Monitoring activities may reveal results that deviate from planned effects, in which case corrective actions are prescribed (40 CFR 1505.2(c)).

The Sitka District Ranger is responsible for ensuring that project implementation, mitigation, monitoring and enforcement are accomplished as specified.

## Enhancement Opportunities

The Knutson-Vandenberg Act (1930), as amended by the NFMA of 1976, allows the Forest Service to collect receipts from timber sales for Sale Area Improvement (SAI) projects. Top priority for these funds is to ensure stand regeneration. The Sitka District Ranger will prioritize subsequent projects, such as precommercial thinning, fisheries enhancement, and soil stabilization, and list them on the SAI plan. If funding for resource enhancement projects is not available from K-V receipts, these projects could be added to the regular program budget. The Sitka Ranger District will develop the SAI plan during final timber sale preparation. Specific enhancement opportunities identified for the Selected Alternative are listed in Appendix A of the Final EIS.

# Findings Required by Law

National Forest Management Act

The National Forest Management Act (NFMA) requires specific determinations in this Record of Decision including consistency with the existing Forest Plan and Regional Guide. It also requires a determination of clearcutting as the optimal method of harvesting and specific authorization of clearcuts over 100 acres.

**Tongass Land Management Plan and Alaska Regional Guide.** This decision is consistent with the Alaska Regional Guide and the Tongass Land Management Plan of 1979, as amended. I have reviewed the management direction and the schedule of activities for the VCUs included in the Selected Alternative, and find the Selected Alternative to be consistent with these elements. The areas of undisturbed old-growth wildlife habitat maintained in this alternative exceed the standards for retention established in TLMP.

Although not required, the activities authorized in this decision are consistent to the extent practicable with the proposed standards and guidelines and management prescriptions of the proposed Forest Plan Revision.

**Clearcutting as the Optimal Method of Harvesting.** The Alaska Regional Guide established management direction and standards for western hemlock - Sitka spruce forest type (Alaska Regional Guide, page 3-18). The Guide states that even-aged management in the form of clearcutting will be used only where this practice is determined to be optimum to meet the objectives and requirements of the Forest Plan, where there is a high risk of dwarf mistletoe reinfection, and where risk of windthrow is determined to be high. Dwarf mistletoe is somewhat of a problem in specific areas within the Northwest Baranof Project Area. All of the harvest units being proposed for clearcut with reserves as a harvest method in the Selected Alternative have either a high level of mistletoe infection or a high risk of windthrow. Clearcutting of the proposed harvest units will help meet the objective of maintaining fast-growing, mistletoe-free stands of mixed species and is the optimum method of harvesting, considering the following factors referenced in the Alaska Regional Guide:

- Hemlock dwarf mistletoe, *Arcenthobium tsugense*, an important parasite of western hemlock can best be controlled by clearcutting. Elimination of residual overstory trees infected with dwarf mistletoe prevents infection of western hemlock in the new stand.
- Risk of blowdown in residual stands is eliminated. The chance of blowdown along cutting boundaries is increased but can be reduced through proper design of cutting units.

In addition to the direction in the Alaska Regional Guide, the Chief of the Forest Service established new provisions in June 1992 for the reduction of clearcutting on National Forest System Lands. They stated that clearcutting is to be limited to areas that involve one of seven specific circumstances. The clearcuts prescribed in the Northwest Baranof Project Area meet the following circumstance as specified in that direction:

**Record of Decision**

"To preclude or minimize the occurrence of potentially adverse impacts or insect or disease infestations, windthrow, logging damage, or other factors affecting forest health."

**Clearcuts Over 100 Acres in Size.** In the Selected Alternative there are two combinations of units that, when harvested, will produce openings greater than 100 acres. Units 3301, 3302, 3303, and 3304 together make up 121 acres that are proposed for a seed tree harvest. Units 3311, 3312, 3313, and 3314 total 123 acres, all of which would be clearcut with reserves, except the 33 acres in unit 3314. Unit 3314 is proposed as a seed tree cut. For purposes of opening size, seed tree and clearcut with reserves harvest methods are treated as clearcuts. These two additional openings would be created due to transportation and harvest system requirements; relative cost of preparation, logging, and administration of harvest. These units were clearly displayed for comment during the 59-day review of the Draft EIS. This 59-day public comment period meets the requirements of the Alaska Regional Guide for approval of units over 100 acres. Based on public review and the reasons listed for the openings greater than 100 acres above, these units are authorized for harvest as designed.

