UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

OCT 1 8 2004

CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL; et al., | No. 04-35868 |
| Plaintiffs - Appellants, | D.C. No. CV-03-00029-J-JKS District of Alaska, Juneau |
| v. | |
| UNITED STATES FOREST SERVICE; et al., | ORDER |
| Defendants - Appellees, | |
| STATE OF ALASKA; et al., | |
| Defendant-Intervenors - Appellees. | |

Before: KLEINFELD, TASHIMA, and GOULD, Circuit Judges:

We GRANT the emergency motion of appellants National Resources Defense Council (NRDC), et. al., for an injunction pending appeal, enjoining the "Orion North" timber sale pending further order of this court. We also expedite the appeal in accord with the terms below.

It is not disputed that the Forest Service in its 1997 Record of Decision (ROD) amending the Tongass Land Management Plan (TLMP) made an error in interpreting an important report prepared by the agency's economists concerning

**Exhibit 24, page 1 of 5**

market demand for timber during the tenure of the plan.  The mistake doubled the economists' estimate of demand.  The Forest Service has contended that this mistake was harmless error and does not affect the Orion North Timber Sale at issue at this case.  The NRDC has contended that the mistake was integral to market demand calculations that affected the plan's balance of selling logs for the timber industry and preserving old-growth forests and other considerations pertinent under the National Forest Management Act (NFMA) and the TLMP.  In assessing the standards for granting an injunction pending appeal, we must assess both the likelihood of success on the merits and the balance of hardships between the parties.  Our standard, embracing interrelated legal tests that form a "continuum," has been set forth in the Lopez v. Heckler, 713 F.2d 1432, 1435 (9th Cir. 1983).  If NRDC shows a probability of success on the merits, it must also show the possibility of irreparable injury.  If it shows only "serious legal questions," then it must show that the balance of hardships tips sharply in its favor.  Under either standard, we conclude that NRDC is entitled to injunction pending appeal.

NRDC has shown a likelihood of success on the merits.  It appears that the assessment of demand was required under governing law, and that the miscalculation of demand was integral to the Forest Service's planning.  Had the

2

Forest Service thought demand was only one-half of what it assumed, it might have planned to satisfy timber industry needs by sale of timber on property less environmentally sensitive than that at issue here. Also, we have previously indicated that the scope of relief for "harmless error" in the environmental context, where we review agency decision-making, is limited. See Gifford Pinchot v. FWS, 378 F.2d 1059, 1072 (9th Cir. 2004). The planned timber sale here will cause irreparable injury in the sense that old-growth forests will be gone.

Even if the arguments of the Forest Service are shown to have more merit after full briefing and a more detailed review, there are at least "serious legal questions" presented, and we conclude the balance of hardships tips in favor of the plaintiffs. In this respect, we are not unmindful that a mill owner has raised the risk by affidavit that an injunction pending appeal will require the closing of his mill, at least temporarily. However, the plaintiffs are not required to abandon their rights on that account. We may hope that the mill owner will be able to gain enough timber from other sources to continue operations while this expedited appeal is decided, but we cannot say that the balance of hardships here favors the immediate development of a road to the challenged property and the commencement of logging. To the contrary, the road-building activities will cause

3

an immediate and irreparable change to the part of the now-roadless old-growth forest that would be affected by the challenged timber sale.

The motion to expedite the briefing and hearing of this appeal is granted.

Because there were no hearings in the district court, the clerk of that court shall forward the certificate of record immediately. *See* 9th Cir. R. 11-2.

The opening brief and excerpts of record are due November 17, 2004; the answering brief is due December 17, 2004; and the optional reply brief is due December 27, 2004. The provisions of Ninth Circuit Rule 31-2.2(a) shall not apply to this briefing schedule.

The Clerk shall place this case on the February, 2005 calendar in Seattle, Washington.

KLEINFELD, J., dissenting:

I respectfully dissent.

All that is before us is an injunction pending appeal of a tiny percentage of the logging. Even if the demand projection was erroneous, that error would have no effect on this particular small sale. There is plenty of time to consider the plan as a whole on appeal without enjoining this sale. The hardship to the appellants is a sale of a minuscule fraction of the Tongass plan, and it is a fraction that likely

4

would be subject to logging even with a lower demand projection. The hardship to the mill employees who will be thrown out of work, and the mill owner, strikes me as much greater. In view of the careful and thorough consideration of all appropriate factors by the district court, including the balance of hardships, and its careful consideration of the likelihood of success on the merits, and, most important, our very limited scope of review, I would deny the injunction pending appeal.

5

Thomas S. Waldo
Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801-1145
Phone: (907) 586-2751
Fax: (907) 463-5891
twaldo@earthjustice.org

Nathaniel S. W. Lawrence
NATURAL RESOURCES DEFENSE COUNCIL
3723 Holiday Drive, SE
Olympia, WA 98501
Phone: (360) 534-9900
Fax: (360) 534-9909
nlawrence@nrdc.org

Attorneys for Plaintiffs

**FILED**

**NOV - 5 2004**

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA
By_____Deputy

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ORGANIZED VILLAGE OF KAKE, SOUTHEAST ALASKA CONSERVATION COUNCIL, NATURAL RESOURCES DEFENSE COUNCIL, SIERRA CLUB, THE WILDERNESS SOCIETY, and CENTER FOR BIOLOGICAL DIVERSITY,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES FOREST SERVICE; UNITED STATES DEPARTMENT OF AGRICULTURE; MARK REY, in his official capacity as Under Secretary of Agriculture; DENNIS E. BSCHOR, in his official capacity as Alaska Regional Forester; and FORREST COLE, in his official capacity as Forest Supervisor for the Tongass National Forest.<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>Case No.  **J 04 - 0 2 9  CV** |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
**(5 U.S.C. §§ 702, 706(2)(A); 16 U.S.C. §§ 1604, 539d, 3120; 42 U.S.C. § 4332)**

**INTRODUCTION**

1.  This action challenges the 1997 Tongass Land Management Plan Revision ("Tongass Plan"), including its Record of Decision and the Environmental Impact Statement (EIS) accompanying it.  This action also challenges the Threemile Timber Harvest Record of Decision implementing the Tongass Plan and authorizing logging in currently roadless areas.  In addition, this action challenges the Forest Service's temporary rule exempting the Tongass from the Roadless Area Conservation Rule, 36 C.F.R. § 294.

2.  The Tongass Plan allocates about 3.6 million acres of the Tongass to land use designations that allow logging and roadbuilding, of which about 2.5 million acres are currently undeveloped and roadless.  The Threemile project is located on Kuiu Island, about 20 miles southwest of the village of Kake, and is surrounded by Port Camden, Rocky Pass, and Threemile Arm.  The Forest Service issued a draft environmental impact statement for the Threemile project on January 8, 2001.  The Notice of Availability for the draft EIS was published in the Federal Register on January 19, 2001.  A final EIS and Record of Decision were issued on April 16, 2004.

3.  The Threemile Record of Decision authorizes logging on approximately 665 acres and allows 19.5 million board feet of timber to be logged.  The logging and associated roadbuilding is authorized to occur almost entirely within two inventoried roadless areas.  The Forest Service authorized logging of 292 acres and construction of 4.76 miles of new roads in the Camden Inventoried Roadless Area.  It also authorized logging of 329 acres and construction of 3.02 miles of roads in the Rocky pass Inventoried Roadless Area.  Like other Tongass timber sales, the Threemile sale also approves logging of trees that are, on average, more valuable

economically and for wildlife than the average timber available for logging in the Tongass Plan. This practice is unsustainable.

4.  Tongass roadless areas and the high-value stands of old growth forest authorized for logging in the Threemile project are important for wildlife, biological diversity, recreation and other natural resource uses.  The Tongass Plan and the Threemile timber sale do not adequately protect these resources, and the defendants have failed to consider and disclose adequately the adverse impacts of the plan and the timber sale.

5.  The Forest Service concluded that logging in the Threemile area may cause a significant restriction on subsistence uses of deer in the area.  It also determined that the significant restriction was necessary, consistent with sound management of public lands.  The conclusion that the significant restriction is necessary is based on direction in the Tongass Plan and a need to seek to meet market demand.

6.  The plaintiffs are organizations whose members use the roadless areas of the Tongass, including the Threemile timber sale area, for recreation, subsistence use, sport hunting and fishing, camping, photography, wildlife viewing, and other activities that depend on the natural old-growth forest values.  These organizations seek declaratory and injunctive relief preventing the Forest Service from proceeding with actions that cause harm to the environment, and thereby to their members, pending compliance with the law.

