

United States
Department of
Agriculture

**Forest Service**

Tongass National Forest

R10-MB-552

November 2005



# Emerald Bay Timber Sale

## Final Supplemental Environmental Impact Statement and Record of Decision

# Record of Decision

## Emerald Bay Timber Sale

Forest Service, USDA
Ketchikan-Misty Fiords Ranger District
Tongass National Forest
Alaska Region

## Introduction

The 7,845-acre Emerald Bay project area is located approximately 40 air miles north of Ketchikan, Alaska (see Figure 1-1 in Chapter 1 of the Final SEIS). It is located on the Cleveland Peninsula in the Emerald Creek and Wasta Creek watersheds. Access to the area is by small plane originating in Ketchikan or Wrangell or by boat through Ernest Sound.

## Decision

I have chosen Alternative B as the Selected Alternative from the Emerald Bay Timber Sale Supplemental Environmental Impact Statement. My decision will modify the alignment of the first segment of road #8645900-1 which begins at the log transfer facility and is partly located in the estuary fringe. The road will be realigned during layout to avoid the estuary buffer to the extent feasible. This new alignment will also move the road segment farther away from the eagle nest buffer. The Appendix 2 road card shows the segment of road that will be realigned.

I authorize the actions necessary to implement my decision. The Selected Alternative with road realignment achieves Forest Plan goals for the Emerald Bay Timber Production Land Use Designation (LUD), while considering effects to other resources.

A medium old-growth reserve (OGR) lies between the timber sale and Ernest Sound. I determined that the selected road and log transfer facilities (LTF) are the most efficient and economical of six possible routes evaluated. The Forest Plan allows for road construction in Old-growth Habitat LUDs when no other feasible route is possible.

The road is designed to minimize effects to the environment. Road width will be 14 feet, with a clearing width up to 55 feet, and the surface will be outsloped, eliminating the need for ditches and reducing sedimentation in streams. Log-stringer bridges will be used to cross Class I, II, and III streams. Culverts will drain Class IV streams. A road closure will be in effect during and after timber harvest to prevent public travel by motorized vehicle, and log-stringer bridges and culverts will be removed after harvest. Removal of the LTF will further discourage road use.

**Exhibit 35, page 2 of 19**

# Record of Decision

This decision is based on the environmental analysis in the SEIS, agency, governmental, tribal, and public comments received. This decision meets the Purpose and Need for the project, is consistent with the Tongass Land and Resource Management Plan Record of Decision, and is responsive to the issues identified.

## Description of the Selected Alternative

1. The Selected Alternative will harvest approximately 601 acres of commercial forest land to contribute to the Tongass National Forest timber sale program. This harvest provides approximately 16.4 million board feet (MMBF) of sawlog and utility volume. Design features of approved harvest units are described in detail on the Unit Cards in Appendix 1 of the ROD.

2. The Selected Alternative has deferred harvest on 29 acres of Unit 10 pending occupancy surveys on one red-tailed hawk nest. Occupancy surveys will be conducted until either 1) the nest remains unoccupied for 2 consecutive years, at which time harvest may occur, or 2) the timber sale contract is concluded.

3. The Selected Alternative includes both even-aged and uneven-aged silvicultural systems. This meets the standards and guidelines for a Timber Production LUD, and meets the project Purpose and Need by providing timber for market demand. The even-aged, clearcut prescriptions address the issue to provide for efficient harvest operations and sound management of stands for future growth of sawtimber volume of desirable species. The uneven-aged silvicultural system addresses the roadless issue by retaining a forested appearance on all acres not accessible by road. The Unit Cards in Appendix 1 of the ROD provide specific direction for field layout to accomplish these objectives.

4. The Selected Alternative includes construction of 5.8 miles of classified road and 0.4 mile of temporary road. The system road crosses 2.2 miles of a medium OGR. All roads will be closed to public motorized vehicles during timber sale operations and put in storage after harvest activities.

5. The Selected Alternative includes the construction of one land-to-barge LTF at Emerald Bay. The LTF is located within a 330-foot buffer for an active bald eagle nest; which is established through a Memorandum of Understanding with the U.S. Fish and Wildlife Service. The Forest Service received September 9, 2005 a variance to the Memorandum of Understanding (Appendix 3 of the ROD). Road and LTF construction will be allowed within the eagle nest buffer. However, to avoid disturbing bald eagles during courtship and nesting, all construction activities will be restricted from March 1 through August 31.

6. The road, LTF, sortyard, camp, and rock pits will physically alter about 23 acres of the 11,530-acre medium OGR. The OGR will still meet Forest Plan Standards and Guidelines for a medium OGR.

7. Streams will receive buffers that meet standards and guidelines specified by the Forest Plan Riparian Process Group (Forest Plan, page 4-53). Additional windfirm buffers will be added where appropriate.

8. The effects of the Selected Alternative on the subsistence resources are minimal. The direct, indirect, and cumulative effects do not present a significant possibility of a significant restriction of subsistence resources.

9. This decision identifies mitigation measures to reduce or eliminate adverse environmental effects of the timber harvest and road construction activities specified in the Selected Alternative.

# Reasons for the Decision

In making my decision, I considered the issues and concerns raised during scoping, comments on the Draft EIS and Draft SEIS, appeals and the reversal of the 2001 ROD. I considered Forest Plan direction relevant to this project and the competing interests and values of the public. I considered all viewpoints and incorporated them where feasible and consistent with the Purpose and Need of the project. I carefully considered the comments of those opposing this project and the issues identified.

I evaluated the trade-off between resource protection, social values, and timber sale economics. Alternative B provides a beneficial mix of resources for the public, within a framework of existing laws, regulations, policies, public needs and desires, and the capabilities of the land, while meeting the stated Purpose and Need for this project. My decision to implement Alternative B conforms to the Forest Plan and national forest management.

