IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ORGANIZED VILLAGE OF KAKE, SOUTHEAST ALASKA CONSERVATION COUNCIL, NATURAL RESOURCES DEFENSE COUNCIL, SIERRA CLUB, THE WILDERNESS SOCIETY, and CENTER FOR BIOLOGICAL DIVERSITY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES FOREST SERVICE; UNITED STATES DEPARTMENT OF AGRICULTURE; MARK REY, in his official capacity as Under Secretary of Agriculture; DENNIS E. BSCHOR, in his official capacity as Alaska Regional Forester; and FORREST COLE, in his official capacity as Forest Supervisor for Tongass National Forest,<br><br>Defendant. | Case No.<br>J04-0029-CV (JKS) |

DECLARATION OF FORREST COLE

Forrest Cole, declares and states pursuant to 28 U.S.C. 1746:

1. I am the Forest Supervisor for the Tongass National Forest. I have held this position since September 2003. My responsibilities include oversight of all activities on the Tongass National Forest. I make the statements in this declaration based upon personal knowledge and Forest Service records.

2. I have a Bachelor of Science degree in Forestry from Northern Arizona University. After graduating from college I worked in various fire-related jobs in Arizona and then transferred to the Alaska in 1979. While on the Tongass National Forest, I have held the

COLE DECLARATION

1

EXHIBIT 2
Page 1 of 19

positions of Presale Forester-Petersburg Ranger District; Small Sales Forester-Petersburg Ranger District; Timber Management Assistant-Juneau/Yakutat Ranger District; Timber, Minerals, Special Uses Management Assistant-Juneau Ranger District; Timber and Fire Management Staff Officer-Stikine Administrative Area; Resources Staff Officer-Stikine Administrative Area; Forest and Fire Management Staff Officer-Tongass National Forest; and Forest Supervisor. Working for the Regional Office, I have held the positions of team member on the Tongass Land Management Planning Team responsible for the timber, vegetation, and subsistence program areas; and Director of Forest Management for the Alaska Region.

### Schedule for Correction of Forest Plan Defects Identified by Ninth Circuit

3. The Tongass National Forest published a Notice of Intent to prepare an environmental impact statement in the Federal Register (71 Fed. Reg. 15372) on March 28, 2006 for the purpose of correcting deficiencies identified by the Ninth Circuit in *Natural Resources Defense Council v. United States Forest Service,* 421 F.3d 797 (9th Cir. 2005), and to address issues that were raised during the Forest Plan Five-year Review process. The draft EIS is expected to be completed by November 2006 with the final EIS and Record of Decision (ROD) completed by July 2007.

### FY 2006 Timber Sale Schedule

4. The Tongass National Forest periodically issues a schedule of anticipated future sale offerings. I have attached a schedule for FY 2006 and FY 2007 to this declaration which

takes into account recent changes since the issuance of the last Five Year Timber Sale Schedule. After the issuance of the Ninth Circuit's decision in *Natural Resources Defense Council v. United States Forest Service*, I directed the Tongass staff to revise the Tongass timber sale schedule to defer, until after the expected issuance date of the new Tongass Forest Plan amendment, the timber sales from the projects challenged in the complaint in this litigation, as well as in *Natural Resources Defense Council v. United States Forest Service* (*NRDC I*) J03-029 CV (JKS) (D. Alaska) and *Natural Resources Defense Council v. United States Forest Service*, (*NRDC III*) J04-010 CV (JKS) (D. Alaska), except for those sales that were the subject of an existing settlement with plaintiffs in the various actions. I also directed the Tongass staff to avoid timber sales in roadless areas, unless those sales were authorized by projects against which plaintiffs filed no administrative appeal or for which the statute of limitations for judicial review of the project had passed.

