

# Final Environmental Impact Statement
## Tongass National Forest
## Land Management Plan Revision

### Alaska

- Table of Contents
- Record of Decision
- Return to Welcome
- Maps

**Exhibit 86, page 1 of 5**

**Table 3-3**
**Conifer old-growth acres of the Tongass within five landscape positions (in 1996)**

| Landscape Position[1] | Productive Old-growth | Unproductive Old-growth | Total Old-growth |
|---|---|---|---|
| Beach/Estuary Fringe | 751,858 | 255,996 | 1,007,854 |
| Riparian corridor | 625,802 | 390,824 | 1,016,626 |
| <800 ft | 1,843,971 | 1,350,157 | 3,194,128 |
| 800-1,500 ft | 1,288,037 | 916,395 | 2,204,432 |
| >1,500 ft | 533,904 | 1,320,083 | 1,873,986 |
| **Total** | **5,063,571** | **4,233,455** | **9,297,026** |

[1] See text for definitions. For this table the beach fringe is an average of 1,000 feet in width.

Two of the above landscape elements, beach and estuary fringe, and riparian, have special importance as components of old-growth forests, providing unique wildlife habitats, serving as wildlife travel corridors, and providing a forest interface with marine or riverine influences that may distinguish them as separate ecosystems within the larger old-growth forest ecosystem. Riparian areas (also discussed under Fish and Water) are important for fisheries in providing the source of Large Woody Debris that creates pools for rearing habitat, and in controlling stream temperatures and the amount of sediment reaching a stream. Riparian areas provide habitat for terrestrial species associated with aquatic environments (amphibians, for instance, or mammals such as river otter and beaver), and for terrestrial species for which fish from streams are important food (brown and black bears). Riparian areas often contain plant species which can live only where water is available year-round. Riparian soils often support large spruce trees and some of the most highly-productive stands of old growth.

The beach fringe is the forested area adjacent to salt-water shorelines. It is thought to be important as a wildlife travel corridor, as a transition zone between interior forest and salt water influences, and as a unique habitat (or micro-climate) in itself. The beach fringe provides important horizontal or low-elevation connectivity between watersheds, many of which otherwise have very steep sides and/or non-forested ridgetops. In conjunction with riparian areas, which provide connectivity within watersheds, the beach fringe is a component of the major travel corridor system used by many resident wildlife species. The beach fringe is also thought to provide important avian migratory habitat, particularly for neo-tropical migrants.

Protection of the long-term integrity of the beach fringe habitat is a management concern that is addressed by the Beach and Estuary Fringe Forest-wide Standard and Guideline. The beach fringe is an area of approximately 1,000 feet slope distance inland from mean high tide along all marine coastline. The management objective is to maintain the structural and functional integrity of the beach fringe zone to sustain the multiple use values.

Habitat capability models developed for management indicator species indicate that the highest habitat suitability value was assigned to productive old growth forests within the 500' beach fringe zone for the bald eagle, marten, and river otter (Suring 1993). The beach fringe was rated second only to the 1,000' estuary fringe for brown and black bears in overall habitat quality, and higher deer habitat values generally occur in high-volume old growth below 800' elevation, much of which occurs in the beach zone with a moderated maritime-influenced microclimate. A



revised marten habitat capability model rated the beach fringe old growth forests highest among all habitat components (Flynn, 1995).

There are indications that the value of the beach zone habitat may extend beyond the original 500'. Gende et al. (1996) reported reduced bald eagle nesting densities and success in landscapes adjacent to clearcuts and recommended a beach buffer zone of at least 1,000'. The 1,000' beach fringe is also used very frequently by radio-marked goshawks (Iverson *et al.* 1996). The importance of a wider beach fringe zone has long been recognized and is a component of the Retention Factor Method (TLMP 1979 as amended); specifically, 1,000' beach fringe for brown/black bear, 600' for furbearers, and 1/4 mile inland from the beach for deer winter range. Lande (1994) specifically recommended 2,000' wide no-harvest corridors with an additional 1,000' buffer of light intensity management.

The 1,000 foot beach fringe serves many functions: providing more effective landscape linkages between habitat reserves, protecting long-term bald eagle habitat capability, buffering the primary beach fringe zone from windthrow (Hodges 1982, Harris 1989), maintaining a functional interior forest condition within the entire primary beach fringe (Concannon 1995), sustaining habitat for goshawks, and indirectly contributing to overall landscape management of lands between habitat reserves.

**Forest-wide Distribution.** These and other simple ways of characterizing the current condition of the biogeographic provinces can serve as baselines for estimated future changes under the Forest Plan alternatives. Table 3-4 displays the total, and current productive old-growth forest, acres within each of the 21 biogeographic provinces. It also shows, as a percentage of the original (1954) amount, how much of the productive old growth was harvested for timber products between 1954 and 1995 (on National Forest lands). About 400,000 of the 1954 estimated amount of 5,440,000 acres of productive old growth have been harvested since 1954 (about 7 percent of the total).

Table 3-4 also displays the proportion of high volume old-growth in each biogeographic province that averages nearly 42% of all productive old-growth forest. It also shows the amount of high volume old-growth at occurring at elevations less than 500 feet. Table 3-4 also shows the amount of private, state, and municipal lands in each province. Most of these non-federal lands are available for timber harvest and many have been heavily developed which cumulatively impacts old-growth forest resources (see Timber).