**Tongass Timber Reform Act**

Harvest units were designed and will be located to maintain a minimum 100-foot buffer zone for all Class I streams and Class II streams that flow directly into Class I streams as required in Section 103 of the TTRA. The actual widths of these buffer strips will often be greater than the 100-foot minimum. The design and implementation direction for the Selected Alternative incorporates BMPs for protection of all stream classes.

As directed by Section 301 of the TTRA, the Northwest Baranof Project was planned, management requirements were applied, and environmental analysis procedures were followed consistent with procedures for independent National Forest timber sales. Section 301(c)(2) of the TTRA modified the Alaska Pulp Corporation (APC) and Ketchikan Pulp Company contracts to require proportional harvest of Volume Classes 6 and 7 timber. The statute does not impose proportional harvest as a requirement on independent sales. The termination of the APC long-term contract eliminates proportional harvest as an applicable statutory requirement for the Selected Alternative given that Northwest Baranof will be implemented through independent timber sale contracts.

However, analysis of proportional harvest of Volume Classes 6 and 7 was performed using the procedures in Forest Service Sale Preparation Handbook 2409.18, Region 10 Supplement No. 2409.18-93-3 for the Selected Alternative. It was determined that upon completion of the Selected Alternative's harvest, proportionality consistent with FSH 2409.18 direction for Management Areas C40 and C41 will result. Tables 4 through 6 display the current land base distribution of volume classes and the proportionality projections for the Selected Alternative based on USFS handbook direction. Forest Service methodology used to implement section 301(c)(2) has been challenged in court, in *Wildlife Society et al. v. Barton*, J93-001 CIV (D. Alaska). An alternative methodology is being evaluated but is not available at this time.

Record of Decision

Table 4
**ROD Harvest Acres by Volume Class by VCU**

| Management Area | VCU | Volume Class 4 | Volume Class 5 | Volume Class 6 | Volume Class 7 | Total VC 4&5 C40 | Total VC 6&7 C40 | Total VC 4&5 C41 | Total VC 6&7 C41 |
|---|---|---|---|---|---|---|---|---|---|
| C40 | 287 | 26 | 46 | 0 | 0 | 72 | 0 | | |
| C40 | 288 | 240 | 63 | 0 | 0 | 303 | 0 | | |
| C40 | 289 | 86 | 0 | 0 | 0 | 86 | 0 | | |
| C41 | 291 | 104 | 326 | 3 | 0 | | | 430 | 3 |
| C41 | 292/293 | 537 | 652 | 5 | 0 | | | 1189 | 5 |
| C40 | 299 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| C40 | 300 | 131 | 0 | 0 | 0 | 131 | 0 | | |
| C40 | 301 | 131 | 102 | 0 | 0 | 233 | 0 | | |
| C40 | 302 | 216 | 56 | 0 | 0 | 272 | 0 | | |
| Total | | 1,471 | 1,245 | 8 | 0 | 1,097 | 0 | 1,619 | 8 |

Table 5
**Proportionality C40**

| | Total Timber Base | Volume Class 4 & 5 | Volume Class 6 & 7 | Proportional Percent |
|---|---|---|---|---|
| Base | 52,331 | 51,867 | 464 | 0.89 |
| ROD Harvest | 1,097 | 1,097 | 0 | |
| Proportion | 51,234 | 50,770 | 464 | 0.91 |

Table 6
**Proportionality C41**

| | Total Timber Base | Volume Class 4 & 5 | Volume Class 6 & 7 | Proportional Percent |
|---|---|---|---|---|
| Base | 27,653 | 26,945 | 708 | 2.56 |
| ROD Harvest | 1,627 | 1,619 | 8 | |
| Proportion | 26,026 | 25,326 | 700 | 2.69 |

### Endangered Species Act

The Selected Alternative will not have a direct, indirect, or cumulative effect on any threatened, or endangered species in the Northwest Baranof Project Area. A biological assessment and evaluation are included in Appendix B of the Final EIS. I have determined that this action will not have any adverse impacts on any threatened or endangered species.