## JURISDICTION, RIGHT OF ACTION, AND VENUE

7.  This court has jurisdiction pursuant to 28 U.S.C. § 1331 and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-02.  Judicial review is available under the Administrative Procedure Act.  5 U.S.C. §§ 701-06.

**Exhibit 25, page 3 of 35**

8.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

## PLAINTIFFS

9.   The Organized Village of Kake ("OVK") is a federally recognized Indian Tribe

organized under the authority of the Indian Reorganization Acts of 1934 and 1936.  60 Fed. Reg.

9250, 9254 (Feb. 16, 1995).  OVK represents 516 Tribal members, most of whom reside in

Kake.  OVK's mission is to promote the welfare of tribal members and descendants through the

development and operation of social, economic, and cultural enterprises, and to preserve and

maintain Native cultural traditions and the subsistence lifestyle.  One of OVK's highest priorities

is to protect the Village's customary and traditional hunting, fishing, and gathering areas.

10.     Southeast Alaska Conservation Council (SEACC) is a nonprofit organization of 18

volunteer conservation groups in fourteen communities across the Southeast Alaska panhandle,

from Yakutat to Ketchikan, and over 2000 individual members, the majority of whom live in

Alaska.  SEACC advocates the conservation and wise long-term management of the scenic,

wilderness, fish, wildlife, recreation, subsistence and other natural resources and values of southeast

Alaska and the Tongass National Forest in particular.

11.     The Natural Resources Defense Council (NRDC) is a non-profit organization

dedicated to protection of the earth's environment.  NRDC has over 1,500 members in the State

of Alaska and more than 550,000 members in all.  NRDC's involvement in conservation of the

Tongass National Forest dates back almost to the organization's inception.

12.     The Sierra Club is a national grassroots conservation organization.  The Sierra

Club's members are 700,000 Americans, including about 1,850 Alaska residents, who are

inspired by nature.  They explore, enjoy, and protect the wild places of the earth including the

**Exhibit 25, page 4 of 35**

Tongass National Forest. They practice and promote the responsible use of the earth's ecosystems and resources. For over a hundred years they have sought to educate and enlist humanity to protect and restore the quality of the natural and human environment. In Southeast Alaska the Sierra Club is represented by the Juneau Group of the Sierra Club. Sierra Club members reside in nearly every community of Southeast Alaska, from Yakutat to Ketchikan, and derive benefits and enjoyment from the natural environment and unlogged areas of the Tongass National Forest.

13.    The Wilderness Society, founded in 1935, is a national non-profit membership organization devoted to preserving wilderness and wildlife, protecting America's prime forests, parks, rivers, deserts, and shorelines, and fostering an American land ethic. It has approximately 225,000 members nationwide, approximately 700 of whom live in Alaska.

14.    The Center for Biological Diversity (the Center) is a non-profit organization based in Tucson, Arizona. The Center works to protect wild places and their inhabitants. The Center believes that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked. It has been actively involved in protecting Alaska's wildlife since the early 1990's. With regard to the Tongass National Forest, the Center has filed petitions to protect the Queen Charlotte goshawk and the Alexander Archipelago wolf under the Endangered Species Act. The Center is still involved in active litigation over the fate of the goshawk, and carefully follows the fate of many other species that depend upon Tongass wildlands. The Center has 7,500 members including some members who live in Southeast Alaska.

15.    The plaintiffs participate actively in the administrative processes established for management of the Tongass. Various of the plaintiff groups have submitted comments on

**Exhibit 25, page 5 of 35**

proposed actions and draft EISs for the Tongass Plan and for the Threemile timber sale. Various of these groups also have filed administrative appeals (including interventions and interested party comments) of the Tongass Plan and of the 2003 Record of Decision for the Threemile timber sale. Various of these groups also participated in the administrative process for the National Roadless Area Conservation Policy and advocated in favor inclusion of the Tongass in the Rule, and submitted comments in opposition to the Forest Services proposed rule exempting the Tongass from the protections of the Roadless Rule. The plaintiffs have exhausted administrative remedies for each of the decisions challenged in this complaint.

16.     Members of plaintiff organizations reside near, visit, or otherwise use and enjoy the Tongass National Forest, including the Threemile project area. In particular, members of plaintiff organizations use these areas for recreation, subsistence use, sport hunting and fishing, wildlife viewing, photography and education, and aesthetic and spiritual enjoyment. The plaintiffs and their members derive subsistence, cultural, scientific, recreational, aesthetic, and conservation benefits and enjoyment from these areas. The logging authorized in the Threemile timber sale will directly and irreparably injure these interests.

17.     The plaintiff organizations monitor the use of forest ecosystems and compliance with the laws respecting these ecosystems, educate their members and the public concerning management of these ecosystems, and advocate policies and practices that conserve the natural value of these ecosystems. It is impossible to achieve these organizational purposes fully without adequate information and public participation in the processes required by law. The interests and organizational purposes of the plaintiffs are directly and irreparably injured by defendants' violations of the laws as described in this complaint.

**Exhibit 25, page 6 of 35**

18.     Most of Kuiu Island, including those areas scheduled for logging in the Threemile project, is within the traditional clan territory of the Kake Tlingit, and the island contains old village sites and other cultural sites of great historical and religious importance to the members of OVK.  Members of OVK rely on those areas, including those scheduled for logging in this case, for subsistence, economic, social, cultural, and spiritual needs.

19.     Members of OVK have relied on the fish and wildlife resources of Kuiu Island and other areas for their subsistence for hundreds of years, and they continue to do so today. These customary and traditional activities are critical both to the culture and economy of the Tribe, and OVK members depend on the wildlife resources, including deer, for subsistence. Since the arrival of industrial logging on the Tongass less than 40 years ago, these members have witnessed severe degradation and loss of habitat necessary for these customary and traditional activities.  The logging, roads, and associated activities approved in the Threemile project will directly and irreparably injure OVK's interests even further.

## DEFENDANTS

20.     The full name of Defendant United States Forest Service is United States Department of Agriculture, Forest Service.  It is an agency of the Department of Agriculture entrusted with the administration of the national forests, including the Tongass.

21.     Defendant United States Department of Agriculture is the department of the executive branch responsible for overseeing the activities of the Forest Service.

22.     Mark Rey is sued in his official capacity as the Under Secretary, Natural Resources and Environment, United States Department of Agriculture

**Exhibit 25, page 7 of 35**

23.     Defendant Dennis E. Bschor is sued in his official capacity as US Forest Service Region 10 Regional Forester.

24.     Defendant Forrest Cole is sued in his official capacity as the Forest Supervisor for the Tongass National Forest.

## FACTS

Planning Process

25.     The Tongass National Forest in Southeast Alaska is this country's largest National Forest.  The Tongass contains the largest remaining expanse of unaltered coastal temperate rainforest ecosystem in the world.

26.     The National Forest Management Act (NFMA) requires the Forest Service to prepare and revise land and resource management plans for national forests.  16 U.S.C. § 1604.  After a lengthy planning process, the Alaska Regional Forester signed a Record of Decision (ROD) for the Tongass Land Management Plan Revision in May 1997.  At that time, the Forest Service published the revised Land and Resource Management Plan for the Tongass National Forest, its associated Final Environmental Impact Statement (FEIS), and a Record of Decision selecting the management alternative to be implemented.

27.     The 1997 Tongass Plan established a maximum allowable sale quantity (ASQ) of 2.67 billion board-feet per decade, which is equivalent to an annual average of 267 million board-feet (mmbf) per year.

28.     Numerous groups and individuals filed administrative appeals of the Regional Forester's May 1997 decision.

**Exhibit 25, page 8 of 35**

29.    In April 1999, Under Secretary James Lyons resolved all administrative appeals and issued a final Record of Decision for implementation of the Tongass Land Management Plan.  The final Record of Decision modified the May 1997 Record of Decision by reducing the ASQ to 1.87 billion board-feet per decade, which is equivalent to an annual average of 187 million board-feet per year.  The final Record of Decision also identified 18 areas of special interest, mostly in roadless areas.  The 1997 Tongass Plan had assigned these areas to land use designations that allowed logging.  The final Record of Decision changed them to new designations that generally prohibit timber sales.  The final Record of Decision also adopted new standards and guidelines to provide additional protection for wildlife.