I considered the need to manage this timber resource in order to produce saw timber and other wood products on a sustained yield and economical basis. The Selected Alternative implements Forest Plan direction for Timber Production LUDs and the project design is economical. Alternative B has a positive timber sale value in the 1st quarter of 2004, and a positive value for 11 of the 12 quarters in the economic analysis period.

I considered the need to help provide an even flow of timber to meet annual and Forest Plan planning cycle market demand. The Selected Alternative provides about 16 MMBF toward meeting annual market demand.

I considered the need to provide diverse opportunities for natural resource employment and to contribute to local and regional economies. The Selected Alternative estimates 86 job years of employment opportunities and 16 MMBF of wood products are generated to support local and regional economies.

I considered the need to minimize disturbance in Old-growth Habitat LUDs while still meeting the goals, objectives, and desired condition of the Timber Production LUD in an economical manner. The interdisciplinary team (IDT) analyzed the feasibility of using helicopters to eliminate the need for road construction. Declining market values since 1998 made harvest by helicopter an uneconomical option. The Forest Plan allows road building in Old-growth Habitat LUDs if no other feasible means of access exists.

The IDT analyzed five alternate routes to access the project area. The alternate routes required two to three times more road miles at much greater cost, and were determined infeasible due to cost and environmental effects. Four of the alternate road routes also required road construction in Old-growth Habitat LUDs. The three routes leading north to either Sunny Bay or Frost Bay required road construction over steep, rugged terrain. I determined that the road proposed in the Selected Alternative is the most feasible way to access the Timber Harvest LUD.

I considered the effects to Cleveland Roadless Area #528 values and the wilderness characteristics associated with Cleveland Peninsula. The Selected Alternative affects 1.5 percent (2,878 acres) of Cleveland Roadless Area #528 (191,477 acres). Most of the roadless area will retain its identified values (outstanding saltwater fishing in the major bays, opportunity for solitude and primitive recreation, and unmodified natural appearance.) After harvest, the road will be put in storage and allowed to revegetate. The LTF will be removed following harvest.

The Selected Alternative builds 5.8 miles of low-impact classified road and 0.4 mile of temporary road. Road construction standards will minimize effects by limiting road surface width to 14 feet and road-clearing width to 55 feet, and using log-stringer bridges at Class I, II, and III stream crossings, and outsloping the road for runoff. A road closure will be in effect during and after timber harvest to prevent public travel by motorized vehicle.

**Exhibit 35, page 4 of 19**

**Record of Decision**

On August 5, 2005, the Ninth Circuit Court of Appeals ruled that a misinterpretation of the Brooks and Haynes 1997 draft timber demand projections rendered the 1997 Record of Decision for the Tongass Land Management Plan Revision arbitrary and capricious. The court of appeals remanded the matter for further proceedings consistent with the court's opinion. *Natural Resources Defense Council v. U.S. Forest Service*. The process of remedying the defects identified by the court of appeals will be time-consuming. Delaying the completion of this and other site-specific projects should be avoided because it would result in substantially undermining the Forest Service's ability to respond to timber demand.

# Public Involvement

The Council on Environmental Quality (CEQ) defines scoping as "...an early and open process for determining the scope of issues to be addressed and for identifying the key issues related to a Proposed Action" (in Code of Federal Regulations 40 CFR 1501.7). The scoping process was used to invite public participation and collect initial comments.

### Notice of Intent (NOI)
A Notice of Intent was published August 17, 1998 in the *Federal Register* when it was decided that an EIS was to be completed for the project.

### Public Mailing
In early August 1998, a letter providing information and seeking public comment (scoping document) was mailed to 140 individuals and groups that had previously shown interest in Forest Service projects in Southeast Alaska. The mailing included seven Federal agencies, five State agencies and divisions, 22 Native and municipal offices, and 106 businesses and other organizations, groups, and individual citizens. There were 28 responses to this initial mailing.

### Local News Media
Legal announcements about the project were published in the August 15-16, 1998 weekend edition of the *Ketchikan Daily News* and the August 13, 1998 edition of the *Wrangell Sentinel*. A display advertisement with map, describing the project, was published in the August 15-16, 1998, weekend edition of the *Ketchikan Daily News.*

### Public Meetings
A public meeting was held at the Narrows Inn in Ketchikan on August 24, 1998 to provide information and discuss potential areas of concern to be addressed in the project analysis.

### Consultation with Tribal Governments
Government-to-government consultations with federally recognized tribal governments and meetings with traditional tribal governments took place in 1998, 2004 and 2005. Meetings included: Wrangell Cooperative Association, Organized Village of Saxman, Metlakatla Indian Community, and Ketchikan Indian Community. Tribal concerns were considered in the environmental analysis. Tribal consultation does not imply that the tribes endorse the Proposed Action or any of the alternatives.

**Draft EIS 2000**

### Availability of Draft EIS for Public Comment
Availability of the Draft EIS was announced on January 28, 2000, both in the *Federal Register* and through legal notices published February 7, 2000 in the *Ketchikan Daily News* and February 10, 2000 in the *Wrangell Sentinel*. The 45-day public comment period started January 28, 2000 and was extended to April 15, 2000. The Draft EIS was mailed to Federal and State agencies, Native and municipal offices, and others who requested it.

**Record of Decision**

**Public Information Meeting**
In response to public comment, a public meeting was held on March 2, 2000 to introduce a fourth alternative, Alternative D, which combined elements of Alternatives B and C.

**Project Update Letter, March 20, 2000**
A project update letter was sent to those on the Draft EIS mailing list on March 20, 2000 incorporating comments from the public meeting and detailing Alternative D. In order to allow adequate time for comments, this letter extended the comment period on the Draft EIS to May 5, 2000 for a total of 98 days.

**Analysis and Incorporation of Public Comment on the Draft EIS**
Twenty-two agencies, organizations, and individuals submitted written comments on the Draft EIS. The IDT analyzed and incorporated these comments into the Final EIS. Public comments and responses to the comments were included in Appendix D of the Final EIS.