5. The Tongass staff was generally successful in avoiding such areas. The schedule now has no timber sales from the projects authorized by the site-specific projects at issue in the four pending cases scheduled prior to fiscal year 2008. The schedule does include the Buckdance-Madder sale, which is the subject of an interim settlement with plaintiffs, and against which plaintiffs have not sought injunctive relief. In addition, harvest would continue on the Fusion Sale, which is likewise the subject of a partial settlement with the *NRDC I* plaintiffs and consent decree filed in that case on July 26, 2004. Plaintiffs do not seek injunctive relief against those sales.

3

COLE DECLARATION

EXHIBIT 2
Page 3 of 19

6. During FY 2005 and FY 2006, the following sales including volume in roadless areas have been sold:

    A.    Skipping Cow, authorized by the Skipping Cow project ROD in 2000, against which no party filed an administrative appeal.

    B.    Upper Carroll II, authorized by the Upper Carroll project ROD in 1996, for which no action was filed prior to the running of the statute of limitations.

    C.    Lindenberg, authorized by the South Lindenberg project ROD in 1996, for which the statute of limitations has run.

    D.    Red Mountain, authorized by the King George project ROD in 1996, for which no action was filed prior to the running of the statute of limitations.

    E.    In addition, the Forest Service offered the Bocephus sale, authorized by the 1995 Bohemia project ROD and the 1998 Todahl Backline project Decision Notice for which no action was filed prior to the running of the statute of limitations. No bids were received on the sale.

7. Although some timber sale projects are located completely in roaded areas, and others located completely in inventoried roadless areas, it is common for timber sale projects to include both timber and roads in both roadless and roaded areas. For example, the Upper Carroll project ROD approved the harvest of 499 roaded acres (68 percent) and 238 roadless acres (32 percent). The South Lindenberg project ROD authorized the harvest of 255 roaded acres (29 percent) and 616 roadless acres (71 percent). Many of the sales recently sold involve timber that had been previously sold and subsequently returned to

the Forest Service by a mutual contract cancellation. Often the roads to access units were constructed by the prior contract purchaser. For example, the Lindenberg Sale involves timber originally sold to Silver Bay Logging as part of the South Lindy Sale. Silver Bay built the access roads to a number of the units prior to cancellation. The units have been resold to Viking Lumber as part of the Lindenberg Sale.

## FY 2007 Timber Sale Schedule

8. It was not possible to obtain the needed timber volume for FY 2007 solely from the roaded areas of the Tongass. I directed the Tongass staff to schedule timber sales from roadless areas in a manner that minimized impacts to roadless area values. Specifically, the priority was given to scheduling timber sales that involved a slight extension of an existing road system in an area rather than an initial entry into an otherwise undeveloped area. In addition, the priority was given to scheduling timber sales that contained a relatively low proportion of roadless to roaded.

9. During FY 2007, the Forest Service has scheduled two sales from a ROD for the Kuiu project. The draft EIS for that project considers action alternatives ranging from 14.6 to 42.6 mmbf of timber harvest on the northern part of Kuiu Island. Assuming an action alternative of sufficient volume is chosen, the Forest Service has scheduled to sell in the Kuiu Roaded Sale approximately 16 mmbf of timber in FY 2007 *exclusively from roaded areas* within the project area. The Forest Service has scheduled a second sale in FY 2007 from the Kuiu Project, the 18 mmbf Straight Creek timber sale, which is approximately 20 percent roadless.

11. The timber sale schedule for FY 2007 includes 1.5 mmbf in the North Corner sale, authorized in the Doughnut decision notice (EA) in 2000 and the road has been constructed. None of the plaintiffs in this case, *NRDC I* or *NRDC III* filed an administrative appeal against that project.

12. The only other timber sales scheduled for FY 2007 that include harvest in roadless areas are the 26.0 mmbf Scratchings sale, which is approximately 31 percent roadless, and the 18 mmbf Straight Creek sale in the Kuiu project, which is approximately 20 percent roadless.