Across the Tongass, timber harvest has been concentrated in the higher volume classes (harvested stands have averaged 39,000 board feet per acre). In contrast to the approximately 93 percent of productive old growth remaining, a smaller percentage, about 85 percent, of the higher volume acres remains unharvested. To a lesser extent, timber harvest has also been concentrated at the lower elevations: 79 percent of the higher volume old-growth timber lands below 500 feet in elevation remain. Timber harvest has occurred in a spatially clumped fashion across the Tongass, with activity concentrated on islands like Prince of Wales, Northeast Chichagof, and Zarembo. Very little activity has occurred on islands and parts of the mainland within the 19 Wildernesses and 12 legislated LUD II areas.

Fourteen of the 21 biogeographic provinces currently have more than 50 percent of their area in old-growth forest, and for all but two of these the productive old-growth forest component accounts for the majority of the old growth. Sixteen provinces each currently have over 100,000 acres of productive old growth, and three (Admiralty, North Prince of Wales, and Revilla/Cleveland) each have over 500,000

acres.  Five provinces: East Chichagof, East Baranof, Etolin, North Prince of Wales, and Southern Outer Islands, have had ten percent or more of their original (1954) productive old growth harvested (i.e., it is no longer old growth); of these, North Prince of Wales is considerably higher at 24 percent.  In most cases this harvest is a relatively small percentage of total province acres (for instance, the roughly 12,000 acres harvested in East Baranof are about 3 percent of that province's 395,000 acres); in one case, North Central Prince of Wales, harvest (through 1995) is 14 percent of total province acres.

**Table 3-4**
**Distribution of Acres of Private, State, and City Lands and Conifer Old-growth Types by the 21 Biogeographic provinces.**

| | Geographic Unit | Total Land | Private, City & State Ownership | % Private City & State Ownership | Productive Old-growth | High Volume Old-growth | High Volume Old-growth <500' Elev. | Percent[1] Old-growth Harvested | Other forest lands |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Yakutat Forelands [2] | 339,470 | 32,294 | 10 | 47,720 | 27,881 | 27,561 | 6 | 56,746 |
| 2 | Yakutat Uplands [2] | 918,943 | 681 | 0 | 24,136 | 11,448 | 9,648 | 4 | 18,864 |
| 3 | East Chicagof Is | 1,131,878 | 67,532 | 6 | 409,659 | 155,323 | 64,092 | 9 | 272,166 |
| 4 | West Chicagof Is | 287,581 | 2,345 | 0 | 72,274 | 18,984 | 10,922 | 0 | 113,697 |
| 5 | East Baranof Is | 395,140 | 2,201 | 0 | 97,888 | 31,768 | 15,351 | 10 | 101,237 |
| 6 | West Baranof Is | 798,802 | 23,566 | 3 | 218,763 | 56,691 | 30,159 | 6 | 245,798 |
| 7 | Admiralty Is | 1,086,102 | 35,278 | 3 | 591,407 | 337,194 | 14,0141 | 0 | 272,548 |
| 8 | Lynn Canal | 671,709 | 20,897 | 3 | 155,577 | 62,363 | 23,844 | 0 | 123,692 |
| 9 | North Coast Range | 1,111,129 | 96,554 | 9 | 324,305 | 131,789 | 42,325 | 0 | 176,556 |
| 10 | Kupreanof/Mitkof Is | 843,439 | 81,549 | 10 | 318,928 | 104,893 | 39,653 | 8 | 342,836 |
| 11 | Kuiu Is | 494,345 | 920 | 0 | 302,451 | 173,022 | 89,415 | 7 | 132,999 |
| 12 | Central Coast Range | 739,566 | 10,108 | 1 | 245,065 | 105,020 | 44,801 | 2 | 181,687 |
| 13 | Etolin Island | 519,254 | 16,325 | 3 | 229,765 | 82,216 | 31,778 | 12 | 201,354 |
| 14 | North Central POW | 1,489,549 | 255,630 | 17 | 531,261 | 220,131 | 96,175 | 24 | 413,367 |
| 15 | Revilla Is/Cleveland Pen. | 1,347,906 | 173,535 | 13 | 520,989 | 254,814 | 78,756 | 6 | 476,166 |
| 16 | Southern Outer Islands | 223,959 | 8,681 | 4 | 115,487 | 50,784 | 26,413 | 10 | 70,277 |
| 17 | Dall Island and Vicinity | 199,109 | 83,222 | 42 | 68,326 | 33,925 | 16,111 | 0 | 31,993 |
| 18 | South Prince of Wales | 394,907 | 30,363 | 8 | 161,981 | 74,361 | 34,446 | 1 | 156,657 |
| 19 | North Misty Fiords | 977,955 | 3,900 | 0 | 198,824 | 77,162 | 27,233 | 0 | 288,578 |
| 20 | South Misty Fiords | 906,884 | 681 | 0 | 312,945 | 111,452 | 49,872 | 0 | 371,442 |
| 21 | Ice Fields [2] | 3,007,014 | 980 | 0 | 115,821 | 37,798 | 9,600 | 3 | 184,795 |
| | **Forest-wide** | **17,884,641** | **947,242** | **5** | **5,063,571** | **2,159,020** | **908,295** | **7** | **4,233,455** |

1 Percentage of the original (1954) productive old-growth harvest between 1954 and 1995.
2 For these provinces the oldest tree stands are used; they may not contain all the characteristics associated with old-growth stands.

The remaining aspects of the compositional component of biodiversity are described elsewhere in this FEIS.  These include the abundance and distribution of animal and plant species, the management indicator species, and species vulnerability.  See in particular Threatened, Endangered, and Sensitive species; and Wildlife (viability and species-specific discussions).

**Structure**

Structure, at the landscape scale, refers to how many of the compositional elements just discussed are distributed across the landscape or forest.  Some of these distributional aspects have been discussed or suggested, such as the relationship between elevation and productive vs. non-productive old-growth forests.  Beyond that, distribution is difficult to describe narratively: the "Land and Timber Type" map in the map packet, and the map of the old-growth block inventory, give a better picture.  In relation to wildlife habitats, distribution is a key element of the viability analyses for wildlife and fish.