### Bald Eagle Protection Act

Management activities inconsistent with current bald eagle use within 330 feet of an eagle nest tree are restricted by an Interagency Agreement between the Forest Service and the U. S. Fish and Wildlife Service to facilitate compliance with the Bald Eagle Protection Act. Four variances from the Interagency Agreement must be obtained for implementation of the Selected Alternative for reconstruction of roads within 330 feet of known eagle nest trees. A variance must also be issued for conducting helicopter operations within 1/4 mile of eagle nests.

### Clean Water Act

The location of harvest units and roads for the Selected Alternative was guided by standards, guidelines, and direction contained in the current TLMP, the proposed TLMP Revision, the Alaska Regional Guide, and applicable Forest Service manuals and handbooks. The unit cards and road cards (Appendices N and O in the Final EIS and ROD Appendix B) contain specific details on practices prescribed to prevent or reduce non-point sediment sources. Implementation with site specific application and monitoring of approved BMPs will comply with applicable State Water Quality Standards Regulations. These regulations provide for variances from antidegradation requirements and water quality criteria. The harvest and road building operators will be responsible for compliance, including obtaining any variance required by the State, and will be monitored for compliance by the Forest Service. The Forest Service expects the Northwest Baranof Project activities to fully qualify for any variance required by the State, according to the criteria in 18 AAC 70.015.

A monitoring plan to detect and evaluate possible effects of bark accumulations, oil sheens, and surface runoff will be implemented as a part of the permitting process for log transfer facilities (BMP 14.4, FSH 2509.22).

### National Historic Preservation Act

Heritage resource surveys have been completed in the Project Area. We have consulted the Sitka Tribe of Alaska and the State Historic Preservation Officer, and have complied with the provisions of 36 CFR part 800. The State Historic Preservation Officer has concurred with our finding that proposed units, roads, and LTFs displayed in the four action alternatives, with some specific stipulations, have no effect on cultural resources. Based on surveys conducted by professional archaeologists in the Project Area, I have determined there will be no significant effects on cultural resources. We have completed the Section 106 review for all timber harvest related activities displayed in the Final Environmental Impact Statement. This includes roads, units, and LTFs in all alternatives. The Forest Service timber sale contract contains enforceable measures for protecting any undiscovered cultural resource that might be encountered during sale operations.

### Federal Cave Resource Protection Act of 1988

The actions in the Selected Alternative will not have a direct, indirect, or cumulative effect on any significant cave in the Northwest Baranof Project Area. No cave resources have been documented in the Project Area and no caves were discovered during field work done for this analysis (Final EIS, Chapter 3).

### ANILCA Section 810 Subsistence Evaluation and Findings

A subsistence evaluation was conducted for the five alternatives considered in detail in accordance with ANILCA Section 810. Two open house meetings followed by ANILCA Section 810 hearings were held in Sitka on September 11 and September 27, 1995. During the hearings, subsistence concerns were expressed by people giving testimony.

The evaluation of comments from the public, subsistence hearing testimony, and additional analysis, indicates that the potential foreseeable effects from the action alternatives in the Northwest Baranof Project Area do not indicate a significant possibility of a significant restriction of subsistence uses for brown bear, furbearers, marine mammals, waterfowl, salmon, other finfish, shellfish, and other foods such as berries and roots.