30.    On March 31, 2001, the court vacated the 1999 Record of Decision in *Alaska Forest Association, et al., v. United States Department of Agriculture, et al.*, No. J99-0013 CV (JKS) (D. Alaska).  The court also enjoined the Forest Service from implementing the 1999 Record of Decision and ordered the Forest Service to prepare a supplemental EIS addressing the changes from the 1997 Tongass Plan.  However, the Forest Service never prepared a supplemental EIS to address those proposed changes.  Instead, the agency has chosen to implement the 1997 Tongass Plan without the changes adopted by Under Secretary Lyons.

31.    The Forest Service has implemented the Tongass Plan with numerous decisions to authorize new timber sales.  These decisions include (date of signing of Record of Decision follows):  Threemile (April 16, 2004); Woodpecker (September 12, 2003); Madan (July 31, 2003); Finger Mountain (June 20, 2003); Cholmondeley (April 23, 2003); Sea Level (May 3, 1999); Canal Hoya (April 1, 1999); Crane and Rowan Mountain (June 30, 1998); and Chasina (April 27, 1998).  The Forest Service prepared a site-specific EIS for each of these decisions.

**Exhibit 25, page 9 of 35**

32.     The timber sale offerings approved under these EISs have caused and are projected to cause adverse impacts to wildlife and other resources including visual quality, roadless recreation, and subsistence use, and sport hunting.

Planning for Viable Populations of Wildlife

33.     As part of formulating wildlife protections for possible use in the Tongass Plan, the Forest Service, responding to congressional direction, assembled a group of prominent scientists to provide peer review for protective strategies it was considering.  The primary wildlife conservation strategy considered by the Forest Service at the time, like that eventually adopted as a part of the Tongass Plan, was a system of reserves protecting a limited amount of old growth habitat throughout the Forest.  This peer review group identified important considerations for wildlife not proposed by the Forest Service, including the protection of large unroaded, unlogged blocks of habitat, and the conservation of "high volume" forest stands.  The peer review group ultimately concluded that the Forest Service's conservation strategy was not adequate to protect old growth dependent wildlife.

34.     High volume stands, characterized in part by the presence of large trees and having special significance as wildlife habitat, are a relatively scarce resource in Southeast Alaska.  They have been disproportionately targeted for logging by the Forest Service and on lands adjacent to the Tongass by others, in an unsustainable and harmful practice known as "highgrading."

35.     Concerns over highgrading led Congress in 1990 to adopt protections for high volume stands.

**Exhibit 25, page 10 of 35**

36.     Scientific panels convened by the Forest Service evaluated the alternatives presented in the 1996 Revised Supplemental Draft EIS (RSDEIS) for the Tongass Plan for their effects on individual wildlife species and groups of related species.  Several of these panels rated alternatives similar to the one ultimately adopted as having a relatively low likelihood of maintaining viable populations of the species well-distributed throughout the Tongass.

37.     A majority of members of the scientific peer review group described above submitted a joint statement on the RSDEIS emphasizing the importance of preserving the Tongass' remaining large blocks of old growth, including undeveloped watersheds, from logging and of avoiding logging of high volume stands.  These scientists specifically identified the RSDEIS strategies as inadequate to ensure the continued viability of wildlife well-distributed in the Tongass.

38.     Public comments on the RSDEIS also requested that the Forest Service develop one or more alternatives that actively provided timber for industrial use but scheduled logging only outside of the remaining blocks of undeveloped old growth watersheds.

39.     The Forest Service convened scientific panels to evaluate the alternatives in the Tongass Plan's FEIS for their impacts on wildlife viability.  Once again, several of these panels rated the preferred and similar alternatives as having a relatively low likelihood of maintaining viable populations of the species well-distributed throughout the Tongass.

40.     The Forest Service made some adjustments to the FEIS's preferred alternative prior to adopting it as the Tongass Plan in the 1997 Record of Decision.  These adjustments did not, however, remedy the central defects identified by scientists and the public in the preferred alternative.

**Exhibit 25, page 11 of 35**

41.    The former scientific peer review members described above analyzed the Tongass Plan as adopted in 1997 and prepared a joint statement concluding that the plan would not ensure the continued viability of Tongass wildlife species, that continued logging and roading of existing large blocks of old growth, including undeveloped watersheds, was inconsistent with maintaining wildlife viability, and that high volume stands had to be maintained for wildlife. This statement was submitted to the Forest Service during the administrative appeal process for the Tongass Plan.

42.    The Tongass Plan FEIS did not include information then available to the Forest Service about the significance and scarcity of high volume class forest stands in Southeast Alaska, the reduction in their numbers throughout the region by logging, and the likely impact of the FEIS alternatives on such stands and their associated values.

43.    The Tongass Plan FEIS analyzed the impacts of the various alternatives on forest "volume strata." In so doing, the FEIS did not include information then available to the Forest Service about the original proportion of high strata stands in the region and their disproportionate loss to logging over time.

44.    The Tongass Plan FEIS analyzed the impacts of alternatives on volume strata on the assumption that each stratum would be logged in proportion to its occurrence on the Tongass.

45.    The Tongass Plan does not prohibit highgrading, or disproportionate logging, of volume strata or volume classes. For the first decade of the Tongass Plan, the Forest Service planned to log a disproportionate amount of high volume timber. For example, the Canal Hoya draft and final EISs state that "there is a disproportionate amount of harvesting planned within high-volume low-elevation stands – areas that also provide critical wildlife habitat and are the most valuable to several species of concern…."

-12-

**Exhibit 25, page 12 of 35**

46.     Since the Tongass Plan was adopted, the Forest Service has continued to highgrade Tongass timber.

47.     The EISs for timber projects implementing the Tongass Plan do not contain information or analyses that adequately reveal the past history, significance, and impacts of highgrading.

48.     Recently the Forest Service has begun to offer timber sales that highgrade the Tongass' high value cedar stands.

49.     The EISs for timber projects that highgrade cedar do not reveal significant information available to the Forest Service about the possible consequences of this practice.

Tongass Plan Market Demand Analysis

50.     In making his decision adopting the 1997 Tongass Plan, the Alaska Regional Forester used a draft report projecting market demand prepared by Pacific Northwest Station economists Brooks and Haynes ("Timber Products Output and Timber Harvests in Alaska: Projections for 1997-2010" (Brooks and Haynes,  May 15, 1997)).  This draft report projected a market demand ranging from a low scenario in which harvest levels were between 65-72 mmbf/year to a high scenario in which harvest levels were between 136-206 mmbf/year over the thirteen-year period.

51.     The 1997 Record of Decision states that the demand projections contained in that draft are "for sawlogs suitable for producing lumber in Southeast Alaska mills."

52.     This statement is incorrect.  In fact, the projections encompass both sawlogs and utility logs.

53.     This error led to an assumption in the Tongass Plan decision that an annual logging level of between 130 mmbf and 296 mmbf would be needed to satisfy the projections in the May 15 Brooks and Haynes draft.

54.     In adopting a plan, the Regional Forester was, among other things, seeking to provide sufficient timber to meet market demand for the planning cycle, under 16 U.S.C. § 539d.

55.     The erroneous interpretation of the May 15 Brooks and Haynes draft caused the Regional Forester to seek to provide a supply of timber that was significantly higher than the actual Brooks and Haynes projections.

56.     In so doing, the Forest Service allocated significantly more land for timber production than was necessary to meet the Brooks and Haynes projected market demand. Logging and road construction on these lands causes harm to wildlife, recreation, subsistence, and other multiple use objectives.


Actual Market Demand

57.     Beginning in the 1950s, the United States annually sold large volumes of timber to the Ketchikan Pulp Company (KPC) and Alaska Pulp Company (APC), and their predecessors, pursuant to 50-year contracts intended to facilitate construction and operation of two large pulp mills.

58.     APC ceased operation of its Sitka pulp mill in 1993, and the Forest Service terminated its long-term contract in 1994. APC removed 94 mmbf of Tongass timber in FY 1994 and 15 mmbf in FY 1995. It has logged no timber from the Tongass since.

59.     KPC ceased operation of its Ketchikan pulp mill in 1997. To resolve legal claims, the United States, KPC, and Louisiana-Pacific Corporation entered a Settlement Agreement in

1997.  The agreement canceled the contract.  The United States agreed to pay KPC approximately $135 million and to make 300 mmbf of Tongass timber available to KPC for cutting in 1997, 1998, and 1999.  KPC dropped its claims and agreed to cut this timber and keep its sawmills operating.  In 1999, the agreement was extended to grant one more year to cut the remaining timber, to provide start-up timber for a proposed new veneer mill.

60.    In attempting to meet market demand for Tongass timber, the Forest Service forecasts demand using estimates contained in the final 1997 Brooks and Haynes report, published shortly after the 1997 Tongass Plan.  The report is entitled "Timber Products Output and Timber Harvest in Alaska: Projections for FY97-10" (Brooks and Haynes; PNW-GTR-409, September, 1997).