Some comments expressed concern about road building and timber harvest in Cleveland Roadless Area #528. They thought the roadless nature of the Cleveland Peninsula should be retained. They referenced a letter from the Governor of Alaska corroborating that statement. Others were concerned that a precedent would be set by proposing to build a road through a medium old-growth reserve. They cited possible effects to fish and wildlife resources and wondered what allowances would be made. These comments are the roadless and OGR issue and are discussed in Chapter 2 of the Final EIS.

Some comments expressed concern over the economic viability of proposing uneven-aged management prescriptions in an isolated Timber Production LUD. They also questioned whether these prescriptions would meet the objectives of the LUD and the Purpose and Need for the project. These comments are the timber economics issue discussed in Chapter 2 of the Final EIS.

The IDT evaluated and responded to these comments (Appendix D of the Final EIS). Final EIS Chapters 2 and 3 summarize the analysis of effects to roadless values, the medium old-growth reserve, and timber economics.

**Final EIS and Record of Decision 2001**

**Final EIS and Record of Decision**
Forest Supervisor Thomas Puchlerz signed the Emerald Bay Timber Sale Record of Decision on September 13, 2001. Alternative D was the Selected Alternative. The Notice of Availability of the Final Environmental Impact Statement was published November 2, 2001 in the *Federal Register*. The legal notice was published November 2, 2001 in the *Juneau Empire* the *Ketchikan Daily News*, and the *Wrangell Sentinel*. A corrected legal notice was published in the three newspapers on November 16, 2001, restarting the 45-day appeal period, which ended December 31, 2001.

**Appeal of the Record of Decision**
The Tongass Forest Supervisor's decision was reversed on appeal to the Regional Forester because the EIS did not adequately consider the potential effects of the project on roadless area values and wilderness characteristics.

**Project Update 2002**

**Public Scoping – Project Update Letter, October 2002**
A project update letter was mailed October 2002 to the EIS mailing list. It announced the preparation of the Supplemental EIS (SEIS). The letter requested comments on the preparation of the SEIS. Fourteen agencies, organizations, and individuals submitted comments.

**Draft SEIS 2004**

**Availability of the Draft SEIS for Public Comment**
Availability of the Draft SEIS was announced October 15, 2004 in the *Federal Register*. This announcement started a public comment period ending November 29, 2004. The Draft SEIS mailed to Federal and State agencies, tribal governments, municipal offices, organizations, and individuals.

An article regarding the project was published in the October 12, 2004 edition of the *Ketchikan Daily News.*

**Exhibit 35, page 6 of 19**

# Record of Decision

### Comments on the Draft SEIS

Fifty-two agencies, organizations, and individuals submitted written comments on the Draft SEIS. Comment in an email form letter was received from 40,000 respondents. The interdisciplinary team analyzed and responded to the comments. These comments and responses are included in Appendix D.

### Subsistence Hearings

Two evening subsistence hearings were held for the Emerald Bay project:

October 25, 2004 at the Ketchikan-Misty Fiords Ranger District; the hearing included call-in testimony to allow Meyers Chuck residents to participate. One person attended and testified at the hearing.

October 27, 2004 Nolan Museum, Wrangell, AK. No one attended the meeting.

**Final SEIS 2005**

### Publication of the Final SEIS

The Notice of Availability of the Final SEIS and Record of Decision (ROD) has been published in the *Federal Register*. Legal notices have been run in the *Juneau Empire*, the newspaper of record, and in the *Ketchikan Daily News* and *Wrangell Sentinel*. The legal notice of availability published in the *Juneau Empire* initiates a 45-day appeal period (36 CFR 215), during which the project cannot be implemented. Copies of the Final SEIS and ROD have been mailed to Federal and State agencies, tribal governments, municipal offices, and to those who requested them or responded to the Draft SEIS. An e-mail was sent to those who submitted electronic form letters in response to the Draft SEIS providing notice of the availability of the ROD on the internet at http://www.fs.fed.us/r10/tongass/projects/decisions/recdecn/05emeraldbay.shtml. The Final SEIS is also available at the Ketchikan-Misty Fiords Ranger District Office.

# Coordination with Other Agencies

From the time scoping was initiated, meetings and site visits with interested State and Federal agencies have occurred. Issues were discussed and information was exchanged.

An interagency team of biologists representing the U.S. Fish and Wildlife Service (USFWS), Alaska Department of Fish and Game (ADF&G), and the Forest Service reviewed small old-growth reserves for location and function in the project area. The team did not recommend any changes to the adjacent small old-growth reserves. The USFWS and Forest Service conducted a site visit of the LTF and proposed road sites in early June 2000.

On March 18, 2004 Forrest Cole, representing the Tongass National Forest met with Bruce Halstead of the U.S. Fish and Wildlife Service (USFWS) and the Ketchikan-Misty Ranger District staff. The purpose of the meeting was to address USFWS concerns about road building in the medium old-growth reserve, the LTF construction, eagle nests, other wildlife species concerns, and alternative silvicultural methods. The Forest Service reviewed potential routes that would avoid the old-growth reserve. Analysis and field reconnaissance was conducted in June of 2005. These alternate routes are discussed in the Final SEIS, Chapter 3, Transportation section.

A Biological Assessment was prepared and sent to the U.S. Fish and Wildlife Service and to the National Marine Fisheries Service as part of the Section 7 consultation under the Endangered Species Act. USFWS concurred with the findings August 8, 2005. NMFS concurred with the findings September 6, 2005.

To comply with the essential fish habitat (EFH) agreement, the Forest Service contacted NMFS on October 17, 2003 to explain the situation regarding the Emerald Bay Timber Sale appeal process. A revised EFH assessment was sent to NMFS and they concurred with the findings December 18, 2003.