### Not all scheduled volume is likely to be offered

13. The total volume scheduled for offer in FY 2006 is 54 mmbf. This figure includes the Madder/Buckdance sale that is pending award during FY 2006. The total volume scheduled for sale in FY 2007 is 125 mmbf. The scheduled timber sales are subject to a number of contingencies that must be successfully completed for the planned volume to be offered in its entirety. First, many of the sales planned for FY 2006 and FY 2007 would come from projects for which the FEIS and ROD are expected, but not yet complete. For all scheduled timber to be offered there would have to be: no delay in the completion of the site-specific RODs; every one of those RODs would have to choose an action alternative with enough volume to accommodate the planned sale; the administrative appeals would have to be unsuccessful for every one of those RODs; and there would have to be no litigation impediment to the sales. In addition, federal law in the FY 2007 Interior Appropriations Act prohibits the Forest Service from offering timber sales which do not appraise with a positive value.



EXHIBIT 2
Page 6 of 19

14. For example, the Synchro timber sale had been scheduled as a 40 mmbf timber sale in FY 2007 using units from the 1996 NW Baranof EIS, but the sale will be removed from the schedule because it did not receive a positive appraisal. Another example is that the Scott Peak timber sale had been scheduled for FY 2006, but it was reversed in an administrative appeal and is now scheduled for FY 2007. Overlook (4.1 MMBF) was scheduled for sale in 2006, but has been moved to FY 2007 due to a withdrawn decision after administrative appeal.

## Demand for Timber in FY 2006 and FY 2007

15. In recent years the timber industry in Southeast Alaska has been in a very precarious position. The economic timber volume under contract has been consistently low. The remaining mills have operated at an inefficiently low level of mill capacity that does not allow the high fixed costs of the business to be spread among much timber volume, thus resulting in a high average cost that cannot be maintained indefinitely. Further, the low level of timber supply and timber under contract has precluded mills from obtaining the financing for investments that would make the mills more competitive in the changing world market. Such investment is especially necessary in order to install infrastructure to permit the use of lower grade saw and utility logs.

16. As of March 31, 2006, a total of 130 mmbf of timber was effectively under contract (considering the anticipated cancellations of the Orion North, South Lindy, Bohemia, and Shamrock timber sales; and the anticipated award of the Madder-Buckdance and Skipping Cow timber sales), distributed as follows:

COLE DECLARATION

7

EXHIBIT 2
Page 7 of 19

**Effective Remaining Volume under Contract (March 31, 2006):**

|  | Volume (mmbf) |  |
|---|---|---|
| Pacific Log and Lumber | 38.9 | (excluding Orion North and including Madder-Buckdance) |
| Viking Lumber Company | 49.4 | (excluding Shamrock and Bohemia) |
| Silver Bay Logging | 0.0 | (excluding South Lindy) |
| Icy Strait Lumber and Mill | 8.2 |  |
| Alcan Forest Products | 24.6 | (including Skipping Cow) |
| Other Small Operators | 8.9 |  |
|  | 130.0 |  |

This volume under contract includes the following sales that plaintiffs seek to enjoin

    a.    Upper Carroll II, 16.5 mmbf, held by Pacific Log and Lumber.

    b.    Red Mountain, 5.9 mmbf, held by Alcan Forest Products.

    c.    Lindenberg, 23.2 mmbf remaining, held by Viking Lumber.

    d.    Skipping Cow, 18.6 mmbf, contract pending award to Alcan Forest Products after road construction contract is awarded.

17. During FY 2004, the operators harvested and processed through their mills 31 mmbf of timber. The estimated installed capacity of Southeast Mills is 370 mmbf. So the mills were operating at only about 8 percent of installed capacity.

18. To put the percentage of utilized capacity into context, from 1985-1995 Pacific Northwest mills averaged 71 percent utilization. The 1997 TLMP Revision FEIS reported an average utilization rate of 66 percent for Alaska mills during the 1985-1994 period, compared to a 17 percent utilization rate in 2000 (87 mmbf). The SEIS also concluded that if mills close due to extended under-utilized capacity, they are unlikely to be replaced by other processing capacity.