# Biodiversity

## Environmental Consequences

**Direct, Indirect, and Cumulative Effects**

The previous discussions in this section emphasized old-growth forests as the key to describing and understanding the biological diversity of Southeast Alaska and the Tongass National Forest. These old-growth forests, covering about one-half of the 17-million acres of the Tongass, are the primary habitat for the majority of the terrestrial wildlife species. Thus in discussing the potential consequences to biological diversity of the alternatives, old-growth forests as wildlife habitat, and as an ecosystem with uniquely-defined characteristics, will be the major focus. The Wildlife and Fish sections, including results of several panel assessments, address the habitat aspect (and include considerations of abundance, distribution, vulnerability, and so on). The discussion here focuses on general effects to the composition, structure, and functions of the old-growth forest ecosystem, including results of the old-growth ecosystem panel assessment.

Another major reason for focusing on potential effects to the old-growth resource is that most changes to the physical and biological environments of the Tongass resulting from the Forest Plan alternatives will occur in old-growth forest. The majority of potential alterations to vegetation are a direct result of timber harvest and associated road construction, and under any alternative harvest is limited to old growth for at least another six decades. While road construction may occur in all vegetation types (see also the sections on Soils and Water), timber harvest is limited to the productive old-growth forest component. In this context it can be said that the old-growth forest ecosystem is the one most "at risk" from continued Tongass National Forest timber management.

Table 3-5 gives a general overview of anticipated changes to the old-growth forest resource over time. This table displays, by Biogeographic Province, the maximum amount of productive old-growth that is estimated to be in a harvested condition after 10 and 100 years under each alternative. This is expressed as a percent of the estimated amount of productive old-growth forest that existed in 1954 (see discussion of Table 3-4 above). Information from this table is used below to evaluate potential short-term effects to biodiversity, and for comparing to panel assessment results (long-term effects) at the end of this environmental consequences section.

High volume old-growth is a special concern since past timber harvest has been concentrated in these stands. Table 3-6 displays the amount of original (1954) high volume old-growth remaining in 2095 by each province and among alternatives. Alternatives 11, 4 and 5 will retain the greatest amount (76 percent) of the original old-growth of those alternatives that schedule any timber harvest. Only 62 and 66 percent of the high volume old-growth will be retained in Alternatives 7 and 9, respectively.

**Short-term Effects.** The affected environment discussion noted that the current cumulative amount of timber harvest of productive old-growth forests in the biogeographic provinces, expressed as a percentage of the total productive old growth within the province in 1954, varies considerably. For example, five provinces have had more than 10 percent of their productive old-growth forests logged since 1954, with one (North Central Prince of Wales Island) as high as 24 percent. The amount of the 1954 productive old-growth forest no longer in an old-growth condition can serve as a general indicator of the potential loss of several





# Record of Decision
# Tongass National Forest
# Land and Resource Management
# Plan Revision
# Alaska



Table of Contents

Landscape Illustration

Forest Plan Map

Simplified Forest Plan Map

Return to Welcome

*May 1997*

The United States Department of Agriculture (USDA) prohibits discrimination in its programs on the basis of race, color, national origin, sex, religion, age, disability, political beliefs, and marital or familial status. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means of communication program information (braille, large print, audiotape, etc.) should contact the USDA Office of Communications at (202) 720-2791.

To file a complaint, write the Secretary of Agriculture, U.S. Department of Agriculture, Washington, DC 20250, or call 1-800-245-6340 (voice) or (202) 720-1127 (TDD). USDA is an equal employment opportunity employer.

Exhibit 87, page 1 of 6

10_009819

## IV. Rationale For Decision

My decision to select Alternative 11 was reached after a comprehensive review of the relevant environmental, economic, and social consequences of the Final EIS alternatives and is based on a number of factors. The discussion below of why I selected Alternative 11 from among the ten alternatives analyzed in the Final EIS highlights several factors that were of primary importance to my decision. Next, the discussion of public issues and comments further explains why I believe Alternative 11 best responds to multiple needs, including ensuring a healthy forest habitat and providing a sustainable supply of goods and services including timber. My consideration of national policy issues, as explained, further shaped my decision. Forest Plan compliance with applicable laws, regulations, and executive orders, which is discussed in a separate section of this ROD, also was a key factor.

### A. Comparison of Alternatives

The maintenance of habitats needed to ensure the long-term viability of all Tongass wildlife and fish species and to sustain commercial, sport and subsistence use, is a key factor in my decision. In terms of fish, I find that all alternatives maintain riparian habitats and water quality in the short-term to at least the minimums required by law. For long-term viability, however, especially of individual fish stocks or entities, the alternatives have varying degrees of risk. I want to ensure the long-term productivity of Southeast Alaska's exceptional fish resource, to the extent that resource may be affected by management of the Tongass National Forest. Based on the analysis in the Final EIS (Chapter 3, "Fish"), and the results of the two Fish/Riparian panels, Alternatives 2, 6, 7, 9, and 10 generally involve higher risk and do not offer me this assurance. Of the remaining four alternatives (other than Alternative 1), Alternative 11 consistently rated lowest, or as low, in the level of risk to fish. I also favor the use of one forest-wide option, which for Alternative 11 is option 2A as described in the Final EIS (Chapter 3, "Fish"), for riparian protection, and the incorporation of watershed analysis as a part of this option.