The analysis does conclude that there is a significant possibility of a significant restriction on subsistence use of Sitka black-tailed deer in the Project Area for the community of Sitka. Implementation of the Selected Alternative by itself does not present a significant possibility of a significant restriction to subsistence use of deer. The effects of the Selected Alternative on the subsistence use of deer are minimal, with a reduction in deer habitat capability in the future of less than 2 percent. However, there is a significant possibility of a significant restriction when the Selected Alternative together with other past, present, and reasonably foreseeable actions are considered in a cumulative manner. This restriction exists regardless of which alternative is implemented, including the No Action Alternative. This restriction would be a result of (1) a decrease in habitat capability that could decrease the abundance or distribution of deer, (2) high deer mortality during severe winters that occur periodically, (3) average yearly deer harvest levels exceeding what appears to be sustainable harvest levels, and (4) anticipated human population growth with its associated increase in subsistence hunter demand when compared to the habitat capability to produce deer.

**Subsistence Determinations**
Section 810 of ANILCA requires that when a use, occupancy, or disposition of public lands would significantly restrict subsistence uses, determinations must be made that (1) the significant restriction of subsistence uses is necessary, consistent with sound management of public lands, (2) the proposed activity involves the minimum amount of public lands necessary, and (3) reasonable steps will be taken to minimize adverse impacts on subsistence uses and subsistence resources resulting from the action.

**Necessary, Consistent with Sound Management of Public Land**
The Selected Alternative has been examined to determine whether the associated potential restriction to subsistence use is necessary, consistent with the sound management of public lands. Standards used for the review included (1) the Multiple Use Sustained Yield Act of 1960; (2) the National Forest Management Act (NFMA) of 1976 and its implementing regulations; (3) the Alaska National Interest Lands Conservation Act (ANILCA) of 1980; (4) the Alaska Regional Guide (1983); (5) the Tongass Land

Management Plan of 1979 (as amended) and the draft revision; (6) the Tongass Timber Reform Act (TTRA) of 1990; (7) the Alaska State Forest Practices Act; (8) the Alaska Coastal Zone Management Program; (9) Subsistence Management and Use Handbook (1985); and (10) Subsistence Evaluation and Finding (FSH 2609.25).

ANILCA placed an emphasis on the maintenance of subsistence resources and lifestyles. However, the Act also provided for adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people, and recognized public lands necessary and appropriate for more intensive uses. The Act also required the Forest Service to make available for harvest 4.5 billion board feet of timber per decade from the Tongass National Forest. The TTRA removed the 4.5 billion board foot requirement from ANILCA, but directed the Forest Service to seek to meet market demand for timber to the extent consistent with providing for the multiple use and sustained yield of all renewable forest resources, and subject to applicable law.

The Selected Alternative is necessary as a component of the timber management program designed to implement the Forest Plan and to meet TTRA direction. There is currently a very strong market demand for timber, a limited timber supply from other sources, and an underutilized mill capacity in the region. The Selected Alternative provides the most volume to contribute to the Forest Service's actions to seek to meet market demand while providing for other resources and uses. Current timber market analysis indicates that the timber demand exceeds the timber supply. The timber volume provided by the Selected Alternative will best help to bridge that gap. This volume is provided as a component of the ten year timber sale schedule which attempts to provide timber to industry in an even flow over the planning cycle. The timber volume is also a substantial component of the timber sale program to be offered in the next five years on the Chatham Area to meet annual market demand. Timber volume from other areas of the Tongass National Forest is not available to replace this volume in a reasonable time frame.

Of the action alternatives, the Selected Alternative best meets the objectives of the Forest Plan and TTRA direction for timber harvests while also providing protection measures for forest resources. It is consistent with the Forest Plan, laws, regulations, policies, public needs, and the capabilities of the land.

Based on a review of the subsistence hearing testimony and the analysis conducted in the Final EIS, it is apparent that all of the action alternatives involve some potential impact to subsistence deer use in the future. There is no alternative that would meet TLMP objectives and yet avoid a significant possibility of a subsistence restriction somewhere in the National Forest. Therefore, based on the analysis of the information presented in the Final EIS and this ROD, it is my determination that the Selected Alternative is necessary, consistent with sound management of public lands and strikes the best balance between meeting the needs of the public and protecting forest resources.