61.    The 1997 demand projections are an integral component of the formula developed in the 2000 report entitled "Responding to the Demand for Tongass Timber:  Using Adaptive Management to Implement Sec. 101 of the 1990 Tongass Timber Reform Act."  This formula is used annually by the Forest Service in determining the volume of timber to offer each year.

62.    The Forest Service relies explicitly on the 1997 Brooks and Haynes projections in describing the demand for Tongass timber in the Final EIS for the Threemile timber sale.  In the FEIS, the Forest Service also used the 1997 demand projections to set its goals for the volumes of timber under analysis (Pool 1), available for sale (Pool 2), and under contract (Pool 3).  The "anticipated harvest" discussed in Appendix A of the Final EIS is the harvest projected by the 1997 Brooks and Haynes report.

63.    The historical data on which the 1997 demand predictions are based include volume cut pursuant to the two long-term pulp mill contracts.

**Exhibit 25, page 15 of 35**

64.     From the start of the long-term contracts until and including FY 2000, the long-term contracts, including the KPC settlement and extension, accounted for the large majority of the timber cut in the Tongass.

65.     The timber logged from the Tongass between 1997 and 2000 included significant volume provided by the KPC Settlement Agreement and the one-year extension thereof.  In FY 1997, KPC removed approximately 69 mmbf.  In FY 1998, KPC removed approximately 80 mmbf.  In FY 1999, approximately 87 mmbf was removed under the Settlement Agreement. In FY 2000, approximately 80 mmbf was removed under the Settlement Agreement as extended. No Tongass timber has been cut pursuant to KPC's 50-year contract, the Settlement Agreement, or extension since FY 2000.

66.     Annual timber volume cut on the Tongass since the end of the long-term contracts and KPC settlement, as extended, has been significantly lower than the 1997 demand predictions. From FY 1996 to FY 2000, as KPC was finishing out its contract, the logging volume on the Tongass averaged approximately 130 mmbf per fiscal year.  In FY 2001 and FY 2002 the volume logged on the Tongass was approximately 48 mmbf and 34 mmbf respectively.  The volume logged in FY 2003 was approximately 51 mmbf.  The FY 2003 total included approximately 16 mmbf cleared for the Southeast electrical intertie on behalf of Ketchikan Public Utilities.  In FY 2004, the volume logged on the Tongass was approximately 46 mmbf.

67.     There is sufficient timber volume available on the existing road system to maintain current logging levels without allowing logging in Inventoried Roadless Areas.

68.     The 1997 demand predictions are predicated in part on the assumption that a market would develop for low-grade saw logs, utility logs, and manufacturing residue to fill the niche left by the closure of the pulp mills.  Such a market has not arisen.

**Exhibit 25, page 16 of 35**

69.    The Forest Service has recognized that there were already significant differences between the assumptions underlying Brooks and Haynes' 1997 projections and actual conditions in 2000.

70.    Brooks and Haynes estimated that North America's share of Japanese softwood lumber imports would range from 70 to 76 percent, depending on their scenario.  North America accounted for just 61 percent of Japanese softwood lumber imports in 1999.

71.    There is no current market for chipped Tongass logs.

72.    The loss of the market for wood chips has important implications for the economic viability of timber sales on the Tongass.  The lack of a market for chips also has resulted in an increase in applications to export low grade round Sitka spruce and hemlock logs cut from the Tongass.

73.    The veneer plant constructed by Gateway Forest Products in Ketchikan operated for approximately 9-10 months before ceasing production in December 2001, notwithstanding significant public assistance in financing the mill and providing startup timber for it.

74.    The changes in demand and prices have had significant effects on the Southeast Alaska timber industry and the profitability of the remaining facilities.

75.    Since the end of the KPC settlement agreement, as extended, two major Southeast Alaska wood products companies – Gateway Forest Products, Inc. and Silver Bay Logging, Inc. – have filed for bankruptcy protection.

76.    Gateway Forest Products has ceased operation and the majority of its assets have been liquidated.

77.    From FY 1998 to FY 2002, the Forest Service made about 263 timber sale offerings on the Tongass.

78.     Of the sale offerings in this time period, about 75 received no bids.  About 139 received only one bid.  About 49 received multiple bids.

79.      From September 19, 2002 to September 19, 2003 the Forest Service made about 48 timber sale offerings on the Tongass.

80.     Of the sale offerings in this time period, about 28 received one bid.  About 15 received no bids.  About five received multiple bids.  Three of the sales were offered twice during this time period.

81.     In FY03, the Forest Service made about 44 timber sale offerings on the Tongass.

82.     Of the sale offerings in FY03, about 25 received one bid.  About 14 received no bids.  About five received multiple bids.  Three of the sales were offered twice during this time period.

83.     In 2003, Gateway Forest Products and the Forest Service entered into an agreement canceling the nine timber sales it had under contract with a total volume of approximately 108 mmbf.

84.     The Brooks and Haynes demand projections have not been updated since 1997.

85.     In January 2004, the Forest Service announced that 20 timber sales under contract at the time would be available for cancellation by mutual agreement with the purchasers.  All of these sales were originally awarded between October 1, 1995 and January 1, 2002.  They contained about 138 mmbf of remaining volume.  The Forest Service stated that all 20 sales were "uneconomical" under current timber markets.  The Forest Service further stated that it was highly unlikely that markets would improve enough for these sales to become economical during the life of the timber sale contract.

**Exhibit 25, page 18 of 35**

86.    The Forest Service has cancelled 14 of the 20 sales made available for cancellation and received applications to cancel from the operators of at least 3 others.

Timber Sale Losses

87.    Each year, the Forest Service spends tens of millions of dollars administering the Tongass timber sale program.

88.    The Forest Service keeps detailed records of the money it shows as spent each year on the timber sale program.  Some of that information is made available to the public as part of the annual monitoring reports.

89.    The Forest Service reported that in FY 1999 it spent $19,842,546 on "timber management," $7,685,131 on "timber road construction," more than $5 million on "general administration," and more than $3 million on "ecosystem planning, inventorying, and monitoring."

90.    The Forest Service reported that in FY 2000 it spent $14,524,473 on "timber management," more than $3 million each on "road construction" and "road maintenance, nearly $4 million on "general administration," and more than $1 million on "ecosystem planning, inventorying, and monitoring."

91.    The Forest Service reported that in FY 2001 it spent $21,192,221 on "timber management," more than $13 million on "roads" and more than $2 million on "ecosystem planning, inventorying, and monitoring."

92.    The Forest Service reported that in FY 2002 it spent $17,9234,470 on "timber management," more than $15 million on "roads" and more than $3 million on "ecosystem planning, inventorying, and monitoring."

**Exhibit 25, page 19 of 35**

93.    In FY 1999, the value of timber sold from the Tongass totaled approximately $5,456,000.  In FY 2000, the value of timber sold from the Tongass totaled approximately $5,582,000.  That number declined to approximately $1,855,000 in FY 2001 and approximately $1,242,000 in FY 2002.  In FY 2003, the value of timber sold from the Tongass totaled approximately $1,464,000, and in FY 2004, it totaled approximately $1,186,000.

94.    These costs, and the associated losses, were not discussed during the NEPA process for the Threemile timber sale.

95.    The Threemile FEIS states that a "Financial efficiency analysis, which is required for every timber sale project . . . compares the estimated Forest Service direct expenditures with the estimated financial revenues of proposed timber sales."  The FEIS, however, does not present any discussion of Forest Service direct expenditures in preparing the Threemile timber sale.

96.    As one reason for allowing logging, the Threemile ROD states that "[t]he Selected Alternative provides positive economic returns."  That statement is misleading.  In fact, the Forest Service estimates that it will lose $754,823 by selecting Alternative 6.

97.    A document included in the Planning Record, but not referenced or included in the FEIS, calculates the potential Forest Service loss under Alternative 6 to be $754,823.

98.    Even that estimate in the Planning Record understates actual public expenditures. It relies on outdated and incomplete "budget allocation costs and management expenses" as estimates of the costs incurred by the Forest Service.  The budget estimates do not reflect accurately the costs borne by the Forest Service in administering the Threemile timber sale.

99.    The Forest Service itself has recognized in its annual monitoring reports that these numbers are inaccurate and should be revised.

100.    Accordingly, the Forest Service has not disclosed the actual costs it will occur in administering the Threemile timber sale, and it has relied on the mistaken and misleading assertion that Alternative 6 will result in positive economic returns.