**Exhibit 35, page 7 of 19**

**Record of Decision**

Coordination with the State of Alaska included the Division of Governmental Coordination, the Department of Fish and Game, and the Department of Environmental Conservation. The Forest Service determined that implementation of the Emerald Bay project will affect the coastal zone. Based on the analysis in the Final SEIS, review of the Forest Practices Act, and comments from State agencies on the Draft SEIS, the Forest Service determined that the Emerald Bay project is consistent to the maximum extent practicable with the enforceable policies of the Alaska Coastal Management Program. The State concurred with this consistency finding in November 2004.

The State Historic Preservation Officer has been consulted, in accordance with Section 106 of the National Historic Preservation Act (NHPA) and CFR Part 800. Native communities have been contacted and public comment encouraged. The Forest Service has satisfied the consultation process with the State Historic Preservation Officer (SHPO). The SHPO concurs that no effects to heritage resources are anticipated.

The SEIS identifies the agencies that were informed of and/or involved in the planning process (see Distribution List in Chapter 4).

# Alternatives Considered

Four alternatives were considered in detail. Other alternatives were considered in an effort to reduce effects of road and LTF construction in the OGR while maintaining economic viability. These efforts are described in Chapter 2 of the Final SEIS. The Final SEIS analyzed the following alternatives:

**Alternative A - No Action,** proposes no new timber harvest or road construction in the Emerald Bay project area at this time. It does not preclude timber harvest from other areas at this time or from the project area at some time in the future. Council on Environmental Quality (CEQ) regulations require that a "No Action" alternative be analyzed in every EIS (40 CFR 1502.14(d)). This alternative represents the existing condition. It serves as a baseline for comparing the alternatives.

**Alternative B – Selected Alternative** proposes to harvest 601 acres producing 32,749 CCF (16,373 MBF) of timber. Alternative B includes clearcutting (even-aged management) and single-tree selection (uneven-aged) harvest methods. New road construction totals 6.2 miles - 5.8 miles of classified road and 0.4 mile of temporary road with 2.2 miles of road crossing a medium Old-growth Habitat Reserve.

Log-stringer bridges would be used to cross Class I, II, and III streams. Culverts would drain Class IV streams. Road construction could include three 1-acre rock pits. Two of these rock pits could be in the medium Old-growth Habitat Reserve. This alternative would construct a land-to-barge log transfer facility (LTF) at Emerald Bay.

**Alternative C – Proposed Action** proposes to harvest 620 acres by helicopter producing 24,359 CCF (12,179 MBF) of timber. Alternative C uses uneven-aged selection harvest. No log transfer facilities or sort yard are proposed for Alternative C. The logs from the units would be placed directly on barges. This alternative would not include road construction, LTF, or a land camp.

**Alternative D** would harvest 620 acres producing 24,783 CCF (12,391 MBF) of timber. Alternative D uses the uneven-aged selection harvest methods prescribed for Alternative C. This alternative proposes to build 3.8 miles of low-impact classified road (2.2 miles through the medium Old-growth Habitat Reserve). This road would shorten the helicopter-yarding distance, and decrease the logging cost and increase net stumpage value.

Log-stringer bridges would be used to cross Class I, II, and III streams. Culverts would drain Class IV streams. Road construction could include three 1-acre rock pits. Two of these rock

**Exhibit 35, page 8 of 19**

**Record of Decision**

pits could be in the medium Old-growth Habitat Reserve. This alternative would construct a land-to-barge log transfer facility (LTF) at Emerald Bay.

**Environmentally Preferred Alternative**
Implementation of Alternative A, the No-action Alternative, would result in no environmental disturbance and is therefore the environmentally preferred alternative. This is based on the comparison of all the alternatives shown in Table 2-5, Chapter 2, Final SEIS.

All alternatives considered in detail have varying levels of environmental effects depending upon the emphasis of the alternative. Alternative C is the most environmentally preferred of the action alternatives. It would cause the least adverse environmental effects because it proposes 100 percent helicopter yarding of uneven-aged prescriptions with no road building.

# Mitigations

The analysis documented in the SEIS discloses the possible adverse effects that may occur from implementing the actions proposed under each alternative. Measures were formulated to mitigate or reduce these effects. Project-specific mitigation measures are listed below and on the unit and road cards (Appendices 1 and 2 of the ROD).

**Old Growth**
Since new road construction is generally inconsistent with Old-growth Habitat LUD management, road use is limited to logging traffic only. No public motorized use of the road would be allowed during or after timber harvest. Upon completion of the timber sale, the roads would be put into storage and closed to all motorized use.

**LTF and Scenery**
The LTF and operating site would be removed after harvest operations are completed in Alternatives B and D. The rock fill would be spread on the operating area.

A road leading to the LTF would also be built in Alternatives B and D. The potential visual impact of the road accessing the LTF would be mitigated by aligning it to be screened by a buffer of trees, and paralleling slope contours as much as possible to avoid leaving a visible notch created by the right-of-way (ROW) clearing. This would reduce the impact and this segment of road would meet the visual quality objective of Retention.

**Threatened, Endangered, and Sensitive Species**
To prevent disturbance to sea lions (agreement with NMFS 12/18/2000), project-associated boats and barges in transit would be required to remain at least 200 yards from the haulout on Easterly Island. Floating camps and helicopter to barge operations (Alternative C) would be required to maintain a 1-mile distance. Project-associated aircraft would be required to remain at least 0.5 mile horizontal and 1,500 feet vertical distance from the haulout.

Log transfer facilities (LTFs) will be kept clear of dangling cables, ropes, and other materials that could entrap humpback whales (NMFS letter 10/30/2000). Consistent with the Marine Mammal Protection Act, project-associated boats and barges in transit are required to remain at least 100 yards from humpback whales.

**Wildlife**
An occupied red-tailed hawk nest was found in the northern portion of Unit 10. Applicable standards and guidelines (600-foot windfirm buffer) will be applied as long as the nest remains occupied. Activities that would disturb red-tailed hawks would be restricted during the active nesting season (generally March 1st to July 31st).