EXHIBIT 2
Page 8 of 19

19. Timber supply is of particular concern with regard to two mills. The Silver Bay logging company currently has no federal timber under contract and the owners have indicated a willingness to sell the mill. Potential buyers have indicated to me as recently as March 27, 2006, that inadequate availability of Tongass timber is the major impediment to a purchase of the mill. During the winter of 2005-2006, the owner of Pacific Log and Lumber threatened to cease operations at the mill and ship the mill equipment back to the Pacific Northwest unless the operator was successful in acquiring both the Buckdance-Madder and the Upper Carroll II sales. Both sales are located on the same part of Revilla Island. Operating them together provides economic advantages that each of the sales would not have by itself. Pacific Log and Lumber has been awarded the Upper Carroll II sale and award is pending for Buckdance-Madder. Plaintiffs seek to enjoin the Upper Carroll II sale.

Effect of Prohibiting the Signing of Site-Specific RODs and Vacating Existing RODs

20. Not allowing the Forest Service to sign new decisions in inventoried roadless areas or on Kuiu Island has dramatic effects on the Forest Service's ability to make dependable volume available to the existing industry in southeast Alaska. The process for producing timber sale projects is lengthy and complicated. A project first is analyzed for being capable of producing economical timber through a position statement that can take one to two years to produce. Once this "gate" is passed, the project is subjected to two to five years of field data collection and environmental analysis, culminating in a NEPA decision document. The project is then subject to a four-month administrative appeal process, and, if challenged in court, one to three years to resolve the litigation. The project must be laid out in the field and appraised. Necessary regulatory permits must be

obtained. Finally, the contract package is prepared and the sale is competitively bid and sold. Depending on the project's characteristics, it is generally harvested by the sale purchaser over a one to three year period. If the signing of project RODs is enjoined pending the completion of the TLMP ROD, the result will be that the sales will not be available for offer until significantly after the completion of the new TLMP ROD even if that the new plan would allow the project timber sale.

21. The process to produce timber sale projects is commonly referred to as the "timber sale pipeline." In order to have timber sales available each year, there must be several projects progressing in each stage of the pipeline. Should any of the stages of the timber sale pipeline be halted for an extended period of time, then a few years later there will be a gap in the timber volume available for offer.

22. Curtailing the signing of decisions in roadless areas or on Kuiu Island has this effect. If RODs are not signed, then the administrative appeals period does not begin.

23. If the existing environmental analysis and RODs are vacated, it would have an even more dramatic effect on the timber program. Over $10 million has been invested in environmental analysis, field inventory, and decisions for the projects involved in this litigation. If these decisions are vacated, it will leave a huge gap in timber volume availability. New projects may not be available for another three to seven years. No return on investment would occur on the projects lost, and additional funding would be needed to replace lost projects.

24. A site-specific ROD does not require the agency to sell the timber included in that ROD. Signing site-specific RODs does not prevent or prejudice the Forest Service from placing the land covered by those RODs into a land use designation (LUD) prohibiting

timber harvest if the forest planning process indicates that it is appropriate to do so. In the 1997 and 1999 TLMP RODs, the agency did so with regard to a number of sales previously authorized in site-specific RODs. For example, the 1997 TLMP ROD placed the Chicken Creek sale, previously authorized in the Eight-Fathom site-specific EIS in an old growth reserve designation, thereby precluding the timber sale. The 1999 TLMP ROD placed non-development LUDs upon project areas previously authorized in the North and East Kuiu site-specific ROD, the Ushk Bay site-specific ROD, thereby precluding those projects. Congress has shown no reluctance to designate areas as wilderness areas simply because the Forest Service has issued a site-specific timber project decision for that area. The Chuck River timber sale had a decision and was laid out on the ground, but was never offered because the Tongass Timber Reform Act placed the area in wilderness.

### Timber Harvest in Recent Years

25. Timber harvest on the Tongass has been at historic lows in recent years due to a number of factors. Litigation on the Forest Plan since 1997, policy changes relating to the Roadless Area Conservation Rule, the injunction against sales in roadless areas pending preparation of the supplemental environmental impact statement ordered by this Court in *Sierra Club v. Rey,* and individual project challenges are the primary reasons why sufficient timber volume has not been made available to meet demand.