Long-term viability for wildlife species has been extensively studied and analyzed, and is discussed in detail in the Final EIS (pages 3-380 to 3-429) and Appendix N to the Final EIS. Based on this analysis, the alternatives fall into roughly three groups (excluding Alternative 1, which has essentially no additional risk): Alternatives 2, 7, and 9 having relatively high risk of not maintaining habitat sufficient for viability of all species, Alternatives 3, 6, and 10 having an intermediate level of risk, and Alternatives 4, 5, and 11 having a lower risk for various species of concern. I want a Forest Plan that, in conjunction with all the other multiple-use goals and objectives, has a relatively low level of risk—or conversely, gives me the relatively high assurance that the habitat needed for long-term viability of all wildlife species would be maintained and commercial, sport and subsistence use sustained.

Alternatives 4, 5, and 11 are comparable in this regard, although Alternatives 5 and 11 tends to have a somewhat lower risk than Alternative 4 for most species. Each alternative uses a different approach to maintaining viability, with Alternatives 4 and 5 relying more on extended timber harvest rotations and VCU harvest thresholds, with Alternative 5 adding a limited reserve system, and Alternative 11 relying more on a forest-wide system of old-growth habitat reserves, and somewhat greater protection for riparian areas and the beach fringe. In this context, I favor Alternative 11 because, among many reasons, its reserve strategy enables the setting aside of unfragmented old-growth habitat blocks of varying sizes forest-wide, focusing on areas of key importance to wildlife and areas of concern to the public and other agencies; and, within those areas available for timber harvesting, Alternative 11 offers more flexibility for timber harvesting and adaptive management approaches. Additional standards and guidelines added to Alternative 11, which respond to concerns raised in connection with certain wildlife species, provide further assurance that Alternative 11 will adequately maintain wildlife habitat.

Maintaining options for a variety of social and economic uses of the Tongass—from continuing a timber harvest program that provides a sustainable supply of timber and other timber products to providing for subsistence opportunities and unspoiled settings for recreation and tourism—was another key factor in my decision. It is partly a matter of finding a balance, within a multiple-use context, of the many public uses and demands on forest resources, and partly not foreclosing options for the future that changes in public

# Record of Decision

needs, economic conditions, or new technologies may bring. Alternatives 4 and 5 (in addition to Alternative 1) do not have a timber program that would be adaptable to changing demands or new technologies and would be more likely to adversely affect communities whose primary employment comes from timber harvesting. Alternatives 4 and 5 also generally offer fewer opportunities for the more developed types of recreation uses and access. Alternatives 7 and 9 have timber program potentials in excess of what would be needed to respond to changes within the timber industry and would not maintain an acceptable level of scenic quality or undeveloped recreation opportunities. Alternatives 7, 9, and 2 do have a higher PNV than the selected alternative. PNV is but one measure of economic efficiency based on a calculation of assigned dollar value to resource outputs less associated costs. While Alternative 11 has a somewhat lower PNV, given the failure of PNV to consider qualitative factors critical to accurately predicting net public benefits, and the superior ability of Alternative 11 to balance many competing values and uses of the Tongass National Forest, I find that Alternative 11 currently provides the best strategy for maximizing net public benefits.

Alternatives 1, 3, 6, 10, and 11 are better than alternatives 2, 4, 5, 7, and 9 in maintaining scenic quality and undisturbed settings, factors important to the continued expansion of the recreation and tourism industries, and to most Southeast Alaska communities. Based on the previous discussion of fish and wildlife viability, Alternatives 3, 6, 10, and 11 all provide a reasonable assurance of maintaining subsistence resources and opportunities. In both cases, Alternative 11 rates relatively higher than the others. In addition, all five alternatives, 2, 3, 6, 10, and 11, have a timber program potential (Allowable Sale Quantity) that allows flexibility to respond to changing needs within the timber industry, as reflected in the most recent demand study (see Final EIS, Appendix M), and are responsive to communities dependent upon timber harvesting. All five alternatives also recognize areas of high mineral potential within the Tongass.

Finally, several alternatives respond well to the need to recognize and protect areas across the Tongass with special or unique resources or features. Among these are the karst and caves resource, rivers eligible for inclusion in the National Wild and Scenic Rivers System, and areas suitable for designation as Special Interest Areas or Research Natural Areas. Alternatives 7 and 9 fall far short in this regard, and Alternative 2 lacks adequate protection of karst areas and associated caves. Alternatives 3, 4, 5, 6, 10, and 11 apply the Karst and Caves standards and guidelines, and designate all recommended Special Interest Areas. Of these, Alternatives 3, 4, 5, 6, and 10 recommend 25 rivers for Wild, Scenic or Recreational designation, and Alternative 11 recommends 32 rivers. Alternative 11's additional rivers give it a slight edge. Alternatives 1, 2, 3, 4, 5, 6, 7, 10, and 11 designate four additional Research Natural Areas, while Alternative 9 designates no additional ones.

Alternative 1, the "environmentally preferable" alternative, would result in the least adverse effects to the physical and biological environment. Essentially, with no scheduled timber program and no new road construction, it has no additional adverse effects of these types. Accordingly, in comparison with other alternatives, it tends always to rate highest when levels of resource protection are a consideration. Conversely, when timber-related employment and community dependence on such employment, infrastructure development and new road access, or rural development in a multiple-use context, are considerations, Alternative 1 generally ranks lowest. I conclude that it does not provide an acceptable balance between environmental protection and resource use.

Given the many social and economic trade-offs inherent in national forest management, I find that Alternative 11 best balances the many interrelated environmental, social and economic issues that arise when managing for multiple uses. The following discussion of responses to public and other reviewers' comments further explains the rationale underlying my decision.

Record of Decision

300-year rotation). In these units, timber harvest treatments over two-acres in size must meet certain minimum criteria designated to maintain forest stand structure characteristics beneficial to goshawks.