**Amount of Land Necessary to Accomplish the Purpose of the Proposed Action**
The amount of public land involved to implement the Selected Alternative is (considering sound multiple-use management of public lands) the minimum necessary. The Northwest Baranof Project Area was selected to become part of the timber sale schedule because it is designated as a multiple use area that permits timber harvest in the Forest Plan. The TLMP assigned a land use designation (LUD) of IV to approximately 38 percent of the Northwest Baranof Project Area. This designation provides for intensive resource use and development with an emphasis on commodity resources such as timber. The TLMP assigned LUD III to the other 62 percent of the Project Area. LUD III provides for a

variety of uses, including timber production. In addition, the TLMP scheduled timber sale preparation for all Management Areas in the Project Area.

The Project Area is located in an area that has been harvested many times since the arrival of the Russians over 200 years ago. The Selected Alternative has 5 proposed sale areas, four of which are located in areas logged in the past 30 years. These four also utilize the existing LTF sites. The Selected Alternative also provides a sound location and design for all harvest units and roads. The minimum amount of land and roading was used to resolve resource concerns while meeting the purpose and need for the project in a practical and efficient manner. The Selected Alternative harvests less than 6 percent of the inventoried old-growth forest within the Project Area and less that 2.4 percent of the commercial forest land. Resources were protected to the maximum extent practicable.

Choosing an alternative other than the Selected Alternative (including the No Action Alternative) or locating the harvest in another location on the Chatham Area would not avoid or substantially lessen the risk to subsistence use in the future. The total deer habitat capability projected into the future is only expected to be reduced by less than 2 percent by harvest from the Selected Alternative when compared to the No Action Alternative. The risk to subsistence use in the future is primarily a result of (1) a decrease in habitat capability that could decrease the abundance or distribution of deer, (2) average yearly deer harvest levels exceeding what appears to be sustainable harvest levels, and (3) anticipated human population growth with its associated increase in subsistence hunter demand when compared to the habitat capability to produce deer. These effects are independent of the Northwest Baranof Project.

The entire Tongass National Forest is used by one or more rural communities for subsistence purposes for deer hunting (TRUCS, Forest Service 1990b). The areas of most subsistence use are the areas adjacent to existing road systems, beaches, and the areas in close proximity to the communities. Much effort was taken to protect the highest value subsistence areas. For example, beach fringe is one of the most highly used subsistence areas and there is no timber harvest planned in the beach fringe by the Selected Alternative.

Management activities can not completely avoid these subsistence areas due to their location and broad extent across the Forest. Areas other than subsistence use areas that could be harvested may be limited by other resource concerns such as soil and water protection, high-value wildlife habitat, economics, scenic quality, or unit and road design. The impact of viable timber harvest projects always includes the alteration of old-growth habitat which reduces habitat capability for old-growth dependent species.

It is not possible to lessen harvest in one area and concentrate it in another without impacting one or more rural communities' important subsistence use areas. In addition, harvestable populations of game species could not be maintained in a natural distribution across the Forest if harvest was concentrated in specific areas. A well-distributed population of species is also required by the Forest Service regulations implementing the NFMA.

Therefore; it is my determination that the Selected Alternative involves the minimum amount of public land necessary and strikes the best balance between meeting the needs of the public and protecting the forest resources.

**Reasonable Steps to Minimize Adverse Impacts Upon Subsistence Uses and Resources**

Considerable steps were taken to minimize the impacts to subsistence use and resources. The Selected Alternative reflects special efforts by the Forest Service to minimize the effects on resources used for subsistence by those rural communities that would be most likely to receive the highest priority in the event of an ANILCA section 804 "Tier II" restriction. Considerable effort was taken during the Northwest Baranof analysis to protect the highest value subsistence areas for deer. Most areas of high value and historic subsistence use were avoided in the Selected Alterative. No units were placed within the beach fringe or stream buffers which are the areas of traditional use. The affect of the Selected Alternative on subsistence use of deer by the community of Sitka is minimal. The Selected Alternative projects a reduction in deer habitat capability in the future of less than 2 percent.

Another significant subsistence resource in the Project Area is salmon. Fish habitat is protected in the Selected Alternative through the application of the BMPs and stream buffers. In addition to protecting fish habitat these buffers also protect estuarine and riparian habitat important to other species such as deer, bear, and furbearers.