Roadless Area Conservation Rule

101.    Separate from the Tongass planning process, the Forest Service initiated a nationwide process to evaluate the values of and provide management direction for all inventoried roadless areas in the National Forest System.

102.    In November 2000, the Forest Service published a final EIS for a Roadless Area Conservation Rule.  The EIS considered alternatives for protecting inventoried roadless areas within the National Forest System, including an alternative that would have exempted the Tongass from protections.

103.    In January of 2001, the Forest Service adopted a final rule (Roadless Rule) that with limited exceptions, precluded logging and road building in inventoried roadless areas, including such areas in the Tongass.  See Final Roadless Area Conservation Rule, 66 Fed. Reg. 3244, 3266 (Jan. 12, 2001).  The Roadless Rule exempted from its prohibitions any Tongass timber sale for which the notice of availability of a draft EIS was published in the Federal Register before January 12, 2001.

104.    The Roadless Rule provides an exception to the prohibition on road building for Federal Aid Highway projects when the Secretary finds such highway is "in the public interest or is consistent with the purposes for which the land was reserved or acquired and no other reasonable and prudent alternative exists."  36 C.F.R. § 294.12(b)(6).  The Forest Service stated

**Exhibit 25, page 21 of 35**

that this exception was intended to maintain the Secretary's existing authority to approve highways.

105.    The Roadless Rule allows logging incidental to utility corridors.  In the 2000 Final EIS, the Forest Service found that the rule would have minimal impact on the development of utility corridors.

106.    The Threemile timber sale does not qualify for the exemption in the 2001 Roadless Rule and is prohibited by that Rule as adopted.

107.    On July 15, 2003, the Forest Service published a notice of proposed rulemaking in the Federal Register for a temporary rule exempting the Tongass from the Roadless Rule.  See 68 Fed. Reg. 41865 (July 15, 2003).

108.    The Forest Service published a final rule providing for a temporary exemption of the Tongass from the Roadless Rule on December 30, 2003.  The Forest Service did not prepare an environmental assessment, or an EIS for this rule. The final rule asserted that the "decision to adopt the proposed rule as final is supported by the environmental analysis presented in the roadless rule FEIS."

109.    The Forest Service cited economic factors, including the finding in the original Roadless Rule FEIS that 900 jobs in Southeast Alaska could be lost if the Roadless Rule were applied to the Tongass, as justification for its decision to adopt the temporary Tongass exemption.

110.    Currently, the Tongass timber program supports fewer than 200 direct Tongass timber products jobs.

111.    In addition, the Forest Service cited impacts to utility corridors and the development of transportation corridors as reasons for adopting the temporary exemption.

-22-

112.    The Forest Service also characterized the Tongass exemption as affecting

"approximately 300,000 roadless acres."


COUNT I

Failure to Ensure Wildlife Viability

(National Forest Management Act)

113.    The plaintiffs repeat and incorporate by reference the allegations of

paragraphs 1-112.

114.    The National Forest Management Act (NFMA) requires the Forest Service to

adopt regulations for national forest planning.  16 U.S.C. § 1604.

115.    In formulating and adopting the Tongass Plan, the Forest Service was required by

its NFMA regulations in effect at the time, 36 C.F.R. § 219.19 (2000), to manage fish and

wildlife habitat "to maintain viable populations of existing native and desired non-native

vertebrate species" found on the Tongass.

116.    In formulating, adopting, and implementing the Tongass Plan, the Forest Service

was required by its NFMA regulations in effect at the time, 36 C.F.R. § 219.27 (2000), to

"[p]rovide for adequate fish and wildlife habitat to maintain viable populations of existing native

vertebrate species."

117.    For planning purposes, the Forest Service defined a "viable population" in

36 C.F.R. § 219.19 (2000) as "one which has the estimated numbers and distribution of

reproductive individuals to insure its continued existence is well distributed in the planning

area."

**Exhibit 25, page 23 of 35**

118.    In adopting the Tongass Plan and deciding to implement it through the Threemile decision, the Forest Service failed to ensure the population viability of vertebrate species in violation of 36 C.F.R. §§ 219.19 & 219.27 (2000).


COUNT II

Miscalculation of Market Demand in the Tongass Plan

(National Forest Management Act, Tongass Timber Reform Act,

National Environmental Policy Act, Administrative Procedure Act)

119.    The plaintiffs repeat and incorporate by reference the allegations of paragraphs 1-118.

120.    The National Forest Management Act requires the Forest Service to prepare a land management plan for each national forest.  16 U.S.C. § 1604.

121.    The NFMA specifies that each management plan shall:

   (1) provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with the Multiple-Use Sustained-Yield Act of 1960 (16 U.S.C. 528-531), and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness; and

   (2) determine forest management systems, harvesting levels, and procedures in the light of all of the uses set forth in subsection (c)(1) of this section ….

16 U.S.C. § 1604(e).

122.    The Tongass Timber Reform Act exhorts the Forest Service to "seek" to provide enough timber to meet market demand, subject to all applicable laws and "to the extent consistent with providing for the multiple use and sustained yield of all renewable forest resources."  16 U.S.C. § 539d.

**Exhibit 25, page 24 of 35**

123.    The Record of Decision for the Tongass Plan is the formal decision document setting forth the Regional Forester's rationale for adopting the Plan.  40 C.F.R. § 1505.2.

124.    In explaining the basis for the Allowable Sale Quantity of timber that may be cut under the Tongass Plan, the Forest Service made an error in projecting market demand for timber.  The Record of Decision nearly doubles the actual projections.  The market demand projection influenced the amount of land to be made available for logging.  The result was a plan that allowed logging up to an average of 267 mmbf/year, while the demand projection for the highest market scenario was an average of 154 mmbf/year.  More likely medium and low market scenarios had lower demand projections.

125.    In making this error, the Forest Service allowed logging in areas that would cause unnecessary harm to other multiple use objectives, such as wildlife and recreation.

126.    The 1997 Tongass Plan FEIS makes the same error in reporting projected market demand and harvest levels.  The FEIS also uses the same error to predict employment and income levels under the various alternatives.  The result is that the FEIS presents false and misleading data regarding the likely amount of logging and predicted economic benefits of the proposed action and alternatives.

127.    Under the Administrative Procedure Act, the Court "shall … hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law …."  5 U.S.C. § 706(2)(A).

128.    In adopting the Tongass Plan based on a significant error projecting market demand, and in implementing the Plan in the Threemile timber sale project, the Forest Service acted arbitrarily and in violation of its obligations under the National Forest Management Act and the Tongass Timber Reform Act.

129.    The 1997 Tongass Plan FEIS violates NEPA by presenting false and misleading information about projected market demand, logging levels, and economic effects.


COUNT III

Inadequate Alternatives in Tongass Plan FEIS

(National Environmental Policy Act)

130.    The plaintiffs repeat and incorporate by reference the allegations of paragraphs 1-129.

131.    In formulating and implementing the Tongass Plan, the Forest Service was required by National Environmental Policy Act (NEPA) to provide "detailed statement[s] on … alternatives to [its] proposed action[s]," 42 U.S.C. § 4332(C)(iii), and to "study, develop, and describe appropriate alternatives to [its] recommended courses of action."  42 U.S.C. § 4332(E).

132.    White House Council on Environmental Quality ("CEQ") regulations, binding on and adopted by the Forest Service, implement NEPA in part by requiring that an EIS shall "[r]igorously explore and objectively evaluate all reasonable alternatives" to the agency's proposal.  40 C.F.R. § 1502.14(a).

133.    Managing the Tongass by preventing logging in the existing large blocks of old growth, including undeveloped watersheds, is, and was in 1997, an appropriate and reasonable alternative for the Tongass Plan.  This fact is shown by recommendations from scientists and the public that the Forest Service adopt that approach, and by the fact that the agency itself did eventually adopt it for a time by deciding to protect remaining roadless areas on the Tongass.

**Exhibit 25, page 26 of 35**

134.    All of the alternatives in the 1997 FEIS, except Alternative 1, would allow logging at levels in excess of the medium scenario projected by Brooks and Haynes in their May 15, 1997 report.

135.    Managing the Tongass to allow a timber sale program that more closely approximated the actual and likely demand for timber as projected by Brooks and Haynes is, and was in 1997, an appropriate and reasonable alternative for the Tongass Plan.

136.    The Forest Service's failure in the Tongass Plan FEIS to study, develop, describe, rigorously explore, and/or evaluate the alternative of maintaining an active logging program restricted to trees outside of the existing large blocks of old growth, including undeveloped watersheds, violated 42 U.S.C. §§ 4332(C) and (E) and 40 C.F.R. § 1502.14(a).