# Monitoring

Monitoring activities can be divided into three broad categories: Forest Plan monitoring, routine implementation monitoring, and project-specific effectiveness monitoring. The National Forest Management Act requires that national forests monitor and evaluate their Forest Plans (36 CFR 219.11). The Forest Plan (Chapter 6) includes the monitoring and evaluation activities conducted as part of Forest Plan implementation.

Tongass National Forest staff and representatives from other Federal and State agencies annually conduct an interdisciplinary review of BMP implementation and effectiveness. The results of this and other monitoring are summarized in the Tongass National Forest Annual Monitoring and Evaluation Report. This report provides information about how well the management direction of the Forest is being carried out and measures the accomplishment of anticipated outputs, activities and effects.

**Routine implementation monitoring** assesses whether a project was implemented as designed and whether or not it complies with the Forest Plan. The unit and road cards are the basis for determining whether recommendations were implemented for various aspects of the project. Routine implementation monitoring is part of timber sale contract administration. Certified sale administrators and road inspectors ensure that the prescriptions contained on the unit and road cards are incorporated into contract documents and monitor performance relative to contract requirements. Input by resource staff specialists, such as fisheries biologists, soil scientists, silviculturists, hydrologists and engineers, is regularly requested during this implementation monitoring process. These specialists provide technical advice when questions arise during project implementation.

**Project-specific effectiveness monitoring** seeks answers about the effectiveness of design features or mitigation measures in protecting natural resources and their beneficial uses. Road use during and following harvest would be monitored to determine whether closure features are sufficient to preclude motorized access. Harvest units would be monitored 3 years after harvest to determine if regeneration is successful.

**Fisheries**
Salmonid monitoring that was established July 2001 in Birch Creek sub-basin will continue after timber harvest is complete.

**Heritage**
Post-construction monitoring of a sample of roads and units would be implemented to further evaluate the sensitivity model.

**Marine Environment**
Annual dives and dive reports will be prepared while the LTF is in operation. The LTF will be removed after harvest is complete.

**Silviculture**
Post-harvest activities will include regeneration surveys as well as evaluation of residual stands.

**Transportation**
Road use during and following harvest will be monitored to determine whether closure measures are sufficient to preclude all motorized use.

**Wildlife**
Occupancy surveys for the red-tailed hawk nest will be conducted annually.

Bald eagle nests will be monitored for effects throughout the duration of the timber sale.

**Record of Decision**

# Findings Required By Law

Several of the laws and Executive Orders listed in Chapter 1 of the Final SEIS require project-specific findings or other disclosures. They apply to all alternatives considered in detail.

### Alaska National Interest Lands Conservation Act (ANILCA) of 1980; Section 810
Subsistence Evaluation and Findings: A subsistence evaluation was conducted for the four alternatives considered in detail for the Emerald Bay Final SEIS, in accordance with Alaska National Interest Lands Conservation Act (ANILCA) Section 810. ANILCA 810 subsistence hearings were conducted during the comment period for the Draft SEIS. The hearing transcripts are published as Appendix C of the Final SEIS.

This evaluation indicates that the potential foreseeable effects from the alternatives in the Emerald Bay project area do not indicate a significant possibility of a significant restriction of subsistence uses for deer, bear, furbearers, marine mammals, waterfowl, salmon, other finfish, shellfish, and other foods such as berries and roots. See Chapter 3, Subsistence section, in the Final SEIS.

### Bald Eagle Protection Act
Management activities within 330 feet of an eagle nest site are restricted by an Interagency Agreement between the Forest Service and the U.S. Fish and Wildlife Service (USFWS) to facilitate compliance with the Bald Eagle Protection Act. The Selected Alternative includes road and LTF construction within 330 feet of a known bald eagle nest.

The Forest Service and U.S. Fish and Wildlife Service (USFWS) re-authorized the Bald Eagle Memorandum of Understanding (#02MU-111001-018.) on February 26, 2002. The agreement specifies seasonal restrictions to comply with the Bald Eagle Protection Act. All bald eagle nests are considered active from March 1 to May 15. Active nests have seasonal restrictions from March 1 to August 31. The nests appeared unused in 2001, but were active in 2005. Surveys were not conducted in the intervening years. The Forest Service received a variance from the USFWS that will allow construction activities in the 330-foot nest buffer, except between March 1 and August 31.

### Cave Resource Protection Act of 1988
There are no known occurrences of carbonate rock and associated cave resources in the project area. Field reconnaissance identified no areas of concern within the project area.

### Clean Air Act of 1970 (as amended)
Emissions from the implementation of any project alternative will be of short duration and are not expected to exceed State of Alaska ambient air quality standards (18 AAC 50).

### Clean Water Act (1977, as amended)
Congress intended the Clean Water Act of 1972 (Public Law 92-500) as amended in 1977 (Public Law 95-217) and 1987 (Public Law 100-4) to protect and improve the quality of water resources and maintain their beneficial uses. Section 313 of the Clean Water Act and Executive Order 12088 of January 23, 1987 addresses Federal agency compliance and consistency with water pollution control mandates. Agencies must be consistent with requirements that apply to "any governmental entity" or private person. Compliance is to be in line with "all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution."

The Clean Water Act (Sections 208 and 319) recognized the need for control strategies for nonpoint source pollution. The National Nonpoint Source Policy (December 12, 1984), the Forest Service Nonpoint Strategy (January 29, 1985), and the USDA Nonpoint Source Water Quality Policy (December 5, 1986) provide a protection and improvement emphasis for soil and water resources and water-related beneficial uses. Soil and water conservation practices (Best Management Practices) were recognized as the primary control mechanisms for nonpoint source pollution on National Forest System lands. The Environmental Protection Agency

**Record of Decision**

supports this perspective in their guidance, "Nonpoint Source Controls and Water Quality Standards" (August 19, 1987).