### Cost of the Tongass Timber Program

26. Litigation is also one of the primary reasons why the Tongass timber sale program operates at such high costs. Nearly half of the funds allocated to the Tongass are spent on

environmental documentation. Over $10 million has been invested in project-specific environmental analyses that are currently delayed by litigation.

27. The Tongass timber program is expensive to operate. Since 1997, the Forest has experienced significant losses in program investments as a result of a new Forest Plan decision, a modified decision curtailing projects on the Forest, a change in policy resulting from the Roadless Area Conservation Rule, and a host of challenges to projects delaying any return on investments. Total expenditures on the Forest Plan Revision alone, including the current effort to address the Ninth Circuit's decision, are approximately $20 million.

28. There is no legal mandate for the Forest Service to generate a profit. The timber program is not unusual in costing more to operate than the government receives in revenues from the program. In fiscal year 2005, total expenditures on the Tongass exceeded $80 million and the total revenues were slightly in excess of $3 million dollars. Many programs on the Tongass NF generated no revenue, including the subsistence, heritage, inventory and monitoring, land management planning, geology, fish and wildlife management, trail improvements, and fire protection programs. The Tongass NF produces the majority of wildlife and fish for commercial, sport, and subsistence users in Southeast Alaska, yet receives no returns on its investments. The Tongass provides cabins for recreational purposes in semi-remote and remote locations of the Forest. The returns on these investments do not cover annual maintenance costs of the facilities.

29. The Tongass timber program could operate with far less funding if a stable land base suitable for timber harvest was maintained, and if investments in environmental analysis could be used in a timely manner. Operating costs of the Forest Service for timber sale

preparation and administration are similar to those experienced by the State of Alaska in its timber sale program. The main difference in the cost of the two programs arises from the amount of environmental analysis and documentation the Forest Service is required to produce.

30. The Forest Service is directed to manage national forests for multiple uses. The Tongass is capable of producing timber sales that return more than the cost of production if profit was the main objective. However, that has not been the statutory direction from Congress.

## Cancellation of Timber Contracts

31. Plaintiffs' suggestion that the mutual cancellation of timber sales pursuant to Congressional authorization indicates a lack of timber demand on the Tongass is incorrect. Sharp declines in volume under contract occurred in fiscal year 2003 as a direct result of the mutual termination of uneconomical contracts pursuant to the Congressional authorization. The objective of terminating the uneconomical timber sales was to give a more accurate picture of economic timber under contract and to avoid additional mill closures as a result of forcing the industry to harvest timber known to be deficit. Most of the uneconomical sales had been offered and purchased during a time when low value sawlogs and utility logs were expected to be processed in Southeast Alaska pulp mills. Some of the harvest units from the terminated contracts have been reconfigured into new sales and re-offered. Often the economics of the terminated contracts were too deficit to permit reconfiguration and reoffer.

## Conducting Timber Sales only in Roaded Areas

32. I have reviewed plaintiffs' brief in support of their motion for permanent injunction and believe that it understates the impacts of an injunction against all harvest and road construction in roadless areas and on Kuiu Island; a prohibition against new site-specific RODs; and vacation of existing site-specific RODs pending issuance of the new TLMP ROD.

33. It is important to note that the ability of the Forest Service to provide timber in other areas in FY 2006 and FY 2007 is limited to timber for which a site-specific NEPA document has already been prepared, or for which such a document is well advanced in preparation. It is not possible to develop new projects in the roaded portion of the Tongass to meet current needs for timber, nor in time to replace timber volume lost as a result of the requested injunction. Thus, plaintiffs' allegation that in the long term there is sufficient timber in roaded areas to supply 79 mmbf of timber is not relevant to the timber available to supply demand during the period between now and the summer of 2007.