A more detailed explanation of goshawk protection and management provisions can be found in Appendix N of the Final EIS.

*Alexander Archipelago Wolf.* The interagency wolf conservation assessment was developed in cooperation with the U.S. Fish and Wildlife Service and the Alaska Department of Fish and Game (ADF&G) to synthesize the best available information to address wolf conservation. Using the major findings contained within the assessment, the Forest Plan provides a high likelihood of sustaining viable wolf populations in Southeast Alaska (see Appendix N, and pages 3-399 to 3-406 of the Final EIS). The wolf assessment identified three principal management considerations to address both near-term and long-term wolf viability concerns.

1. Deer are the principal prey of wolves; consequently maintaining a long-term deer herd capable of sustaining a viable wolf population is a habitat management concern. The wolf assessment indicated that a deer population of approximately 13 deer per square mile would reduce risks to long-term wolf viability. This density of deer is likely to support wolves and also sustain the current harvest of deer by humans.

2. Large roadless and unfragmented reserves are considered necessary in biogeographic provinces where intensive timber harvesting has occurred or is planned, to reduce the long-term risk to wolf viability. The wolf assessment describes a reserve system of approximately 50,000 acres (the approximate core activity area of one wolf pack) for every 192,000 acres of landscape where wolves occur.

3. The third concern related to wolf viability is the potentially unsustainable human-induced mortality in some areas, both legal and illegal. The wolf assessment identified open road access as a contributing factor to excessive mortality, and found that reported wolf mortality increases substantially when open-road density exceeds 0.7 miles of road per square mile. The Forest Plan requires participation in cooperative interagency monitoring and analysis to 1) identify areas where wolf mortality is excessive; 2) determine if the mortality is unsustainable; and 3) identify the probable causes of the excessive mortality. Access management may be implemented where analysis indicates road access is contributing to unsustainable wolf mortality rates.

Appendix N of the Final EIS contains a thorough explanation of how these three components affect wolf viability and how the Plan will ensure adequate protection.

Recent court action requires the U.S. Fish and Wildlife Service to reconsider its decision not to list the Queen Charlotte goshawk and the Alexander Archipelago wolf pursuant to the Endangered Species Act. Consistent with the principles of adaptive management, the Forest Service will further examine our old-growth habitat strategy relative to conservation measures examined in the interagency conservation assessments prepared over the last 18 months as part of the forest planning process. The Forest Service will work closely with the U.S. Fish and Wildlife Service and State agencies to determine whether any subsequent changes to overall Plan direction will be needed to provide for the conservation of these two subspecies in Southeast Alaska. Such changes, if needed, will be made to the Plan in compliance with applicable laws. Given the habitat strategy in the revised Forest Plan and these commitments, we do not believe that listing of either species is warranted.

Selected Management Indicator Species

*Brown Bear.* Concerns have been raised about road access as a potential contributing factor to brown bear mortality. These concerns, and the Forest Service treatment of them, are similar to those discussed above regarding wolves. If interagency monitoring efforts suggest that excessive bear mortality occurs as a consequence of road access, then road access management will be implemented and hunting regulations will also be examined, in cooperation with other agencies. In addition, the Plan includes a standard and

Record of Decision

# VII. Implementation

### A. Plan Effective Date

The approved Tongass National Forest Land and Resource Management Plan is effective 30 days from the date of the Notice of Availability in the *Federal Register* for the Final EIS.

### B. Transition to the Revised Plan

The revised Plan does not provide final authorization for any activity, including timber sales, nor does it compel that any contracts or permits be advertised or awarded.  Rather, like the 1979 TLMP (as amended in 1985-86 and 1991), it provides a programmatic framework within which project-level decisions, including timber sales, are considered.  Projects must undergo appropriate site-specific analysis, and comply with applicable requirements for public participation, environmental analysis and disclosure, and the administrative appeal procedure before final authorization and implementation.

Timber Sales

The relationship of four categories of timber sale projects to the revised Plan is described below.  In summary, the completed projects in category 1 will not be affected by the revised Plan.  The projects in categories 2 and 3, which were initiated under the management direction of the 1979 TLMP, as amended, and which will all be completed within the next few years, may be affected to varying degrees by the revised Plan.  Many of these projects have already been developed to achieve consistency with recently proposed versions of the revised Plan.  All the new timber sale projects in Category 4 that will be initiated during the 10- to 15-year life of the revised Plan will be consistent with the Plan.

1. *Completed timber sale projects for which NEPA decision documents were signed and whose timber volumes have all been sold to independent operators or released to long-term contract holders before the effective date of this Plan.* The decision documents for these projects do not need to be modified because of the revised plan.

2. *Timber sale projects for which NEPA decision documents were signed before the effective date of this Plan, but whose timber volumes will not have been sold (wholly or in part) before the effective date of this Plan.* The decision documents for these projects do not need to be modified because of the revised plan, except as noted below.  Timber sale projects in this category include, among others, the Northwest Baranof, Eight Fathom, Southeast Chichagof, APC Final Supplement to the EIS's for the 1981-86 and 1986-90 Operating Periods, Kelp Bay, Ushk Bay, Upper Carrol, South Lindenberg, Lab Bay, and Cloudy timber sale projects.  I have reviewed these projects and determined that they are consistent with the goals, objectives, and projected environmental effects of the revised Plan, and that, with the exception of the Eight Fathom and South Lindenberg projects, it is not necessary to modify them further in proceeding with their implementation.  To achieve greater consistency with the revised Plan, I have directed the Forest Supervisors to modify the Eight Fathom timber sale project to avoid compromising an Old-growth Habitat LUD in the Plan, and the South Lindenberg project to better achieve the Plan's riparian standards and guidelines.