The Selected Alternative reflects a reasonable balance between projected need for Tongass timber from the Project Area to help meet TLMP, ANILCA, and TTRA timber-related employment objectives, and continued protection of subsistence uses and resources. Impacts on subsistence have been minimized through the development of the individual harvest units and road corridors, and through the formulation of the alternatives.

The Final EIS and this ROD describe the mitigation measures that will be implemented as a part of the Selected Alternative. Most of the mitigation measures are designed to maintain fish and wildlife habitat productivity at the highest level possible, while still maintaining a supply of timber.

A significant possibility of a significant restriction on the subsistence use of Sitka black-tailed deer in the Project Area is expected when the Selected Alternative together with other past, present, and reasonably foreseeable actions are considered in a cumulative manner. This restriction would be a result of (1) a decrease in habitat capability that could decrease the abundance or distribution of deer, (2) high deer mortality during severe winters that occur periodically, (3) average yearly deer harvest levels exceeding what appears to be sustainable harvest levels, and (4) anticipated human population growth with its associated increase in subsistence hunter demand when compared to the habitat capability to produce deer.

It is my determination that reasonable measures to minimize impacts on subsistence have been adopted to the maximum extent practicable while still meeting the purpose and need for this project.

**Executive Orders 11988 and 11990**

Executive Order 11988 directs Federal agencies to take action to avoid, to the extent possible, the long and short-term adverse impacts associated with the occupancy and modification of floodplains. The numerous streams in the Northwest Baranof Project Area makes it impossible to avoid all floodplains during timber harvest and road construction. The design of the Selected Alternative and the application of Best Management Practices combine to minimize adverse impacts on floodplains.

Executive Order 11990 requires Federal agencies to avoid to the extent possible the long and short-term adverse impacts associated with the destruction or modification of wetlands. The Selected Alternative avoids most identified wetlands, however many small wetlands or muskegs occur as inclusions within forested areas. These areas may be altered by timber harvest or road construction, however techniques and practices required by the Forest Service serve to maintain the wetland attributes. It is estimated there will be no net loss of wetlands with any of the alternatives. Soil moisture regimes and vegetation on some wetlands may be altered in some cases; however, these altered acres would still be classified as wetlands and function as wetlands in the ecosystem.

**Coastal Zone Management Act**

The Coastal Zone Management Act of 1976 (as amended) excludes Federal lands from the coastal zone. However, the act requires that when Federal agencies conduct activity or undertake development affecting the coastal zone, they be consistent to the maximum extent practicable with enforceable policies of the approved Alaska Coastal Management Program.

The Alaska Coastal Management Plan incorporated the Alaska Forest Resources and Practices Act of 1979 (as revised) as the applied standards and guidelines for timber harvesting and processing. The Forest Service standards and guidelines, BMPs, and mitigation measures described in Appendix A of the Final EIS are fully consistent with the State Standards.

Based on the analysis in the Final EIS, review of the Alaska Forest Practices Act, and comments from the City of Sitka and State agencies on the Draft EIS, the action and activities are consistent to the maximum extend practicable with the enforceable policies of the Alaska Coastal Management Plan.

**Federal and State Permits**

Federal and State permits necessary to implement the authorized activities are listed at the end of Chapter 1 of the Final EIS.



## Implementation

Implementation of the decisions made by the Chatham Area Forest Supervisor, which are subject to appeal pursuant to 36 CFR Part 215, may occur on, but not before, 5 business days from the close of the appeal filing period. The appeal filing period closes 45 days after publication of legal notice of this decision in the *Daily Sitka Sentinel* newspaper, published in Sitka, Alaska.

This project will be implemented in two or more timber sales in accordance with Forest Service Manual and Handbook direction for Timber Sale Project Implementation in FSM 2432.3 Gate 3 and FSH 2409.18 Sale Prep. This direction provides a bridge between project planning and implementation, and will ensure execution of the actions, environmental standards, and mitigation approved by this decision, and compliance with TTRA and other laws.

Implementation of all activities authorized by this Record of Decision will be monitored to ensure that they are carried out as planned and described in the Final EIS, ROD, and planned unit and road cards, unless they are modified consistent with direction in FSM 2432.3 and FSH 2409.18.