COUNT IV

Failure to Disclose Highgrading

(National Environmental Policy Act)

137.    The plaintiffs repeat and incorporate by reference the allegations of paragraphs 1-136.

138.    In formulating, adopting, and implementing the Tongass Plan, the Forest Service was required by NEPA to identify "the environmental impact of [its] proposed action." 42 U.S.C. § 4332(C)(i).

139.    White House CEQ regulations, binding on and adopted by the Forest Service, implement NEPA in part by requiring that an EIS shall discuss "the environmental effects of alternatives," including "[d]irect effects and their significance" and those that "are caused by the action and … reasonably foreseeable." 40 C.F.R. §§ 1502.16 & 1508.8.

140.    The Forest Service violated 42 U.S.C. § 4332(C) and 40 C.F.R. §§ 1502.16 and 1508.8 by failing to include in the Threemile FEIS and in the Tongass Plan EIS information available to it about high volume stands, about the history and significance of past highgrading, about reasonably foreseeable future highgrading, and about the possible impacts and significance of highgrading by volume class, volume strata, and/or tree species.

COUNT V

Misleading Presentation of Market Demand

(National Environmental Policy Act)

141.    The plaintiffs repeat and incorporate by reference the allegations of paragraphs 1-140.

142.    NEPA requires federal agencies to prepare environmental impact statements on any proposal for "major Federal actions significantly affecting the quality of the human environment . . .." 42 U.S.C. § 4332(C).

143.    The presentation of incomplete or misleading information in an EIS violates NEPA.

144.    The information about market demand for timber contained in the Threemile FEIS is both incomplete and misleading.  In the FEIS, the Forest Service relied on outdated market demand projections to justify the projects.  The FEIS failed to present the public and decisionmaker with relevant, accurate information known to the Forest Service about market conditions.

145.    The false, incomplete and misleading information in the Threemile EIS violates NEPA.

**Exhibit 25, page 28 of 35**

COUNT VI

Public Investment Analysis

(National Environmental Policy Act)

146.    The plaintiffs repeat and incorporate by reference the allegations of paragraphs 1-145.

147.    The Threemile FEIS is incomplete and misleading because it creates the impression that the Forest Service will make money from the timber sales in the Threemile project area.  The Forest Service estimates that it will lose $754,823, but that information is not disclosed in the FEIS.

148.    The calculation of public expenditures in the Planning Record document does not reflect current cost information collected annually by the Forest Service.  Actual costs are significantly higher than reported.  The agency and the public will bear significant losses on the project not disclosed in the FEIS or Planning Record.  The Forest Service is required to disclose those costs in an EIS.  42 U.S.C. § 4332.

149.    The failures to present accurate information on public costs mislead and fail to inform the public and decisionmaker and thereby violate NEPA.


COUNT VII

Roadless Area Conservation Rule

(Administrative Procedure Act)

150.    The plaintiffs repeat and incorporate by reference the allegations of paragraphs 1-149.

151.    The Federal Register Notice of December 12, 2003 fails to identify any exigency that would justify a temporary rule exempting the Tongass from the Roadless Rule pending the completion of the Nationwide rulemaking process.

152.    The decision to adopt a temporary rule without providing such a rationale is arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

153.    The Forest Service failed to explain how it reached conclusions about the effects of the Roadless Rule that are contrary to those it reached in 2001, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

154.    The Forest Service's decision to exempt the Tongass from the Roadless Rule is arbitrary and capricious because the Forest Service failed to examine other options that would address the perceived problems with the Rule.

155.    The rationales cited for the Tongass exemption are contrary to the evidence before the agency in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

156.    Accordingly, the Tongass exemption is invalid and the 2001 Roadless Rule prohibits the Threemile sale.


Count VIII

Roadless Area Conservation Rule

(National Environmental Policy Act)

157.    The plaintiffs repeat and incorporate by reference the allegations of paragraphs 1-156.

158.    NEPA requires federal agencies to prepare environmental impact statements on any proposal for "major Federal actions significantly affecting the quality of the human environment . . .." 42 U.S.C. § 4332(C).

159.    NEPA separately requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(E).

160.    The decision to exempt the Tongass from the Roadless Rule is a major Federal action with significant effects on the environment.

161.    The decision affects the environment in a significant manner not already considered in the 2000 Roadless Rule FEIS and the Forest Service failed to consider new information relevant to its decision.

162.    Accordingly, NEPA required the Forest Service to prepare a supplemental EIS before proceeding with the Tongass exemption.

163.    The Forest Service's Record of Decision adopting the Tongass exemption contains misleading information in violation of NEPA.

164.    The Forest Service's decision to exempt the Tongass from the roadless rule involves unresolved conflicts concerning alternative uses of available public resources.

165.    There are unexplored alternatives, other than exempting the Tongass, that could address the Forest Service's alleged concerns about potential economic, and transportation burdens created by the Roadless Rule.

166.    Thus, the Tongass exemption was promulgated in violation of NEPA and the APA and is invalid.

167.    Because the Tongass exemption is invalid, the Threemile timber sale violates the Roadless Rule.


COUNT IX

Arbitrary Subsistence Determination

(Alaska National Interest Lands Conservation Act, Administrative Procedure Act)

168.    The plaintiffs repeat and incorporate by reference the allegations of paragraphs 1-167.

169.    ANILCA requires that, prior to allowing logging on the Tongass National Forest, the Forest Service must evaluate the effects of its decision on subsistence uses and needs.  16 U.S.C. § 3120(a).

170.    If the Forest Service determines that allowing logging may "significantly restrict subsistence uses," it may not approve a timber sale in a Record of Decision unless it also determines that doing so is "necessary, consistent with sound management principles for the utilization of public lands."  16 U.S.C. § 3120(a)(3)(A).

171.    The Forest Service determined that allowing logging in the Threemile area may cause a significant restriction on subsistence uses of deer and that such a restriction was necessary, consistent with sound management of public lands.

172.    The Forest Service's conclusion that the significant restriction is necessary is based on direction in the Tongass Plan and a need to seek to meet market demand.

173.    For the reasons explained above, the Forest Service acted arbitrarily in adopting the Tongass Plan.  Therefore, the Plan does not provide a valid basis upon which to determine that the significant restriction on subsistence uses is necessary.

**Exhibit 25, page 32 of 35**

174.    The Forest Service also overstates current market demand for timber and does not sufficiently account for recent market downturns.  Accordingly, meeting market demand also is not a valid reason to decide that significant restrictions on subsistence uses are necessary.

175.    For those reasons, the determination that offering timber in the Threemile area is necessary, consistent with sound management principles, is arbitrary and capricious in violation of ANILCA, 16 U.S.C. § 810(a), and the APA, 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, the plaintiffs respectfully request that the court:

1. Enter a declaratory judgment that:

a.  the Forest Service violated the requirement in its NFMA regulations to ensure minimum viable populations of wildlife well-distributed across the Forest;

b.  the decision adopting the 1997 Tongass Plan was arbitrary, because it was based on a significant error in projecting market demand;

c.  the FEIS for the Tongass Plan violates NEPA by disclosing erroneous information about projected market demand and resulting economic impacts;

d.  the FEIS for the Tongass Plan violates NEPA by failing to consider reasonable alternatives to protect more large blocks of old growth, including undeveloped watersheds, and important high value stands;

e.  the FEIS for the Threemile project and for the Tongass Plan fail adequately to disclose the practice of highgrading and its adverse impacts in violation of NEPA;

**Exhibit 25, page 33 of 35**

f.  the FEIS for the Threemile project violates NEPA by presenting false, incomplete and misleading information about market demand for timber and resulting economic effects;

g. the FEIS for the Threemile project violates NEPA by creating the impression that the Forest Service will make money administering the project and failing to disclose accurate estimates of public costs;

h.  the Tongass exemption from the Roadless Rule published at 68 Fed. Reg. 75,136 is arbitrary and capricious in violation of the Administrative Procedure Act;

i.  the Forest Service violated the National Environmental Policy Act by publishing the rule exempting the Tongass from the Roadless Rule without first preparing a Supplemental EIS, by failing to consider alternatives to the exemption and by including inaccurate and misleading information in the record of decision;

j.  the Threemile timber sale violates the Roadless Rule, and,

k.  the Forest Service violated the Alaska National Interest Lands Conservation Act and the Administrative Procedure Act in determining that a significant restriction on subsistence uses in the Threemile area is necessary, consistent with sound management of public lands;