The Forest Service must apply Best Management Practices (BMPs) that are consistent with the Alaska Forest Resources and Practices Regulations to achieve Alaska Water Quality Standards. The site-specific application of BMPs, with a monitoring and feedback mechanism, is the approved strategy for controlling nonpoint source pollution as defined by Alaska's Nonpoint Source Pollution Control Strategy (October 2000). In 1997, the State approved the BMPs in the Forest Service's Soil and Water Conservation Handbook (FSH Handbook 2509.22, October 1996) as consistent with the Alaska Forest Resources and Practices Regulations. This Handbook is incorporated into the Tongass Land and Resource Management Plan.

A discharge of dredge or fill material from normal silviculture activities such as harvesting for the production of forest products is exempt from Section 404 permitting requirements in waters of the United States, including wetlands (404(f)(1)(A). Forest roads qualify for this exemption only if they are constructed and maintained in accordance with BMPs to assure that flow and circulation patterns and chemical and biological characteristics of the waters are not impaired (404(f)(1)(E). The BMPs that must be followed are specified in 33 CFR 323.4(a). These specific BMPs have been incorporated into the Forest Service's Soil and Water Conservation Handbook under BMP 12.5.

The design of harvest units for the Selected Alternative were guided by standards, guidelines and direction contained in the Forest Plan, and applicable Forest Service Manuals and Handbooks. The unit cards and road cards (Appendices 1 and 2 of the ROD) contain specific details on practices prescribed to prevent or reduce nonpoint sediment sources.

Monitoring and evaluation of the implementation and effectiveness of Forest Plan Standards and Guidelines and Best Management Practices will occur. Project activities are expected to meet all applicable State of Alaska Water Quality Standards Regulations.

**Coastal Zone Management Act (CZMA) of 1972 (as amended)**
The Coastal Zone Management Act of 1972, as amended, while specifically excluding Federal lands from the coastal zone, requires that Federal agency activities be consistent with the enforceable policies of the State coastal management program to the maximum extent practicable when the activities affect the coastal zone. The Forest Service makes this determination.

The Alaska Coastal Management Program incorporated the Alaska Forest Resources and Practices Act (Forest Practices Act) of 1979 as the applied Standards and Guidelines for timber harvesting and processing. The Forest Service Standards and Guidelines, BMPs, and mitigation measures described in the Emerald Bay SEIS meet or exceed the level of protection provided by the enforceable policies of the Forest Practices Act.

Based on the analysis in the SEIS, review of the Forest Practices Act, and comments from State agencies on the Draft SEIS, the Forest Service determined that the project is consistent to the maximum extent practicable with the enforceable policies of the Alaska Coastal Management Program. The State concurred with this consistency finding in November 2004.

**Consumers, Civil Rights, Minorities and Women**
No negative effects to the civil rights of individuals or groups, including minorities and women, are anticipated to be associated with this project. Additional information can be found in the Forest Plan FEIS Chapter 3 and Appendix H.

**Endangered Species Act (ESA) of 1973 (as amended)**
Actions authorized in the action alternatives are not anticipated to have a direct, indirect, or cumulative adverse effect on any threatened or endangered species in the Emerald Bay project area. Consultation was initiated with the U.S. Fish and Wildlife Service and National Marine Fisheries Service. No terrestrial or threatened or endangered species are listed for the Emerald Bay Timber Sale project area (FS Mike Brown memo, 10/17/2000). A combined Biological

**Exhibit 35, page 12 of 19**

# Record of Decision

Assessment (BA) and Biological Evaluation (BE) was prepared for the Emerald Bay Timber Sale, as required by Section 7 of the Endangered Species Act (ESA), as amended, and the USDA Forest Service Threatened, Endangered and Sensitive Plant and Animal Species Policy (FSM 2670). Additional surveys were completed in 2003 and the BA/BE was updated. Concurrence on the final BA/BE was received from USFWS on August 8, 2005, and from NMFS on September 6, 2005. The BA/BE is included as Appendix B of the Final SEIS.

## Magnuson-Stevens Fishery Conservation and Management Act of 1996

Section 305(b)(2) of the Magnuson-Stevens Fishery Conservation and Management Act states that all Federal agencies must consult the National Oceanic and Atmospheric Administration's National Marine Fisheries Service (NMFS) for actions or proposed actions that may adversely affect essential fish habitat (EFH). The Act promotes the protection of EFH through review, assessment, and mitigation of activities that may adversely affect these habitats.

The potential effects of the project on essential fish habitat have been evaluated. For specific information regarding essential fish habitat and the potential effects refer to the Emerald Bay project area Fisheries Resource Report and the Fisheries section of Chapter 3 in the Final SEIS. Analysis completed in the cumulative effects sections for fisheries, soils, and water indicate no significant changes to Riparian Management Areas (RMAs) and floodplains resulting from proposed management activities.

Five factors were considered in evaluating the potential effects on essential fish habitat:

1. Forest Plan Standards and Guidelines for process group riparian buffers have been applied in all instances on Class I, II, and III streams

2. BMPs described in the unit and road cards provide assurance of water quality and aquatic habitat protection for all freshwater streams and marine waters affected by the project

3. Approximately 15 acres of slopes greater than 72 percent have been field reviewed by professional soil scientists who determined harvest of these slopes can be accomplished with no damage to other resources

4. Road construction includes log stringer bridges for all crossings of Class I or II streams

5. Logs would be loaded directly onto a barge so little bark debris would accumulate on the subtidal substrate

The Forest Service determined that Emerald Bay Timber Sale may adversely affect Essential Fish Habitat. However, by implementing Forest Plan Standards and Guidelines and Best Management Practices, effects to Essential Fish Habitat would be minimized. Additional impacts to EFH are likely to occur only from unforeseen events. Concurrence on the EFH finding was received from NMFS on December 18, 2003. Formal Essential Fish Habitat consultation has been completed in accordance with the agreement between the Forest Service and National Marine Fisheries Service.