34. In any event, even in the long term, it is unlikely that the estimated 79 mmbf would meet the needs of existing mills. The 79 mmbf per year figure is an estimate that includes all species, volume and grades of Sitka spruce, western hemlock, western red cedar and Alaska yellow cedar. Of the total volume, approximately 33 percent of the material is low-grade sawlog or utility volume. This material may be chipped and shipped to other locations if a market exists. An additional seven percent of the volume is comprised of cedar, which is generally exported to other locations for processing. The remaining 60 percent of the volume, or 47 mmbf, is the material of sufficient quality and value to meet existing market needs. Of the 47 mmbf, about thirteen percent of this

volume is located on the northern portion of the Tongass where the values are significantly lower due to species characteristics, and where hauling costs to existing processors tend to be high. Consequently, sales from the northern part of the Tongass rarely meet the economic needs of mills concentrated in the more southern parts of the Tongass. Only about 41 mmbf per year is in locations economically accessible to the current industry. This volume is insufficient to operate existing facilities in southeast Alaska at an efficient level of operation.

35. Limiting all timber harvest to only the roaded land base of the Tongass has several adverse effects. First, there is insufficient timber volume along existing roads to meet the demands and capabilities of the existing industry in Southeast Alaska. Second, complete reliance on the roaded volume has adverse effects on the environment because it concentrates all effects of habitat modification to a few areas of the Tongass rather than dispersing those impacts. For example, excluding harvest in roadless areas would require greater harvest along existing road systems like northern Kuiu Island. Excluding harvest from Kuiu Island would concentrate additional harvest to areas like Prince of Wales Island, which has already been heavily harvested. In the long run, producing 47 mmbf per year from roaded areas would result in a half-mile zone of timber harvest for almost the entire length of all roads on the Tongass, a result that would be deleterious to recreation and wildlife interests.

36. Access to resources for commercial, sport, and subsistence use has been a long-term concern to the public of Southeast Alaska. Before roads were constructed, almost all access was limited to the immediate coastal areas of the Forest. Boats were the primary mode of transportation and overland travel was limited to foot traffic. Historical

customary and traditional use areas are concentrated in areas adjacent to the coast. Where roads were accessible to communities, subsistence and recreational uses of the forest came to use the roads to access the interior parts of the islands.

37. The islands of Prince of Wales, Mitkof, Chichagof, Kuiu, Revilla, Kupreanof, and parts of the mainland are the principle roaded areas on the Tongass. Prince of Wales Island roads are easily accessible by a number of communities and connected to the Inter-Island Ferry System. Mitkof Island is directly accessible from Petersburg and tied to the Alaska Marine Highway. Many roads on Chichagof Island are connected to the community of Hoonah as well as the Alaska Marine Highway. Kupreanof Island roads are directly connected to the community of Kake as well as the Alaska Marine Highway. Roads connected to communities are used extensively by the local public, as well as by other communities if the roads are connected to a ferry system. Limiting new projects to road systems not directly tied to communities and/or the southeast ferry systems would provide insufficient volume to maintain the current operating levels of mills in Southeast Alaska.

### Moderate Extent of Development on Kuiu Island

38. Kuiu Island has a total area of 481,012 acres, of which 34,300 acres[1] (7 percent) have been harvested. Most of the productive forest land on Kuiu Island is not available for scheduled timber harvest. Of the 321,729 acres of productive forest in National Forest System lands on Kuiu Island, only 120,141 (37 percent) are located in land use

---

[1] The Forest keeps its record in terms of "existing young growth" which slightly overstates the number of acres harvested because it includes not only harvest but also some acreage of windthrown timber.

designations that allow timber harvest. In contrast, Prince of Wales Island has a total area of 1,618,308 acres. Of that total, 157,179 acres of National Forest System land and 117,881 acres in other ownerships has been harvested, resulting in a harvest percentage of 17 percent of the Island. Zarembo Island has a total acreage of 117,152 acres, of which 15,862 acres or 13 percent of the Island have been harvested.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 4.19.06