   The remaining unsold parts of the timber sale projects in this category which have not already been reviewed with the U.S. Fish and Wildlife Service will continue to be reviewed prior to actual sale.  Any outstanding fish and wildlife concerns identified in such reviews will be alleviated or mitigated where feasible and necessary through site-specific adjustments.

   Also, some new standards and guidelines for wildlife, which address landscape connectivity, endemic terrestrial mammals, northern goshawk, and American marten, were added to the Plan through the process described in Appendix N of the FEIS.  My intent in adding these new standards and guidelines is to avoid some possible long-term cumulative effects without disrupting timber sale

## IX. Contact Persons

If you would like more information on the Forest Plan or the Final Environmental Impact Statement, please contact any of the following officials:

Gary Morrison, Forest Supervisor
Tongass National Forest, Chatham Area
204 Siginaka Way
Sitka, AK 99835
907-747-6671

Abigail Kimbell, Forest Supervisor
Tongass National Forest, Stikine Area
P.O. Box 309
Petersburg, AK 99833
907-772-3841

Bradley Powell, Forest Supervisor
Tongass National Forest, Ketchikan Area
Federal Building
Ketchikan, AK 99901
907-225-3101

Beth Pendleton, Team Leader
Forest Plan Revision Team
8465 Old Dairy Road
Juneau, AK 99801
907-586-8700

Signature

*[signed]*  May 23, 1997

Phil Janik
Regional Forester                    Date

Exhibit 87, page 6 of 6

10_009865

# Tongass National Forest
# Land and Resource Management Plan

## Forest Plan

- Table of Contents
- Forest Plan Map
- Return to Welcome

**Exhibit 88, page 1 of 7**

10_006454

# Appendix C
## Best Management Practices

The Clean Water Act of 1972 (Public Law 92-500), as amended in 1977 (Public Law 95-217) and 1987 (Public Law 100-4), has the objective to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. The Act provides a means to protect and improve the quality of the water resources and maintain their beneficial uses. Sections 208 and 319 of The Clean Water Act recognize the need for control strategies for nonpoint source pollution.

To provide environmental protection and improvement emphasis for water and soil resources and water-related beneficial uses, the National Nonpoint Source Policy (December 12, 1984), the Forest Service Nonpoint Strategy (January 29, 1985), and the USDA Nonpoint Source Water Quality Policy (December 5, 1986) were developed. Best Management Practices (BMP's) were recognized as the primary control mechanisms for nonpoint sources of pollution on National Forest System lands.

In order to comply with State water quality standards, the Forest Service applies BMP's that are "consistent" with the Alaska Forest Resources and Practices Act (1990) and other applicable State water quality regulations. In recognition of the importance of BMP's, they are identified as one portion of the "Forest Service Alaska Region Water Quality Management Plan," as described in the USDA Forest Service/Alaska Department of Environmental Conservation Memorandum Of Agreement (1992).

Best Management Practices may be defined as: land management methods, measures or practices intended to minimize or reduce water pollution including, but not limited to, structural and nonstructural controls, operation and maintenance procedures, other requirements, and scheduling and distribution of activities. The site-specific application of the BMP's is designed with the consideration of geology, land type, hydrology, soil type, erosion hazard, climate, cumulative effects, and other factors in order to fully protect and maintain soil, water, and water-related beneficial uses, and to prevent or reduce nonpoint source pollution.

Direction for the use of BMP's on National Forest System lands in Alaska is included in Chapter 10 of FSH 2509.22, The Soil and Water Conservation Handbook. The handbook describes the application, monitoring, evaluation, and refinement of these BMP's. The following list is a summary of the BMP's, and includes the practice number (from the Soil and Water Conservation Handbook), name, and objective of the Best Management Practices used in the Alaska Region. This summary represents the most recent update to the BMP's (October 31, 1996); the BMP's will likely continue to be updated throughout the planning period.

*Best Management Practices*

| No. | PRACTICE | OBJECTIVE |
|---|---|---|
| 12.1 | Cumulative Watershed Effects Analysis | To determine the Cumulative Watershed Effects (CWE) on the beneficial uses of water caused by multiple land management activities, distributed over both time and space. |
| 12.2 | Rehabilitation After Mass Wasting | To identify actions to be taken where mass wasting threatens water quality. |
| 12.3 | Watershed Rehabilitation Planning, and Implementation | To identify degraded watershed conditions, to plan and prioritize watershed rehabilitation projects, and to minimize soil erosion and improve water quality. |
| 12.4 | Floodplain Identification, Evaluation, and Protection | To identify floodplain values and, where practicable, avoid the adverse impacts to soil and water resources associated with the occupancy and modification of floodplains. |
| 12.5 | Wetland Identification, Evaluation, and Protection | To identify wetland functions and value, and provide appropriate protection measures designed to avoid adverse hydrologic impacts. |
| 12.6 | Riparian Area Designation and Protection | To identify riparian areas and their associated management activities. |
| 12.6a | Buffer Design and Layout | To design streamside buffers to meet objectives defined during the implementation of BMP 12.6. |
| 12.8 | Oil Pollution Prevention and Servicing/Refueling Operations | To prevent contamination of surface and subsurface soil and water resources from spills of petroleum products. |
| 12.9 | Oil and Hazardous Substances Pollution Contingency Planning | To prevent the contamination of waters from accidental spills of oil and hazardous substances (including pesticides) at sites where a Spill Prevention Control and Countermeasure (SPCC) plan or hazardous substances contingency plan is required. |
| 12.10 | Control of Activities Under Special Use Permit | To ensure water resource protection measures are incorporated within special-use permits. |
| 12.13 | Administrative Site Planning and Management | To consider water pollution and other adverse environmental and health impacts in the location, design, and management of administrative sites. |
| 12.14 | Planning, Design, and Management of Utility Corridors | To ensure water resource protection measures are incorporated into the construction and maintenance of utility corridors. |
| 12.15 | Management of Sanitary Facilities and Sanitary Guidelines for Temporary Camps and Primitive Developments | To comply with regulations for the disposal of sewage at administrative sites, facilities under special-use permit, temporary camps, and primitive developments of all types. |
| 12.16 | Control of Solid Waste Disposal | To protect surface and subsurface soil and water resources from harmful nutrients, bacteria, and chemicals through proper disposal of solid waste and use of alternative construction materials. |
| 12.17 | Revegetation of Disturbed Areas | To provide ground cover to minimize soil erosion. |
| 13.1 | Timber Sale Planning | To incorporate soil and water resource considerations into Timber Sale Planning. |
| 13.2 | Timber Harvest Unit Design | To incorporate site-specific soil and water resource considerations into integrated timber harvest unit design criteria. |
| 13.3 | Designating Water Quality Protection Needs on Sale Area/Unit Release Maps | To delineate the location of protection areas and to ensure their recognition, proper consideration, and protection on the ground. |