Final EIS and ROD Appendices contain the planned unit and road cards. These cards are an integral part of this decision because they document the specific resource concerns, management objectives, and mitigation measures to govern the layout of the harvest units and construction of roads. These cards will be used during the implementation process to ensure that all aspects of the project are implemented within applicable standards and guidelines and that resource impacts will not be greater than those described in the EIS. Similar cards will be used to document any changes to the planned layout as the actual layout and harvest of the units occurs with project implementation. The implementation record for this project will display each harvest unit, transportation facility, and other project components as actually implemented, any proposed changes to the design, location, standards, and guidelines, or other mitigation measures for the project, and the decisions on the proposed changes.

Proposed changes to the authorized project actions will be subject to the requirements of the National Environmental Policy Act (NEPA), the National Forest Management Act of 1976 (NFMA), Section 810 of the Alaska National Interest Lands Conservation Act (ANILCA), the Tongass Timber Reform Act (TTRA), the Coastal Zone Management Act (CZMA), and other laws concerning such changes.

In determining whether and what kind of NEPA action is required, I will consider the criteria for whether to supplement an existing EIS in 40 CFR 1502.9(c) and FSH 1909.15, sec. 18, and in particular, whether the proposed change is a substantial change to the Selected Alternative as planned and already approved, and whether the change is relevant to environmental concerns. Connected or interrelated proposed changes regarding particular areas or specific activities will be considered together in making this determination. The cumulative impacts of these changes will also be considered.

The intent of field verification that occurs during planning is to confirm inventory data and to determine the feasibility and general design and location of a unit or road, not to locate the final boundaries or road locations. Minor changes are expected during implementation to better meet on-site resource management and protection objectives. Minor adjustments to unit boundaries are also likely during final layout for the purpose

of improving logging system efficiency. This will usually entail adjusting the boundary to coincide with logical logging setting boundaries. Many of these minor changes will not present sufficient potential impacts to require any specific documentation or action to comply with applicable laws. Some minor changes may still require appropriate analysis and documentation to comply with FSH 1909.15, sec. 18.

# Right to Appeal

This decision is subject to administrative review (appeal) pursuant to 36 CFR Part 215. A written notice of appeal must be filed with the Appeal Deciding Officer:

>   Phil Janik
>   Regional Forester
>   USDA Forest Service, Region 10
>   P.O. Box 021628
>   Juneau, AK 99802-1628

The Notice of Appeal must be filed within 45 days of publication of notice of this decision in the *Daily Sitka Sentinel*.

In accordance with 36 CFR Section 215.14, it is the responsibility of those who appeal a decision to provide the Appeal Deciding Officer sufficient evidence and rationale to show why the Responsible Official's decision should be remanded or reversed. The written notice of appeal filed must meet the following requirements:
1. State that the document is a Notice of Appeal filed pursuant to 36 CFR Part 215;
2. List the name, address, and telephone number of appellant;
3. Identify the decision document by title and subject, date of the decision, and name and title of the Responsible Official;
4. Identify the specific change(s) in the decision that the appellant seeks or portion of the decision to which the appellant objects;
5. State how the Responsible Official's decision fails to consider comments previously provided, either before or during the comment period specified in 36 CFR 215.6 and, if applicable, how the appellant believes the decision violates law, regulation or policy and, if applicable, specifically how the decision violates the law, regulation, or policy.

The first timber sale is planned to be made available as part of the current timber supply prior to September 30, 1996. Implementation of this action can begin 5 business days after the close of the 45 day appeal filing period. An appeal of this decision would evoke a stay of implementation of the Selected Alternative until fifteen days after the appeal decision.

**Contact Person**

For additional information concerning the specific activities authorized with this decision contact the Northwest Baranof Planning team:

James M. Thomas
Northwest Baranof Planning Team
Sitka Ranger District, Chatham Area, Tongass NF
204 Siginaka Way
Sitka, Alaska  99835

(907) 747-6671

GARY A. MORRISON
Forest Supervisor                                    Date 2/5/96