2.  Enter appropriate injunctive relief;

3.  Award plaintiffs the costs of this action, including reasonable attorneys' fees; and

4.  Grant such other relief as this Court deems just and proper.

Respectfully submitted this 5th day of November 2004,

Thomas S. Waldo
Eric P. Jorgensen
Deirdre McDonnell
Michael C. LeVine
EARTHJUSTICE

Nathaniel S. W. Lawrence
NATURAL RESOURCES DEFENSE COUNCIL

Attorneys for Plaintiffs

**Exhibit 25, page 35 of 35**

| Purchaser Name | Sale Name | Cancelled as of 11/30/04 | Volume Cancelled (MBF) |
|---|---|---|---|
| David Seaford | Log Jam | YES | 1,191 |
| David Seaford | Rush Fast | NO | 0 |
| New Age Mining&Excavation | Wolf Pup | YES | 1,193 |
| Pacific Log & Lumber Ltd | Rowan Mountain | YES | 20,231 |
| Pacific Log & Lumber Ltd | Salty | YES | 300 |
| Pacific Log & Lumber Ltd | Todahl Backline | YES | 7,868 |
| Seley Family Partnership | Picasso | YES | 238 |
| Silver Bay Logging Inc | Canal Hoya | YES | 16,127 |
| Silver Bay Logging Inc | Crystal | YES | 7,017 |
| Silver Bay Logging Inc | King George | YES | 3,780 |
| Silver Bay Logging Inc | Rio Beaver | YES | 4,525 |
| Silver Bay Logging Inc | South Lindy | YES | 5,225 |
| Silver Bay Logging Inc | Upper Carroll | YES | 22,019 |
| The Mill Inc | Wedge | NO | 0 |
| Viking Lumber Company | 6402 | YES | 9,488 |
| Viking Lumber Company | Bohemia | YES | 7,845 |
| Viking Lumber Company | Shamrock | YES | 3,548 |
| Viking Lumber Company | South Arm | NO | 0 |
| Whitestone SE Logging Co | Humpback/Gallagher | YES | 11,265 |
| 3-D Logging | Deadwood #3 Salvage | YES | 73 |
| **Total Volume Cancelled** | | | 121,932 |

**Exhibit 26, page 1 of 1**

BRUCE M. LANDON
Department of Justice
Environment & Natural Resources Division
801 B Street, Suite 504
Anchorage, Alaska 99501-3657
(907) 271-5452
FAX (907) 271-5827
Email: bruce.landon@usdoj.gov

Attorney for Federal Defendants

RECEIVED

JAN 1 2 2005

EARTHJUSTICE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ORGANIZED VILLAGE OF KAKE, SOUTHEAST ALASKA CONSERVATION COUNCIL, NATURAL RESOURCES DEFENSE COUNCIL, SIERRA CLUB, THE WILDERNESS SOCIETY, and CENTER FOR BIOLOGICAL DIVERSITY, <br><br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES FOREST SERVICE; UNITED STATES DEPARTMENT OF AGRICULTURE; MARK REY, in his official capacity as Under Secretary of Agriculture; DENNIS E. BSCHOR, in his official capacty as Alaska Regional Forester; and FORREST COLE, in his official capacity as Forest Supervisor for Tongass National Forest, <br><br> Defendant. | )<br>)<br>)  Case No. J04-0029-CV (RRB)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

ANSWER

Using the same numbering of paragraphs and sentences, federal defendants

1

answer the complaint as follows:

1. This paragraph is a characterization of plaintiffs' case and requires no answer.

2. Federal defendants admit the allegations in the second, third and fourth sentences. With regard to the first sentence, federal defendants admit that the forest plan allocates 3.6 million acres of the Tongass to land use designations that allow logging and road building of which approximately 2.5 million acres are currently undeveloped and roadless, but clarify that of that 3.6 million acres, only 676,000 are suitable and scheduled for timber production, of which approximately 300,000 acres are currently undeveloped and roadless. With regard to the fifth sentence, Federal defendants admit the signing of the ROD and release to the public of the FEIS, but deny that these acts took place on the days stated in this sentence.

3. Federal defendants admit the allegations in the first, second, third and fourth sentences, and deny the allegations in the fifth and sixth sentences.

4. Deny.

5. The first two sentences purport to paraphrase the contents of a document which is the best evidence of its contents. Federal defendants deny the allegations in the third sentence.

6. Federal defendants have insufficient knowledge or belief to answer the allegations in the first sentence. The second paragraph is plaintiffs' characterization of their case and requires no answer.

7. This paragraph consists of conclusions of law not requiring an answer.

8. This paragraph consists of conclusions of law not requiring an answer.

9. Federal defendants admit the allegations of the first sentence and have insufficient knowledge or belief to answer the remaining allegations in this paragraph.

2

10. Federal defendants have insufficient knowledge or belief to answer the allegations in this paragraph.

11. Federal defendants have insufficient knowledge or belief to answer the allegations in this paragraph.

12. Federal defendants have insufficient knowledge or belief to answer the allegations in this paragraph.

13. Federal defendants have insufficient knowledge or belief to answer the allegations in this paragraph.

14. Federal defendants have insufficient knowledge or belief to answer the allegations in this paragraph.

15. Federal defendants admit the allegations of this paragraph as to some of the plaintiffs, but deny that all of the plaintiffs have acted as alleged in the paragraph. Federal defendants deny that any of the plaintiffs have satisfied the requirements of issue exhaustion as to some or all of the claims in this action.

16. Federal defendants have insufficient knowledge or belief to answer the allegations in this paragraph.

17. Federal defendants have insufficient knowledge or belief to answer the allegations in this paragraph.

18. Federal defendants admit that the project area is within the territorial division of the Kakekwann and otherwise have insufficient knowledge or belief to answer the allegations in this paragraph.

19. Federal defendants admit the first sentence and have insufficient knowledge or belief

3

to answer the allegations in the second sentence, and deny the allegations in the remainder of this paragraph.

20. Admit.

21. Admit

22. Admit

23. Admit

24. Admit

25. Federal defendants admit that the Tongass in Southeast Alaska is the country's largest national forest, and deny the remaining allegations in this paragraph.

26. The first sentence consists of conclusions of law not requiring an answer. Federal defendants admit the remaining allegations in this paragraph.

27. This paragraph purports to paraphrase a document which is the best evidence of its contents.

28. Admit.

29. Federal defendants admit the allegations of the first sentence except the characterization of the 1999 ROD as the "final" Record of Decision. The remaining allegations in the paragraph purport to paraphrase documents which are the best evidence of their contents.

30. Federal defendants admit the allegations of the first, third and fourth sentences. The second sentence purports to paraphrase a document, which is the best evidence of its contents. .

31. Federal defendants admit the allegations in this paragraph, with the qualification that the Three-Mile ROD was signed on April 23, 2004.

32. Deny

4

33. Federal defendants admit the allegations of the first sentence, except the allegation that the group was assembled "responding to congressional direction." A congressional committee did suggest the need for a peer review, but federal defendants know of no such direction from Congress as a whole. Federal defendants deny the allegations in the second, third and fourth sentences.

34. Deny

35. Federal defendants admit that Congress adopted modifications to the long-term contracts to regulate harvest of volume class six and seven as set forth in section 301 of the Tongass Timber Reform Act and otherwise deny the allegations of this paragraph.

36. Federal defendants admit the allegations in the first sentence and deny the allegations in the second sentence.

37. This paragraph seeks to paraphrase a document which is the best evidence of its contents.

38. Federal defendants admit that some public comments requested an alternative that had as a component a prohibition on building roads in unroaded watersheds and that other public comments requested an alternative that had a component that would have placed the three largest old growth "patches" in reserves. Federal defendants admit that the proponents of those alternatives assumed that those alternatives would permit some level of timber harvest on the Tongass. Federal defendants otherwise deny the allegations in this paragraph.

39. Federal defendants admit the allegations in the first sentence. The allegations in the second sentence paraphrase a document which is the best evidence of its contents.

40. Federal defendants admit the allegations in the first sentence and deny the allegations

5

in the second sentence.

41. The first sentence purports to paraphrase a document which is the best evidence of its contents. Federal defendants admit the allegations in the second sentence.

42. Deny.

43. This paragraph purports to paraphrase a document which is the best evidence of its contents.

44. This paragraph purports to paraphrase a document which is the best evidence of its contents.

45. Federal defendants deny the allegations in the first and second sentences. The third sentence purports to paraphrase documents which are the best evidence of their contents.