## National Forest Management Act (NFMA) of 1976 (as amended)

The Forest Plan complies with all resource integration and management requirements of 36 CFR 219 (219.14 through 219.27). Application of Forest Plan direction for the Emerald Bay Timber Sale project ensures compliance at the project level. All required interagency review and coordination has been accomplished. Units 11b and 12b each have clearcut areas totaling over 100 acres; however, no individual created openings would exceed 100 acres.

All alternatives fully comply with the Forest Plan and Forest Service Manual (FSM) 2410.3, R10 Supplement 2400-2002-1 (5/7/2002). The Emerald Bay project incorporates all applicable Forest Plan Standards and Guidelines and management area prescriptions, as they apply to the project area, and complies with Forest Plan goals and objectives.

**Record of Decision**

**National Historic Preservation Act (NHPA) of 1966 (as amended)**
Heritage resource surveys of various intensities have been conducted in the project area, following inventory protocols approved by the Alaska State Historic Preservation Officer. The State Historic Preservation Officer has been consulted, in accordance with Section 106 of the NHPA and 36 CFR Part 800. I have determined that there will be no effects on known heritage resources.

Native communities have been contacted and public comment encouraged. The Forest Service has satisfied the consultation process with the State Historic Preservation Officer. Forest Service timber sale contracts contain enforceable measures for protecting any undiscovered heritage resource that might be encountered during sale operations. See discussion under Heritage Resources in Chapter 3 of the Final SEIS.

**Tongass Timber Reform Act (TTRA) of 1990**
Harvest units were designed with no less than 100-foot buffer zones for all Class I streams and Class II streams which flow directly into Class I streams as required in Section 103 of the TTRA.

## Other Findings

**Forest Service Transportation Final Administrative Policy (Roads Rule)**
The Emerald Bay Timber Sale Final SEIS and this ROD have been prepared to be consistent with the Forest Service Transportation Final Administrative Policy, the *Tongass National Forest Level Road Analysis* (January 2003), and the Emerald Bay Roads Analysis and Determination.

## Executive Orders

**Executive Order 11988 (Floodplains)**
Executive Order 11988 directs Federal agencies to take action to avoid, to the extent possible, the long- and short-term adverse effects associated with the occupancy and modification of floodplains. The numerous streams in the project area make it impossible to avoid all floodplains during timber harvest and road construction. The project design and the application of BMPs combine to minimize adverse effects on floodplains.

**Executive Order 11990 (Wetlands)**
Executive Order 11990 requires Federal agencies to avoid, to the extent possible, the long- and short-term adverse effects associated with the destruction or modification of wetlands. Roaded access to the project area cannot avoid wetlands. Techniques and practices required by the Forest Service serve to maintain the wetland attributes including values and functions. Soil moisture regimes and vegetation on some wetlands may be altered in some cases; however, these altered acres would still be classified as wetlands and function as wetlands in the ecosystem.

**Executive Order 12898 (Environmental Justice)**
Executive Order 12898 directs Federal agencies to state clearly in the EIS whether a disproportionately high and adverse human health or environmental impact on minority populations, low-income populations or Indian tribe is likely to result from the proposed action and any alternatives. The Executive Order specifically directs agencies to consider patterns of subsistence hunting and fishing when an agency action may affect fish or wildlife. The issue of environmental justice has been addressed through the subsistence and socioeconomic analyses in Chapter 3 of the Final SEIS. Environmental justice was not identified as an issue for the Emerald Bay project because: 1) the Socioeconomic Panel's evaluation of the Forest Plan alternatives effect on the community of Meyers Chuck (Forest Plan FEIS p. 3-527 and 3-608 to 611), 2) the Forest Plan determination that Selected Alternative 11 would be similar in its

**Exhibit 35, page 14 of 19**

## Record of Decision

effects to the rated alternatives, 3) the Emerald Bay project falls within the scope of the Forest Plan, and 4) the Emerald Bay project is not likely to have a significant possibility of a significant restriction on subsistence resources (Final SEIS, Chapter 3, Subsistence section).

### Executive Order 12962 (Aquatic Systems and Recreational Fisheries)

Executive Order 12962 requires Federal agencies to evaluate the effects of proposed activities on aquatic systems and recreational fisheries. The Selected Alternative minimizes the effects on aquatic systems through project design, watershed assessment, application of Forest Plan Standards and Guidelines, BMPs, and site-specific mitigation measures. Recreational fishing opportunities would remain essentially the same because aquatic habitats are protected through implementation of BMPs and riparian buffers.

### Executive Order 13007 (Indian Sacred Sites)

Executive Order 13007, Indian Sacred Sites, provides presidential direction to Federal agencies to give consideration to the protection of American Indian sacred sites and allow access where feasible. In a government-to-government relationship, the tribal government is responsible for notifying the agency of the existence of a sacred site. A sacred site is defined as a site that has sacred significance due to established religious beliefs or ceremonial uses, and which has specific, discrete, and delineated location, which has been identified by the tribe. Tribal governments or their authorized representatives have not identified any specific sacred site locations in the project area.

### Executive Order 13175 (Government-to-Government Consultation)

Executive Order 13175 directs Federal agencies to respect tribal self-government, sovereignty, and tribal rights, and to engage in regular and meaningful government-to-government consultation with tribes on proposed actions with tribal implications. The Forest Service met with four tribes during the planning stages of the project.

Wrangell Cooperative Association, Wrangell AK 10/02/98, 11/01/04, 11/11/04, 11/12/04

Saxman Tribal Council, Saxman AK 11/03/04

Metlakatla Indian Community, Metlakatla AK 11/16/04

Ketchikan Indian Community, Ketchikan AK 10/25/04

### Executive Order 13186 (Migratory Birds)

The Migratory Bird Treaty Act of 1918 (amended in 1936 and 1972) prohibits the taking of migratory birds, unless authorized by the Secretary of Interior. The law provides the primary mechanism to regulate waterfowl hunting seasons and bag limits, but its scope is not just limited to waterfowl. Over 100 species of birds migrate from other states and countries to Alaska to breed, nest, and fledge their young. Most of these birds fly to interior or northern Alaska and only pass through the project area on the way to their breeding grounds. The migratory species that may stay in the area utilize most, if not all, of the habitats described in the analysis for breeding, nesting, and raising their young. The effects on these habitats were analyzed for this project.