FORREST COLE

17

COLE DECLARATION

EXHIBIT 2
Page 17 of 19

## Tongass Timber Schedule Fiscal Year 2006

| Timber Sale | Volume (mmbf) | Percent Roadless | NEPA Document and Decision Date |
|---|---|---|---|
| Buckdance/Madder Reoffer | 17.3 | 38% | Sea Level EIS (5/99) |
| Tuxekan | 17.0 | 0% | Tuxekan EIS (est. 2006) |
| Backline | 7.0 | 0% | Backline EA (est. 2006) |
| Heceta CT Sale | 2.5 | 0% | Heceta Second Growth EA (8/04) |
| Various | 2.0 | 0% | Goose EA (est. 2006) |
| Various | 1.5 | 0% | TNB Small Sales EA's & CE's/Control Lake EIS (5/98) |
| Blue Light Special | 1.3 | 0% | Doughnut EA/Porcupine CE (DN 6/00) |
| Micro Sales | 1.0 | 0% | Roadside EA (5/03) |
| Otter Lake | 1.0 | 0% | Small Otter EA (est. 2006) |
| Drumlin Patch Cut | 0.5 | 0% | Drumlin CE (2/04) |
| Couverden Small Sales | 0.5 | 0% | Couverden EIS (7/05) |
| Humpback II | 0.5 | 0% | Supplement to APC 81-86 and 86-90 EISs (11/89) |
| Blind Slough | 0.5 | 0% | Woodpecker EIS (12/02) |
| Small Sale | 0.4 | 0% | YRD Small Sales |
| Micro-Sales | 0.3 | 0% | Roadside EA (5/03) |
| Lazy Lightening | 0.2 | 0% | Chichagof CE (3/06) |
| Fishtrap Salvage | 0.2 | 0% | Misc. Small Sales CE |
| Last Call | 0.1 | 0% | Corner Bay CE (12/05) |
| Buckhorn | 0.1 | 0% | Chichagof CE (est. 2006) |
| Total | 53.9 | | |

## Tongass Timber Schedule Fiscal Year 2007

| Timber Sale | Volume (mmbf) | Percent Roadless | NEPA Document and Decision Date |
|---|---|---|---|
| Kuiu Roaded | 16.0 | 0% | Kuiu EIS (est. 2006) |
| Scott Peak | 8.4 | 0% | Scott Peak EIS (11/05) |
| Scratchings | 26.0 | 31% | Scratchings EIS (est. 2006) |
| Overlook | 4.1 | 0% | Overlook EA (11/05 and withdrawn) |
| Soda Nick Small Sales | 1.0 | 0% | Soda Nick EA (est. 2006) |
| Straight Creek | 18.0 | 20% | Kuiu EIS (est. 2006) |
| Baht | 15.0 | 0% | Baht EIS (est. 2006) |
| Francis Cove | 8.0 | 0% | Traitors Cove EIS (est. 2006) |
| Rockfish | 7.0 | 0% | Traitors Cove EIS (est. 2006) |
| North Thorne | 6.0 | 0% | North Thorne EIS (est. 2006) |
| SW Neets | 3.0 | 0% | Traitors Cove EIS (est. 2006) |
| Various | 3.0 | 0% | Goose EA (est. 2006) |
| North Corner | 1.5 | 95% | Doughnut EA (6/00) |
| Various | 1.0 | 0% | TNB Small Sales EA's & CE's (est. 2006)) |
| Micro Sales | 1.0 | 0% | Roadside EA (5/03) |
| Soda Nick Small Sales | 2.0 | 0% | Soda Nick EA (est. 2006) |
| Road's End | 1.0 | 0% | Woodpecker EIS (12/02) |
| Slide | 1.0 | 0% | Woodpecker EIS (12/02) |
| Couverden Small Sales | 0.5 | 0% | Couverden EIS (7/05) |
| Small Sales | 0.4 | 0% | HRD Small Sales EA (est. 2006) |
| Micro-Sales | 0.3 | 0% | Roadside EA (5/03) |
| Small Sale | 0.3 | 0% | YRD Small Sales EA (est. 2006) |
| Various | 0.2 | 0% | SRD Small Sale CE (est. 2007) |
| Total | 124.7 | | |