| No. | PRACTICE | OBJECTIVE |
|---|---|---|
| 13.4 | Timber Sale Operating Schedule | To ensure that erosion control and timing responsibilities are incorporated into the Operating Schedule. |
| 13.5 | Identification and Avoidance of Unstable Areas | To avoid triggering mass movements and resultant erosion and sedimentation by excluding unstable areas from timber harvest. |
| 13.9 | Determining Guidelines for Yarding Operations | To select appropriate yarding systems and guidelines for protecting soil and water resources. |
| 13.10 | Log Landing Location and Design | To design and construct landings to minimize soil erosion and water quality degradation. |
| 13.11 | Scheduling and Enforcement of Erosion Control Measures During Timber Sale Operations | To ensure that the Purchaser's operations are conducted according to the Timber Sale Contract with respect to soil and water resource protection. |
| 13.12 | Site Preparation | To maintain sufficient ground cover to minimize soil erosion. |
| 13.14 | Completion of Erosion Control for Unit Acceptance and Sale Closure | To assure that the required erosion control work is completed before unit acceptance. |
| 13.16 | Stream Channel Protection (Implementation and Enforcement) | To provide site-specific stream protection prescriptions consistent with objectives identified under BMP's 12.6 and 12.6a. Objectives may include the following: (1) maintain the natural flow regime; (2) provide for unobstructed passage of stormflows; (3) maintain integrity of the riparian buffer to filter sediment and other pollutants; (4) restore the natural course of any stream that has been diverted as soon as practicable; (5) maintain natural channel integrity to protect aquatic habitat and other beneficial use, and (6) prevent adverse changes to the natural stream temperature regime. |
| 13.17 | Nonrecurring "C" Provisions For Soil and Water Quality Protection | To insert nonrecurring (Special) "C" provisions into the Timber Sale Contract to protect soil and water resources, where standard "B" or "C" provisions do not apply or are inadequate to protect watershed values. |
| 13.18 | Modification of the Timber Sale Contract | To seek an Environmental Modification of the Timber Sale Contract if new circumstances or conditions indicate that the timber sale will cause irreparable damage to soil, water, or watershed values. |
| 14.1 | Transportation Planning | To assure soil and water resources are considered in transportation planning activities. |
| 14.2 | Location of Transportation Facilities | To ensure soil and water resources protection measures are considered when locating roads and trails. |
| 14.3 | Design of Transportation Facilities | To incorporate site-specific soil and water resource protection measures into the design of roads and trails. |
| 14.4 | Location, Permitting, and Design of Log Transfer Facilities (LTFs) | Locate and design log transfer facilities (LTFs) to minimize impacts on soil and water quality. |
| 14.5 | Road and Trail Erosion Control Plan | Develop Erosion Control plans for road or trail projects to minimize or mitigate erosion, sedimentation, and resulting water quality degradation prior to the initiation of construction and maintenance activities. Ensure compliance through effective contract administration and timely implementation of erosion control measures. |
| 14.6 | Timing Restrictions for Construction Activities | Minimize erosion potential by restricting the operating schedule and conducting operations during lower risk periods. |
| 14.7 | Measures to Minimize Mass Failures | To minimize the chance and extent of road-related mass failures, including landslides and embankment slumps. |