46. Deny

47. This paragraph purports to paraphrase documents which are the best evidence of its contents.

48. Deny

49. Deny

50. Federal defendants admit that the Regional Forester considered the Brooks and Haynes draft report when making his decision adopting the 1997 Plan and otherwise deny the allegations of this paragraph.

51. This paragraph purports to paraphrase a document which is the best evidence of its contents.

52. This paragraph purports to paraphrase a document which is the best evidence of its contents.

6

53. Deny

54. This paragraph purports to paraphrase a document which is the best evidence of its contents.

55. Deny

56. Deny

57. Deny

58. Federal defendants admit the allegations in the first sentence and deny the allegations in the remaining sentences..

59. Federal defendants admit the allegations in the first sentence.  With regard to the second sentence, federal defendants admit that one of the purposes of the agreement was the resolution of certain legal claims.  The  allegations in the third, fourth and fifth sentences purport to paraphrase the agreement, which is the best evidence of its contents.  Federal defendants admit the allegations in the final sentence.

60. Deny

61. Deny

62. Deny

63. This paragraph purports to paraphrase a document which is the best evidence of its contents.

64. Admit

65. Federal defendants admit the allegations of sentences 1-5 and deny the allegations in the final sentence.

66. Federal defendants deny the allegations in the first sentence and admit the allegations

in the remaining sentences.

67. Deny

68. Deny

69. Deny

70. This paragraph purports to paraphrase a document which is the best evidence of its contents.

71. Deny

72. Federal defendants admit that there has been an increase in applications for export of low grade round Sitka spruce and hemlock logs cut from the Tongass, and otherwise deny the allegations of this paragraph.

73. Admit except with regard to the "significance" of the public assistance.

74. Admit except with regard to the allegations of "significance."

75. Federal defendants admit the allegations, but affirmatively state that on December 10, 2003, the United States bankruptcy judge for the District of Alaska approved Silver Bay's reorganization plan, and that the Ketchikan Gateway Borough as bought the Gateway veneer plant.

76. Admit

77. Admit

78. Admit

79. Admit.

80. Admit

81. Admit

8

82. Admit

83. Admit

84. Federal defendants admit that Haynes and Brooks have not updated their projections, but deny that the Forest Service has not updated market demand projections.

85. This paragraph paraphrases the Forest Service media announcement which is the best evidence of its contents.

86. Federal defendants admit that 20 sales were available for cancellations, that 9 sales have been cancelled, that there are outstanding requests for cancellation of 8 sales, and otherwise deny the allegations of this paragraph.

87. Admit

88. Admit

89. This paragraph paraphrases the Forest Service 1999 monitoring report, which is the best evidence of its contents

90. This paragraph paraphrases the Forest Service 2000 monitoring report, which is the best evidence of its contents.

91. This paragraph paraphrases the Forest Service 2001 monitoring report, which is the best evidence of its contents.

92. This paragraph paraphrases the Forest Service 2002 monitoring report, which is the best evidence of its contents.

93. This paragraph paraphrases the Forest Service 2003 cut and sold report, which is the best evidence of its contents.

94. Deny

9

95. This paragraph paraphrases documents which are the best evidence of their contents.

96. The first sentence paraphrases a document, which is the best evidence of its contents. Federal defendants deny the remaining allegations of this paragraph.

97. This paragraph paraphrases documents which are the best evidence of their contents.

98. Deny

99. Deny

100. Federal defendants admit the allegations in the first sentence, with the qualification that the actual costs of a timber sale cannot be known until the completion of the sale. Federal defendants deny the allegations of the second sentence.

101. Admit.

102. Federal defendants admit the allegations of the first sentence. The remaining sentences paraphrase a document, which is the best evidence of its contents.

103. Federal defendants admit that the Department of Agriculture published the Roadless Rule in January 2001. The remaining allegations consist of conclusions of law not requiring a response.

104. This paragraph consists of conclusions of law not requiring a response.

105. The first sentence consists of conclusions of law not requiring a response. The second sentence paraphrases a document which is the best evidence of its contents.

106. Federal defendants admit that the Three-mile sale did not qualify for the exemption in the 2001 Roadless Rule as originallly adopted. The remaining allegations constitute conclusions of law not requiring an answer.

107. Admit

10

108. Federal defendants admit the allegations in the first sentence and deny the allegations in the second sentence. The final sentence paraphrases a document, which is the best evidence of its contents.

109. This paragraph paraphrases a document which is the best evidence of its contents.

110. Deny

111. This paragraph paraphrases a document which is the best evidence of its contents.

112. This paragraph paraphrases a document which is the best evidence of its contents.

113. Federal defendants repeat and incorporate their responses to paragraphs 1-112.

114. This paragraph consists of conclusions of law not requiring an answer.

115. This paragraph consists of conclusions of law not requiring an answer.

116. This paragraph consists of conclusions of law not requiring an answer.

117. This paragraph consists of conclusions of law not requiring an answer.

118. Deny.

119. Federal defendants repeat and incorporate their responses to paragraphs 1-118.

120. This paragraph consists of conclusions of law not requiring an answer.

121. This paragraph consists of conclusions of law not requiring an answer.

122. This paragraph consists of conclusions of law not requiring an answer.

123. This paragraph consists of conclusions of law not requiring an answer.

124. Deny

125. Deny

126. Deny

127. This paragraph consists of conclusions of law not requiring an answer.

11

128. Deny

129. Deny

130. Federal defendants repeat and incorporate their responses to paragraphs 1-129.

131. This paragraph consists of conclusions of law not requiring an answer.

132. This paragraph consists of conclusions of law not requiring an answer.

133. The first sentence constitutes a conclusion of law not requiring an answer. Federal defendants deny the allegations of the second sentence.

134. This paragraph purports to paraphrase a document which is the best evidence of its contents.

135. This paragraph consists of conclusions of law not requiring an answer.

136. Deny.

137. Federal defendants repeat and incorporate their responses to paragraphs 1-136.

138. This paragraph consists of conclusions of law not requiring an answer.

139. This paragraph consists of conclusions of law not requiring an answer.

140. Deny.

141. Federal defendants repeat and incorporate their responses to paragraphs 1-140.

142. This paragraph consists of conclusions of law not requiring an answer.

143. This paragraph consists of conclusions of law not requiring an answer.

144. Deny.

145. Deny.

146. Federal defendants repeat and incorporate their responses to paragraphs 1-145.

147. Deny

12

148. Federal defendants deny the allegations in the first, second and third sentences. The fourth sentence consists of conclusions of law not requiring an answer.

149. Deny.

150. Federal defendants repeat and incorporate their responses to paragraphs 1-149.

151. This paragraph purports to paraphrase a document and consists of conclusions of law not requiring an answer.

152. Deny

153. Deny

154. Deny

155. Deny

156. Deny

157. Federal defendants repeat and incorporate their responses to paragraphs 1-156.

158. This paragraph consists of conclusions of law not requiring an answer.

·159. This paragraph consists of conclusions of law not requiring an answer.

160. This paragraph consists of conclusions of law not requiring an answer.

161. Deny

162. Deny

163. Deny

164. This paragraph consists of conclusions of law not requiring an answer.

165. Deny

166. Deny

167. Deny

13

168. Federal defendants repeat and incorporate their responses to paragraphs 1-167.

169. This paragraph consists of conclusions of law not requiring an answer.

170. This paragraph consists of conclusions of law not requiring an answer.

171. This paragraph purports to paraphrase a document which is the best evidence of its contents.

172. Deny

173. Deny

174. Deny

175. Deny

The remaining allegations constitute plaintiffs' prayer for relief and require no answer.

If any allegation as to which federal defendants state that no answer is required in fact requires an answer, federal defendants deny the allegation. All other allegations not answered above are denied.

14

DEFENSES

1. Plaintiffs lack standing.

2. The Court lacks subject matter jurisdiction over part or all of plaintiffs' claims.

3. Plaintiffs fail to state a cause of action on which relief may be granted.

4. Plaintiffs, or some of them, have failed to exhaust their administrative remedies in whole or in part.

WHEREFORE, federal defendants pray for judgment dismissing this action, plaintiffs to take nothing and federal defendants to be awarded their costs and such other relief as the court deems just.

RESPECTFULLY SUBMITTED this _9ᵗʰ_ day of January, 2005, at Anchorage, Alaska.


BRUCE M. LANDON

Attorney for Federal Defendants

15

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of January, 2005, a copy of the foregoing was served by United States mail, first class, postage paid, to the following counsel of record:

Thomas S. Waldo
Nathaniel S.W. Lawrence

*Lorraine Carter*
Lorraine Carter

16