None of the action alternatives is anticipated to have a significant direct, indirect, or cumulative effect on any migratory bird species for this project area. There may be direct minor effects on individuals or small groups and their nests from the harvest of timber or the disturbance caused by harvest activities.

# Federal and State Permits

Federal and State permits necessary to implement the authorized activities are listed at the end of Chapter 1 in the Final SEIS.

**Exhibit 35, page 15 of 19**

**Record of Decision**

# Planning Record

The planning record for this project includes the Draft EIS, Final EIS, Draft SEIS, Final SEIS, Forest Plan, all material incorporated by reference, and other critical materials produced during the environmental analysis of this project. The planning record is available for review at the Ketchikan-Misty Fiords Ranger District.

# Implementation Process

Implementation of this decision may occur no sooner than 50 days following publication of the legal notice of the decision in the Juneau Empire, published in Juneau, Alaska.

Timber harvest activities in the Emerald Bay project area will take place in the Timber Production LUD, which are lands found suitable for timber production under provisions of the National Forest Management Act. The timber would be offered in one sale. The sale volume would be set aside as "shelf volume" if no acceptable bids are received. The sale could then be re-advertised in the future when market conditions improve.

This project will be implemented in accordance with Forest Service Manual (FSM) and Forest Service Handbook (FSH) direction for Timber Sale Project Implementation in FSM 2430 and FSH 2409.15. This direction provides a bridge between project planning and implementation and would ensure execution of the actions, environmental standards, and mitigations approved by this decision, and compliance with the TTRA and other laws. All applicable Best Management Practices (BMPs) will be applied to the Selected Alternative.

Implementation of all activities authorized by this Record of Decision will be monitored to ensure that they are carried out as planned and described in the Final SEIS.

Appendices 1 and 2 to this Record of Decision contain the Selected Alternative's unit and road cards. These cards are an integral part of this decision because they document the specific resource concerns, management objectives, and mitigation measures to govern the layout of the harvest units and construction of roads. These cards will be used during the implementation process to assure that all aspects of the project are implemented within applicable standards and guidelines and that resource effects would not be greater than those described in the Final SEIS. Similar cards will document any changes to the planned layout, as the actual layout and harvest of the units occurs with project implementation.

The implementation record for this project will display:

- Each harvest unit, transportation facility, and other project components as actually implemented,
- Any proposed changes to the design, location, standards, and guidelines, or other mitigation measures for the project, and
- Authorization of the proposed changes.

# Process for Change During Implementation

Proposed changes to the authorized project actions will be subject to the requirements of the National Environmental Policy Act (NEPA), the National Forest Management Act of 1976, Section 810 of the Alaska National Interest Lands Conservation Act, the Tongass Timber Reform Act, the Coastal Zone Management Act, and other laws concerning such changes.

In determining whether and what kind of NEPA action is required for proposed changes during implementation, the Forest Supervisor will consider the criteria set forth in the Code of Federal

**Exhibit 35, page 16 of 19**

**Record of Decision**

Regulations (40 CFR 1502.9(c)), and Forest Service Handbook (FSH) 1909.15, sec. 18 for determining whether to supplement an existing Environmental Impact Statement. In particular, the Forest Supervisor will determine whether the proposed change is a substantial change to the Selected Alternative as planned and already approved, and whether the change is relevant to environmental concerns. Connected or interrelated proposed changes regarding particular areas of specific activities will be considered together in making this determination. The cumulative impacts of these changes will also be considered.

Minor changes are expected during implementation to better meet on-site resource management and protection objectives. Minor adjustments to unit boundaries are also likely during final layout for the purpose of improving logging system efficiency. This will usually entail adjusting the boundary to coincide with logical logging setting boundaries. Many of these minor changes will not present sufficient potential impacts to require any specific documentation or other action to comply with applicable laws. Some minor changes may still require appropriate analysis and documentation to comply with FSH 1909.15, sec. 18.

# Right to Appeal

This decision is subject to administrative appeal. Organizations or individuals may appeal this decision according to Title 36 Code of Federal Regulations (CFR) part 215. The appeal must be filed within 45 days of the date that legal notification of this decision is published in the *Juneau Empire,* the official newspaper of record. The written Notice of Appeal must be filed with:

> Regional Forester, Alaska Region
> U.S. Department of Agriculture, Forest Service
> P.O. Box 21628
> Juneau, AK 99802-1628

It is your responsibility to provide the Regional Forester with sufficient evidence and rationale to show why the decision by the Forest Supervisor should be changed or reversed. The Notice of Appeal must:

1. State that the document is a Notice of Appeal filed pursuant to 36 CFR Part 215,

2. List the name, address, and, if possible, the telephone number of the appellant,

3. Identify the decision document by title and subject, date of the decision, and name and title of the Responsible Official,

4. Identify the specific change(s) in the decision that the appellant seeks or portion of the decision to which the appellant objects, and

5. State how the Responsible Official's decision fails to consider comments previously provided, either before or during the comment period specified in 36 CFR 215 and, if applicable, how the appellant believes the decision violates law, regulation or policy.

For additional information concerning this decision, contact Lynn Kolund, District Ranger, Ketchikan-Misty Fiords Ranger District, 3031 Tongass Ave, Ketchikan, AK 99901, or call (907) 228-4100.

_____          9. 30. 05
FORREST COLE                                         Date

Forest Supervisor

**Record of Decision**

Selected Alternative – Record of Decision



**Exhibit 35, page 18 of 19**

**Record of Decision**

This page left blank