# Best Management Practices

| No. | PRACTICE | OBJECTIVE |
|---|---|---|
| 14.8 | Measures to Minimize Surface Erosion | To minimize the erosion from cutslopes, fillslopes, and the road surface and consequently reduce risk of sediment production. |
| 14.9 | Drainage Control to Minimize Erosion and Sedimentation | To minimize the erosive effects of concentrated water flows from transportation facilities and the resulting degradation of water quality through proper design, and construction of drainage control systems. |
| 14.10 | Pioneer Road Construction | To minimize sediment production associated with the pioneer road construction. |
| 14.11 | Timely Erosion Control Measures for Incomplete Projects | To minimize erosion of and sedimentation from disturbed ground on incomplete projects by completing erosion control work prior to seasonal or extended shutdowns. |
| 14.12 | Control of Excavation and Sidecast Material | To reduce sedimentation from unconsolidated excavated and sidecast material caused by road construction, reconstruction, or maintenance activities. |
| 14.14 | Control of In-Channel Operations | To minimize stream channel disturbances and related sediment production. |
| 14.15 | Diversion of Flows Around Construction Sites | To identify and implement diversion and de-watering requirements at construction sites to protect water quality and downstream uses. |
| 14.17 | Bridge and Culvert Design and Installation | To minimize the impact on water quality, streamcourses, and fisheries resources from the installation of bridges, culverts, and other stream crossings. |
| 14.18 | Development and Rehabilitation of Gravel Sources and Quarries | To minimize sediment from borrow pits, gravel sources, and quarries, and to limit channel disturbance from gravel sources permitted for development within floodplains. |
| 14.19 | Disposal of Construction Slash and Stumps | To ensure that debris generated during construction is prevented from obstructing channels or enroaching on stream, and sensitive karst features. |
| 14.20 | Road Maintenance | To maintain all roads in a manner which provides for soil and water resource protection by minimizing rutting, road prism failures, sidecasting, and blockage of drainage facilities. |
| 14.22 | Access and Travel Management | To control access and manage road use to reduce the risk of erosion and sedimentation from road surface disturbance especially during the higher risk periods associated with high runoff and spring thaw conditions. |
| 14.23 | Snow Removal Operations | To minimize impacts of snow removal operations on road surfaces and embankments and to reduce the probability of sediment production. |
| 14.24 | Road Obliteration | To reduce sediment generated from temporary or short-term roads and return the land to production by obliterating roads at the completion of their intended use. |
| 14.25 | Surface Erosion Control at Facilities | To minimize the amount of erosion and sedimentation at non-silvicultural facilities through implementation of a pollution prevention plan. |
| 14.26 | Daily LTF Cleanup | Assure cleanup of bark, debris, or other solid materials daily when accumulations are present. Dispose of the materials in an acceptable manner, to prevent water quality degradation. |
| 14.27 | Log Storage/Sort Yard Erosion Control | To avoid generation of fine particles, and control the overland flow of particles carrying hazardous materials into waterways. |
| 15.1 | Pesticide-Use Planning | To incorporate water quality and hydrologic considerations into the pesticide-use planning process. |

| No. | PRACTICE | OBJECTIVE |
|---|---|---|
| 15.2 | Follow Pesticide Label and EPA Registration Directions | To prevent water contamination and risk to humans from pesticide application, cleaning of equipment, and disposal of pesticide containers. |
| 15.4 | Pesticide Spill Contingency Planning | To provide a response strategy for mitigating contamination of water from accidental pesticide spills. |
| 15.5 | Protection of Water Quality, Wetlands, and Riparian Areas During Pesticide Application | To minimize the risk of pesticide contamination of surface or sub-surface waters, by identifying and protecting riparian areas, wetlands, and non-target areas. To determine and document that pesticides have been applied safely. |
| 16.1 | Recreation Facilities Planning and Location | To protect soil and water resources through appropriate planning, design and location of recreational facilities. |
| 16.4 | Trail Construction and Maintenance | To minimize soil erosion and water quality problems originating from trails and their drainage structures. |
| 16.5 | Management of Off-Highway Vehicle Use | To control Off-Road Vehicle (OHV) use which is causing soil erosion and adverse effects on water quality and to identify corrective measures. |
| 17.1 | Mining Site Conditions, Planning, and Design | To incorporate soil and water resource considerations into the Plan of Operations for exploration and extraction of locatable and salable minerals. |
| 17.2 | Placer Mining (NPDES) Permits | To incorporate soil and water resource considerations into NPDES Permits for placer mining plans of operation for placer mining. |
| 17.3 | Hard Rock Mining | To incorporate soil and water resource considerations into the planning process for mining plans of operation for lode mining operations. |
| 17.4 | Permits and Administration of Geophysical Operations | To protect the quality of surface and ground water from degradation resulting from geophysical activities on National Forest System lands. |
| 17.5 | Site Closure and Rehabilitation | To incorporate soil and water resource considerations into the planning process for mining Plan of Operation. |
| 17.6 | Abandoned Mine Land Reclamation | To reduce erosion and water quality degradation by sediment and toxic substances from abandoned mined lands and mining facilities through reclamation of these lands. |
| 18.1 | Fish and Wildlife Habitat Improvement Planning | To incorporate soil and water resource considerations into planning for fish and wildlife improvement projects. |
| 18.2 | Development of Ground water-fed Spawning and Rearing Habitat from Gravel Extraction and Other Sites | To minimize sediment production from gravel extraction and/or ground reshaping during and following construction of groundwater-fed spawning and rearing streams and ponds. |
| 18.3 | In-Channel Excavation or Disturbance During Fish and Wildlife Habitat Improvement Projects | To minimize stream channel disturbances and related sediment production from fish and wildlife habitat improvement projects through identification of, and compliance with project specifications. |
| 18.4 | Ground Fertilization for Wildlife Habitat Improvement | To minimize impacts to water quality in stream systems and lakes within and adjacent to areas being fertilized. |
| 18.5 | Lake Fertilization for Fish Habitat Improvement | To limit eutrophication in Forest lakes. |
| 19.1 | Fire and Fuel Management Activities and Prescriptions | To reduce flooding and erosion by controlling the frequency, intensity, and destructiveness of wildfire. |
| 19.2 | Protection of Water Quality Through Prescribed Burning Prescriptions | To maintain soil productivity, minimize erosion, and the introduction of ash, sediment, nutrients, and debris into surface waters, through the formulation of the burning prescription. |

Best Management Practices

| No. | PRACTICE | OBJECTIVE |
|---|---|---|
| 19.3 | Minimizing Watershed Impacts from Fire Suppression Efforts | To minimize watershed impacts caused by fire-related suppression activities. |
| 19.4 | Stabilization of Fire Suppression Related Watershed Damage | To stabilize all areas that have had their erosion potential significantly increased, or their drainage pattern altered by suppression related activities. |
| 19.5 | Emergency Watershed Rehabilitation | To minimize the loss of soil and, the deterioration of water quality, both on and off site. |